## No. 24-1061

# In the United States Court of Appeals
## for the First Circuit

---

**JOSEPH R. CAPEN; NATIONAL ASSOCIATION FOR GUN RIGHTS,**
*Plaintiffs-Appellants*,

v.

**ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts,**
*Defendant-Appellee*,

**CHARLES D. BAKER, in his official capacity as Governor of the Commonwealth of Massachusetts,**
*Defendant.*

On Appeal from the United States District Court
for the District of Massachusetts, Boston
No. 1:22-cv-11431-FDS

---

**OPENING BRIEF OF APPELLANTS, JOSEPH R. CAPEN;
NATIONAL ASSOCIATION FOR GUN RIGHTS**

---

BARRY K. ARRINGTON
ARRINGTON LAW FIRM
4195 Wadsworth Boulevard
Wheat Ridge, CO 80033
(303) 205-7870
barry@arringtonpc.com

*Counsel for Appellants*

## FRAP 26.1 DISCLOSURE STATEMENT

Appellant National Association for Gun Rights is a non-profit corporation that is not owned by any parent or publicly held company. It does not issue stock and therefore no parent or publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

FRAP 26.1 DISCLOSURE STATEMENT ..................................................i

TABLE OF AUTHORITIES....................................................v

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ..............ix

GLOSSARY ..........................................................x

JURISDICTIONAL STATEMENT ......................................1

STATEMENT OF THE ISSUE................................................1

STATEMENT OF THE CASE ..................................................2

I. Facts ....................................................................2

A. The Challenged Laws ........................................................2

B. The Plaintiffs ..................................................................4

C. The Banned Arms Are in Common Use ................................4

SUMMARY OF THE ARGUMENT ......................................8

STANDARD OF REVIEW....................................................11

ARGUMENT ......................................................................11

I.     The Applicable Legal Standard ....................................11

       A.     *Gould's* Pre-*Bruen* Approach ................................11

       B.     The *Bruen* Framework ..........................................12

II.    Plaintiffs Have Met Their Burden Under *Bruen's* Step One ........14

A.  The Plain Text of the Second Amendment Covers Plaintiffs' Conduct .......................................................... 14

B.  The District Court Correctly Held That the Banned Arms Are Presumptively Protected by the Constitution .............. 17

III.  It is Impossible for the Commonwealth to Meet its Burden Under *Bruen's* Step Two .................................................... 17

IV.  The District Court's Stealth Interest-Balancing Should be Rejected ........................................................................ 20

V.  On Second Thought, The District Court Was Not That Stealthy . 27

VI.  *Heller* Rejected "Dangerousness" Arguments Practically Identical to Those Advanced by the District Court ................................. 28

VII.  The District Court's Historical Analysis is Directly Contrary to *Heller* and *Bruen* ...................................................... 30

VIII.  All Magazines Are Protected by the Plain Text ........................ 32

IX.  Massachusetts' Policy Goals Are Not Relevant to the Analysis ... 34

X.  The "Common Use" Test is Not Circular .................................. 36

XI.  A Weapon Can Change from Uncommon to Common ................. 37

XII.  This is Not a "Nuanced" Case ............................................... 38

XIII.  None of the Laws Listed by Defendant Come Close to Being Analogous to the Statutes ........................................................ 39

A.  Introduction ..................................................................... 39

B.  There Were *Zero* Prohibitions on Possessing Firearms in the Founding Era ............................................................ 40

iii

C.  The Regulation of the "Use" of Guns, Knives, Clubs, and Trap Guns is Not Analogous to an Absolute Ban on Mere Possession in the Home ............................................................ 42

D.  Multi-Shot Arms Have Existed for Centuries ...................... 47

E.  The Early Militia Laws Completely Foreclose the Possibility That Defendant Will Find an Analogous Founding-Era Regulation ................................................................ 48

F.  Twentieth-Century Laws Are Irrelevant .............................. 49

XIV. Defendant Misunderstands *Heller's* Reference to Weapons "Most Useful in Military Service" ................................................. 50

XV.  The Difference Between Semi-Automatic AR-15s and Automatic M16s is Legally Significant ............................................................ 53

XVI. The Commonwealth's Handgun Ban is Glaringly Unconstitutional ................................................................................... 53

XVII. The Statutes Ban a Class of Weapons ......................................... 54

XVIII. The Other Factors Weigh in Favor of Injunctive Relief ............. 55

CONCLUSION ........................................................................................ 57

CERTIFICATE OF COMPLIANCE ...................................................... 58

CERTIFICATE OF SERVICE ................................................................ 59

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Andrews v. State,*
50 Tenn. 165 (1871) .................................................................. 44, 45, 46

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey,*
910 F.3d 106 (3d Cir. 2018) ................................................................ 16

*Bevis v. City of Naperville, Illinois,*
85 F.4th 1175 (7th Cir. 2023) .............................................. 5, 16, 36, 52

*Brox v. Hole,*
83 F.4th 87 (1st Cir. 2023) ................................................................. 11

*Caetano v. Massachusetts,*
577 U.S. 411 (2016) (*per curiam*) .................................. 15, 23, 24, 25, 52

*D.C. v. Heller,*
554 U.S. 570 (2008) ..................................................................... *passim*

*Duncan v. Becerra,*
970 F.3d 1133 (9th Cir. 2020), *vacated on other grounds and
remanded*, 49 F.4th 1228 (9th Cir. 2022) ............................................. 3

*Duncan v. Bonta,*
2023 WL 6180472 (S.D. Cal. Sept. 22, 2023) .................... 39, 40, 41, 42

*Duncan v. Bonta,*
83 F.4th 803 (9th Cir. 2023) ........................................................ 16, 19

*Elrod v. Burns,*
427 U.S. 347 (1976) ..................................................................... 55, 56

*Ezell v. City of Chicago,*
651 F.3d 684 (7th Cir. 2011) ............................................................. 55

*Fraser v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
No. 3:22-CV-410, 2023 WL 3355339 (E.D. Va. May 10, 2023)...... 48, 49

*Friedman v. City of Highland Park, Ill.*,
577 U.S. 1039 (2015)................................................................... 9, 18, 19

*Gould v. Morgan*,
907 F.3d 659 (1st Cir. 2018) ........................................................ 11, 12

*Heller v. D.C.*,
670 F.3d 1244 (D.C. Cir. 2011) .................................................... 31, 32

*Hyde Park Partners, L.P. v. Connolly*,
839 F.2d 837 (1st Cir. 1988) ................................................................56

*Kolbe v. Hogan*,
813 F.3d 160 (4th Cir. 2016)........................................................ 16, 52

*Miller v. Bonta*,
2023 WL 6929336 (S.D. Cal. Oct. 19, 2023) ..................... 18, 41, 51, 55

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022).......................................................................... *passim*

*Nken v. Holder*,
556 U.S. 418 (2009).................................................................... 11, 56

*Sindicato Puertorriqueno de Trabajadores v. Fortuno*,
699 F.3d 1 (1st Cir. 2012) ..........................................................55, 56

*Sosa v. Massachusetts Dep't of Correction*,
80 F.4th 15 (1st Cir. 2023)................................................................ 11

*Staples v. United States*,
511 U.S. 600 (1994)..........................................................................53

*Stenberg v. Carhart*,
530 U.S. 914 (2000).............................................................................3

*Worman v. Healey*,
  922 F.3d 26 (1st Cir. 2019) ........................................... 9, 10, 12, 27, 28

## Constitutional Provisions

U.S. Const. amend. II ................................................................... *passim*

U.S. Const. amend. V ................................................................. 51

## Statutes

28 U.S.C. § 1292(a)(1) ................................................................. 1

28 U.S.C. § 1331 ........................................................................ 1

Mass. Gen. Laws ch. 140, §§ 121, 131M ................................... 3

Pub. L. No. 103-322, 108 Stat. 1796 (1994). ........................... 2, 3

Militia Act of 1792, 1 Stat. 271, 2 Cong. Ch. 33 ..................... 48

## Other Authorities

Bloomberg, W*hy Gunmakers Would Rather Sell AR-15s Than Handguns*, FORTUNE (June 20, 2018), available at https://bit.ly/3R2kZ3s ................................................... 5, 6

Brief of Petitioners, *D.C. v. Heller*, 2008 WL 102223 ............................. 35

*Commonly Owned: NSSF Announces Over 24 Million MSRS in Circulation*, (July 20, 2022), available at https://bit.ly/3pUj8So ........ 5

William *English, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022), available at https://bit.ly/3yPfoHw ........................................................ 6, 7

Federal Bureau of Investigation, *Crime Data Explorer*, available at https://bit.ly/49Kj78o ........................................................ 18

Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 Hastings L.J. 1285 (2009)...........................5

Gary Kleck, *Targeting Guns: Firearms and Their Control* (1997)...........6

Kobayashi & Olson et al., *In re 101 California Street: A Legal and Economic Analysis of Strict Liability for the Manufacture and Sale of "Assault Weapons,"* 8 Stan. L. & Pol'y Rev. 41 (1997)......................3

David Kopel, *Bowie Knife Statutes 1837-1899*, available at bit.ly/3RNRpQD ................................................................................ 43

David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849 (2015)................................ 5, 7, 19, 47

David B. Kopel and Joseph G.S. Greenlee, *This History of Bans on Types of Arms Before 1900*, 50 Journal of Legislation, Vol. 50, No. 2 (2024), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4393197.......... 40

National Shooting Sports Foundation, Inc., *2021 Firearms Retailer Survey Report*, available at https://bit.ly/3gWhI8E .............................5

National Shooting Sports Foundation, Inc., *Modern Sporting Rifle Comprehensive Consumer Report* (July 14, 2022), available at https://bit.ly/3GLmErS ........................................................................8

Mark W. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied Heller in Arms-Ban Cases-Again*, 2023 Harv. J.L. & Pub. Pol'y Per Curiam 41 (2023) ... 20, 31, 38

U.S. Dept. of Just., *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015-2019, Crime in the United States*, 2019, FBI, available at https://bit.ly/31WmQ1V.................................................6, 7

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Plaintiffs request oral argument because this case involves important issues of constitutional law.

# GLOSSARY

"Commonwealth" and "Defendant" mean the Commonwealth of Massachusetts. The Commonwealth is effectively the Defendant-Appellee because Andrea Joy Campbell is named in her official capacity as Attorney General of the Commonwealth of Massachusetts.

"Plaintiffs" means Plaintiff-Appellants National Association for Gun Rights and Joseph R. Capen.

"Statutes" means Mass. Gen. Laws ch. 140, §§ 121 and 131M. The Statutes are set out at length in the Addendum.

## JURISDICTIONAL STATEMENT

The challenged Statutes ban the sale, purchase, and possession of certain firearms and magazines. Plaintiffs brought this action challenging the Statutes under the Second Amendment. Appendix ("App.") 19. The district court had jurisdiction of this action under 28 U.S.C. § 1331, because the action arises under the Constitution and laws of the United States. On November 9, 2022, Plaintiffs filed a motion seeking a preliminary injunction enjoining enforcement of the Statutes. App. 35. The district court denied Plaintiffs' motion for preliminary injunction in an order dated December 21, 2023. Addendum ("Addm.") 38. Plaintiffs appealed the district court's order to this Court on January 10, 2024. App. 2090. This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) (order denying request for preliminary injunction appealable).

## STATEMENT OF THE ISSUE

Can the government ban the sale, purchase, and possession of firearms and firearm magazines when tens of millions of the banned arms are possessed by millions of law-abiding Americans for lawful purposes?

## STATEMENT OF THE CASE

### I.    Facts

#### A.    The Challenged Laws

In 1994, Congress enacted a national ban on certain firearms and magazines. Pub. L. No. 103-322, §§ 110101-06, 108 Stat. 1796, 1996-2010 (1994). The federal ban, which lapsed in 2004, prohibited the manufacture, transfer, and possession of "semiautomatic assault weapons" and the transfer and possession of "large capacity ammunition feeding devices." *Id*. §§ 110102-03, 108 Stat. at 1996-2000. The federal ban defined the term "semiautomatic assault weapon" to include nineteen specific models, as well as any semi-automatic rifle, pistol, or shotgun with two or more combat-style features or the ability to accept a detachable magazine. *Id*. § 110102(b), 108 Stat. at 1997-98. The term "large capacity ammunition feeding device" was defined as any magazine or other feeding device that could accept more than ten rounds of ammunition. *Id*. § 110103(b), 108 Stat. at 1999.

In 1998, Massachusetts passed an arms ban modeled on the federal ban. The state law makes it a crime to sell, transfer, or possess a "semiautomatic assault weapon" as defined by the federal law, copies or

duplicates of those weapons, and magazines capable of holding more than ten rounds of ammunition. Mass. Gen. Laws ch. 140, §§ 121, 131M.

The term "assault weapon," is, of course, a made-up political term. "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists to expand the category of 'assault rifles' so as to allow an attack on as many additional firearms as possible on the basis of undefined 'evil' appearance." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n. 16 (2000) (Thomas, J., dissenting), *quoting* Kobayashi & Olson et al., *In re 101 California Street: A Legal and Economic Analysis of Strict Liability for the Manufacture and Sale of "Assault Weapons,"* 8 Stan. L. & Pol'y Rev. 41, 43 (1997) (internal quotation marks omitted). "Large capacity feeding device" (often abbreviated as "LCM") is also a politically charged misnomer. Such magazines come standard with many handguns, which the Supreme Court has recognized as the "quintessential self-defense weapon." *Duncan v. Becerra*, 970 F.3d 1133, 1142 (9th Cir. 2020) *vacated on other grounds and remanded*, 49 F.4th 1228 (9th Cir. 2022) (*quoting D.C. v. Heller*, 554 U.S. 570, 629 (2008)).

### B.     The Plaintiffs

Plaintiff Joseph Capen and the members of the National Association for Gun Rights on whose behalf this action is brought are law-abiding citizens of the Commonwealth. App. 59-61. They are eligible under the laws of the United States and the Commonwealth to receive and possess firearms and magazines. *Id*. They intend to and, but for the credible threat of prosecution, would acquire firearms and magazines banned by the Statutes to keep in their homes for self-defense and for other lawful purposes. *Id*.

### C.     The Banned Arms Are in Common Use

Tens of millions of firearms such as those defined as "assault weapons" in the Statutes are owned by millions of American citizens who use those firearms for lawful purposes. App. 63. The banned firearms are perfectly legal to build, buy, and own under federal law and the laws of the vast majority of states.[1] The AR-15 in particular – the paradigmatic

---

[1] App. 1210-11.

firearm banned by the Commonwealth[2] – is the most popular rifle in America.[3]

In recent years, the AR-15 has been "the best-selling rifle type in the United States." Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 Hastings L.J. 1285, 1296 (2009). These rifles are the second-most common type of firearm sold (at approximately 20% of all firearm sales) behind only semi-automatic handguns. *See* National Shooting Sports Foundation, Inc., *2021 Firearms Retailer Survey Report*, 9, available at https://bit.ly/3gWhI8E (last visited Feb. 26, 2024).

There are more than twenty-four million firearms such as those banned by the Statutes in circulation in the United States. *Commonly Owned: NSSF Announces Over 24 Million MSRS in Circulation*, (July 20, 2022), available at https://bit.ly/3pUj8So (last visited Feb. 26, 2024).

As of 2018, AR-15s made up roughly thirty-five percent of all newly manufactured guns sold in America. Bloomberg, *Why Gunmakers Would*

---

[2] *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1183 (7th Cir. 2023).
[3] *Id.* at 1215 n.9 (7th Cir. 2023) (Brennan, J., dissenting) (AR-15 is the most popular rifle in Ameria. (*quoting* David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 859 (2015)).

*Rather Sell AR-15s Than Handguns*, FORTUNE (June 20, 2018), available at https://bit.ly/3R2kZ3s. Another survey of gun owners estimated that 24.6 million Americans have owned AR-15s or similar rifles. *See* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned,* 1 (May 13, 2022), available at https://bit.ly/3yPfoHw (last visited Feb. 26, 2024).

AR-style rifles are commonly and overwhelmingly possessed by law-abiding citizens for lawful purposes. In the English survey of 16,708 gun owners, recreational target shooting was the most common reason for possessing an AR-style firearm (cited by 66% of owners), followed closely by home defense (61.9% of owners) and hunting (50.5% of owners). English, *supra*, at 33-34. The fact that "assault" rifles are used extremely rarely in crime underscores that AR-15s and other banned firearms are commonly possessed by law-abiding citizens for lawful purposes. Evidence indicates that "well under 1% [of crime guns] are 'assault rifles.'" Gary Kleck, *Targeting Guns: Firearms and Their Control,* 112 (1997).

This conclusion is borne out by FBI statistics.  In the five years from 2015 to 2019, there were an average of 14,556 murders per year in the United States. U.S. Dept. of Just., *Expanded Homicide Data Table 8:*

6

*Murder Victims by Weapon, 2015-2019, Crime in the United States*, 2019, FBI, available at https://bit.ly/31WmQ1V, (last visited Feb. 27, 2024). On average, rifles of all types[4] were identified as the murder weapon in 315 murders per year. By way of comparison, on average, 669 people were murdered by "personal weapons" such as hands, fists, and feet. *Id*.

The banned magazines are also in common use. Plaintiff's expert stated that over 150 million magazines with a capacity greater than ten rounds are owned by law-abiding American citizens who use those magazines for lawful purposes. App. 63. According to the English survey, 48.0% of gun owners, about 39 million people, have owned magazines that hold over 10 rounds, and up to hundreds of millions of such magazines have been owned. English, 20.

There is nothing surprising about such numbers. Many of the most popular semi-automatic rifles are manufactured with standard magazines holding more than ten rounds. *See, e.g.*, David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 and Alb. L. Rev. 849, 859 (2015) ("The most popular rifle in American history is the AR-15 platform, a semiautomatic rifle with standard magazines of twenty or

---

[4] So-called "assault weapons" are a subset of "rifles."

thirty rounds."). Indeed, over three quarters of modern sporting rifle magazines in the country have a capacity of more than 10 rounds. *See* National Shooting Sports Foundation, Inc., *Modern Sporting Rifle Comprehensive Consumer Report*, 31 (July 14, 2022), available at https://bit.ly/3GLmErS (last visited Feb 26, 2024).

The Commonwealth never attempted to refute Plaintiffs' evidence regarding the number of banned arms in circulation. Indeed, the Commonwealth agreed with Plaintiffs. Its expert submitted a declaration stating that approximately 24.4 million "assault weapons" are in circulation. App. 746.

## SUMMARY OF THE ARGUMENT

This is a simple case. In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the Court set forth a two-part test for reviewing Second Amendment challenges: (1) Is the plaintiff's proposed conduct covered by the plain text? (2) If so, can the government demonstrate that its law is consistent with the Nation's history and tradition of firearms regulation? In this case, Plaintiffs easily meet step one because the banned weapons are bearable arms, and their desire to keep and bear them is covered by the plain text. But it is impossible for the

8

Commonwealth to carry its burden under step two. Tens of millions of the banned weapons are possessed by law-abiding citizens for lawful purposes, i.e., the banned weapons are in common use. In *D.C. v. Heller*, 554 U.S. 570 (2008), the Court held there is no tradition of banning weapons in common use. Therefore, the Statutes are categorially unconstitutional. In summary, millions of citizens own tens of millions of the banned weapons. Under the Supreme Court's precedents, "*that is all that is needed* for citizens to have a right under the Second Amendment to keep such weapons." *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J., joined by Scalia, J., dissenting from denial of certiorari) (emphasis added).

The district court declined to apply *Heller's* common use test because it believed it is "circular." Instead, the district court engaged in an extensive empirical analysis supposedly to determine whether the arms may be banned because they are "dangerous and unusual." In reality, in the meat of its opinion, the district court engaged in an interest-balancing analysis that was practically identical to the intermediate scrutiny analysis performed by this Court in *Worman*. But the whole point of *Bruen* was to preclude such freewheeling interest balancing in the Second

Amendment context. Thus, the district court clearly erred when it re-packaged *Worman's* intermediate scrutiny interest-balancing analysis as a "dangerous and unusual" analysis. The banned weapons cannot be *both* dangerous and unusual because they are the opposite of unusual, i.e. they are in common use by millions of law-abiding citizens.

*Heller* held that no Founding-era law was remotely as burdensome as an absolute ban on an arm in common use. The historical record has not changed. None of the laws the Commonwealth claims are analogous to its arms ban are as burdensome as its absolute ban on weapons in common use. In the Founding era, there were zero laws banning firearms of any kind. Indeed, the early militia laws make it clear that far from banning commonly possessed firearms, early Americans were *required* to obtain them.

*Heller* made it clear that an absolute ban on handguns is unconsti-tutional. The district court acknowledged that the Statutes ban certain handguns (i.e., "pistols") and it acknowledged that *Heller* prohibits hand-gun bans. But it never explained why the Defendant's handgun ban is consistent with *Heller*. Finally, the remaining preliminary injunction fac-tors favor Plaintiffs.

## STANDARD OF REVIEW

Plaintiffs have requested a preliminary injunction. A preliminary injunction may be granted upon a showing that the plaintiff is (1) likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Brox v. Hole*, 83 F.4th 87, 91 (1st Cir. 2023). The third and fourth factors merge when the government is the defendant. *Nken v. Holder*, 556 U.S. 418, 435 (2009). This Court reviews the district court's rulings on abstract legal issues de novo and its findings of fact for clear error. *Sosa v. Massachusetts Dep't of Correction*, 80 F.4th 15, 26 (1st Cir. 2023).

## ARGUMENT

## I.    The Applicable Legal Standard

### A.    *Gould's* Pre-*Bruen* Approach

After *Heller*, the circuit courts, including this Court, coalesced around a "two step" approach for the analysis of Second Amendment challenges. The courts asked (1) whether the regulated activity fell inside the scope of the right as originally understood, and if it fell within that scope, (2) applied either strict or intermediate scrutiny depending on how close

the law came to the "core" of the Second Amendment right and how severe the burden was on that right. *See Gould v. Morgan*, 907 F.3d 659, 668-69 (1st Cir. 2018), *abrogated by Bruen*. Following *Gould*, this Court upheld the Statutes challenged in this action in *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019), *abrogated by Bruen*. In doing so, for purposes of the first step of the discredited two-part test, *Worman* assumed without deciding that the banned firearms and magazines are covered by the Second Amendment. *Id.* at 36. *Worman* then applied intermediate scrutiny to uphold the Statutes. *Id.* at 39.

## B.    The *Bruen* Framework

In *Bruen*, the Supreme Court definitively rejected the tiers-of-scrutiny "two-step" approach to Second Amendment claims that had been developed by the circuit courts after *Heller*. The Court held that while the first step of this approach was broadly consistent with *Heller*, the Court's precedents did not support applying means-end scrutiny in the Second Amendment context. *Bruen*, 597 U.S. at 19. "Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* The Court noted that instead of interest-balancing, *Heller*

12

"focused on the historically unprecedented nature of the District's ban, observing that few laws in the history of our Nation have come close to that severe restriction." *Id.* at 22 (cleaned up). No law in the history of the Nation "remotely burden[ed] the right of self-defense as much as an absolute ban on handguns." *Id.* Thus, the "Second Amendment did not countenance a 'complete prohibition' on the use of 'the most popular weapon chosen by Americans for self-defense in the home.'" *Id.* (internal citation omitted).

In *Worman* this Court deferred to "the legislature's prerogative to weigh the evidence, choose among conflicting inferences, and make the necessary policy judgments." 922 F.3d at 40 (cleaned up; citations omitted). *Bruen* flatly rejected this approach. The Court wrote:

> If the last decade of Second Amendment litigation has taught this Court anything, it is that federal courts tasked with making such difficult empirical judgments regarding firearm regulations under the banner of "intermediate scrutiny" often defer to the determinations of legislatures. But while that judicial deference to legislative interest balancing is understandable – and, elsewhere, appropriate –it is not deference that the Constitution demands here. The Second Amendment "is the very product of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense. *Heller*, 554 U.S. at 635, 128 S. Ct. 2783. It is this balance – struck by

13

the traditions of the American people – that demands our unqualified deference.

*Id.* 597 U.S. at 26.

*Bruen* summarized the standard for applying the Second Amendment with the following two-step analysis: "[1] When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. [2] The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 24.

## II. Plaintiffs Have Met Their Burden Under *Bruen's* Step One

### A. The Plain Text of the Second Amendment Covers Plaintiffs' Conduct

*Heller* stated that the plain text analysis focuses on the "normal and ordinary" meaning of the words in the Constitution. 554 U.S. at 576. Following *Heller's* lead, *Bruen's* step one test is not demanding. This is demonstrated by the fact that in the Court's 70-page opinion, it dispensed with the plain text inquiry in only six short paragraphs. The Court simply looked to the most common "definition" of the key terms in "the Second

14

Amendment's text" (i.e., "the people," "keep," "bear," and "Arms"). *Id*. 597 U.S. at 32-33. *Bruen's* resolution of the "plain text" step boiled down to a single sentence: "Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id*. at 32.

The plain text inquiry is equally straightforward here. The Commonwealth prohibits the possession of certain firearms. The Second Amendment's plain text covers the right to "keep and bear arms." U.S. Const. amend. II. Thus, the only question at the plain text threshold is whether the banned firearms are "Arms." The answer is easy. Indeed, it should go without saying that fire*arms* are "arms." But to the extent there was ever any doubt, this Court has removed it. As *Heller* explained and *Bruen* reiterated, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Bruen*, 597 U.S. at 28 (*quoting Heller*, 554 U.S. at 582); *accord Caetano v. Massachusetts*, 577 U.S. 411, 411 (2016) (*per curiam*). That includes "'any thing that a man … takes into his hands, or useth in wrath to cast at or strike another,'" *Heller*, 554 U.S. at 581, which a firearm surely is, no matter what features it has. *Heller* noted that even "one founding-era thesaurus" that

offered a relatively "limited" view of the term's scope still "stated that all firearms constituted 'arms.'" *Id*.

The magazines banned by the Statutes are also covered arms. The Second Amendment covers all "modern instruments that facilitate armed self-defense." *Bruen*, 597 U.S. at 28. Magazines are an essential component of all semi-automatic firearms. App. 1638-39. Therefore, they fall within the category of modern instruments that facilitate armed self-defense. Numerous courts have held that magazines are "arms" within the meaning of the Second Amendment. *See e.g.*, *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018), *abrogated on other grounds by Bruen*; and *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016), *on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017), *abrogated on other grounds by Bruen. See also Bevis*, 85 F.4th at 1209 (Brennan, J., dissenting); and *Duncan v. Bonta* ("*Duncan II*"), 83 F.4th 803, 813 (9th Cir. 2023) (Bumatay, J., dissenting).[5] The district court

---

[5] As precedent, Judge Brennan's and Judge Bumatay's opinions have the disadvantage of being dissents. But they have the advantage of actually following *Bruen* and *Heller*, and Plaintiffs cite them for that reason. All citations to "*Bevis*" and "*Duncan II*" herein are to these dissenting opinions unless otherwise noted.

properly held that magazines as a general class are covered by the plain text. Addm. 32.

## B. The District Court Correctly Held That the Banned Arms Are Presumptively Protected by the Constitution

The plain text of the Second Amendment covers Plaintiffs' proposed conduct. Therefore, the Constitution presumptively protects that conduct. *Bruen*, 597 U.S. at 24. Another way of saying the same thing is that the Statutes are presumptively unconstitutional. The district court correctly held that Plaintiffs had carried their burden under *Bruen's* plain text step. It wrote: "Both sides agree that the weapons at issue are presumptively protected by the Second Amendment . . ." Addm. 15.

## III. It is Impossible for the Commonwealth to Meet its Burden Under *Bruen's* Step Two

The Commonwealth's expert, Dr. Louis Klarevas, stated in his Declaration that there are approximately 24.4 million "assault weapons" [6] in circulation, and in 2022 sixty-three people were killed in seven mass shootings. App. 778. Thus, according to Defendant's own expert, at least

---

[6] App. 735. Dr. Klarevas uses the term "modern sporting rifle" (National Shooting Sports Foundation's term for AR-15 and AK-47 platform rifles) as a proxy for "assault weapons."

24,399,937 of the 24.4 million "assault weapons" in circulation in 2022 were not used in mass shootings.

General crime data paint a similar picture. According to the FBI, in 2022, 542 people were killed by rifles of all types in the entire country. Federal Bureau of Investigation, *Crime Data Explorer*, available at https://bit.ly/49Kj78o (last visited Feb. 27, 2024). If, conservatively, every rifle-related homicide involved an "assault weapon," out of 24,400,000 such firearms in circulation, fewer than .002% were used in homicides in 2022.[7]

Defendant insists that it is constitutional to ban the 99.998% of "assault weapons" that were not used in homicides because of the .002% that were. App.96-97. Defendant is wrong. Millions of citizens own tens of millions of AR-15s, and they use them overwhelmingly for lawful purposes. Under the Supreme Court's precedents, particularly *Heller*, "*that is all that is needed* for citizens to have a right under the Second Amendment to keep such weapons." *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J., joined by Scalia, J., dissenting from denial of

---

[7] *See also Miller v. Bonta*, 2023 WL 6929336, at *3 (S.D. Cal. Oct. 19, 2023) (appeal filed), where the court performed a similar analysis using 2021 statistics.

certiorari) (emphasis added). The same is true for the banned magazines. There are over 150 million such magazines in circulation. App. 63. And that is all that is needed for the magazines to be protected. *Duncan v. Bonta*, 83 F.4th 803, 816 (9th Cir. 2023) (Bumatay, J., dissenting) (quoting Justice Thomas's *Friedman* dissent).

Firearms are generally divided into two categories, handguns and long guns. *Heller*, 554 U.S. at 629. *Heller* held that handguns may not be categorically banned because they are in common use. *Id*. at 628-29. The AR-15 is the most popular long gun in America.[8] If the most popular long gun in the country may be banned, it follows that all other long guns may be banned as well and *Heller* is cabined to its facts. But nothing in *Heller* suggested the Court intended it to be limited to its specific facts.

Just the opposite is true. In *Heller*, the Court performed an exhaustive search of the historical record and concluded that no Founding-era regulation "remotely burden[ed] the right of self-defense as much as an absolute ban" on a weapon in common use. *Id*. 554 U.S. at 632. Thus, laws that ban weapons in common use for lawful purposes – whether

---

[8] David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 859 (2015) (AR-15 most popular rifle).

handguns or long guns – are categorically unconstitutional. *Id.* at 628. There is no need to revisit this issue in each arms ban case. *See* Mark W. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied Heller in Arms-Ban Cases-Again*, 2023 Harv. J.L. & Pub. Pol'y Per Curiam 41, 2 (2023) ("In arms-ban cases, *Heller's* 'in common use' constitutional test controls, and there is nothing for the lower courts to do except apply that test to the facts at issue.").

In summary, it is impossible for Massachusetts to carry its burden under *Bruen's* "history and tradition" step. After an exhaustive search, *Heller* concluded that a ban of a weapon in common use is not consistent with the Nation's history and tradition of firearms regulation. It follows that the Commonwealth's ban on weapons in common use for lawful purposes is categorically unconstitutional.

## IV.   The District Court's Stealth Interest-Balancing Should be Rejected

The district court was not happy with the "common use" test, and it was not shy about expressing its displeasure.[9] At the hearing on

---

[9] Indeed, the court flatly rejected the "common use" test, writing that "it is insufficient that a weapon merely be 'common' for regulation to be impermissible." Addm. 28.

Plaintiffs' motion for preliminary injunction, the court stated: "[I]t seems to me bizarre to say that all you need to show is that lots of people have these [weapons]. I mean, you know, lots of people have fentanyl, millions of people probably, you know, have illegal drugs. That's not the standard for whether or not you can ban it." App. 2050, 1-5. The district court's mindset was perfectly reflected in this statement.[10] Fentanyl is bad; AR-15s are bad, and if the government can ban the former, it stands to reason it can ban the latter no matter how many millions of citizens possess them.

Of course, the district court could not very well say it was upholding Massachusetts' arms ban because it furthers the commendable policy goal of banning weapons it believes are just as much a scourge on society as fentanyl. Even a cursory reading of *Bruen* reveals that whether the regulation promotes a policy goal the court believes is laudable is irrelevant to the Second Amendment analysis. 597 U.S. at 17 (for regulation to be upheld, the government may not simply posit that the regulation

---

[10] The district court was not finished directing vitriol at *Heller*: "[A]s long as it becomes commonly used, we're stuck, *the Constitution is in effect a suicide pact.*" App. 2064, 4-7 (emphasis added).

promotes an important interest). Interest-balancing and means-end scrutiny are not legitimate tools of Second Amendment analysis. *Id*. at 19.

Faced with *Bruen's* prohibition on overt interest-balancing, the district court engaged in stealth interest-balancing to uphold the Statutes. It did this by turning the "dangerous and unusual" analysis into an empirical interest-balancing test. The district court performed this feat of jurisprudential alchemy by first noting that *Heller* held that banning dangerous and unusual weapons is consistent with the Nation's historical tradition of firearms regulation. Addm. 16, n.9 (quoting *Heller*, 554 U.S. at 627). And then the court held that this test means the government may ban weapons that are "unreasonably dangerous" and unusual in the sense that they are not suitable for self-defense and therefore not reasonably necessary for self-defense. Addm. 17-18, 23.

Thus, the district court took upon itself the role of determining whether the banned weapons are: (1) unreasonably dangerous; (2) suitable for self-defense; and (3) reasonably necessary for self-defense. And on pages 25 to 29 of its opinion, the district court engaged in an extensive empirical analysis of these issues and upheld the Statutes based on that analysis.

The problem with the district court's analysis should be immediately apparent. In its opinion, the district court made numerous empirical judgments about the costs and benefits of the banned weapons. But the whole point of *Bruen* was to prohibit judges from making such "difficult empirical judgments" about "the costs and benefits of firearms restrictions," given their "lack of expertise in the field." 597 U.S. at 25 (cleaned up). Why did *Bruen* put federal courts out of the "empirical judgment" business? For the very reason demonstrated by the district court here – "courts tasked with making such difficult empirical judgments . . . defer to the determinations of legislatures" too often. *Id*. at 26. For that reason, this Court should reject the district court's attempt to transmogrify the "dangerous and unusual" test into a vehicle for stealth interest balancing.

Properly understood, the "dangerous and unusual" test has no application in this case. The district court pointed to Justice Alito's concurrence in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), to support its theory. The court wrote that "for the term 'dangerous' to have any meaning at all, it must be refined in some way, or it will simply apply to every type of firearm." Addm. 16, citing *Caetano*, 577 U.S. at 418 (Alito, J.,

concurring in the judgment). Unfortunately, the district court got Justice

Alito's concurrence exactly backwards. Justice Alito wrote:

> The Supreme Judicial Court's holding that stun guns may be banned as "dangerous and unusual weapons" fares no better. As the *per curiam* opinion recognizes, *this is a conjunctive test: A weapon may not be banned unless it is both dangerous and unusual.* Because the Court rejects the lower court's conclusion that stun guns are "unusual," it does not need to consider the lower court's conclusion that they are also "dangerous." See ante, at 1027 – 1028. But make no mistake—the decision below gravely erred on both grounds.

*Id.* at 417 (emphasis added).

Justice Alito then criticized the Supreme Judicial Court's formula-

tion of the "dangerousness" element of the test as far too broad. He wrote:

> [The lower court's] test may be appropriate for applying statutes criminalizing assault with a dangerous weapon. But it cannot be used to identify arms that fall outside the Second Amendment. *First, the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes. See Heller*, *supra*, at 627, 128 S.Ct. 2783 (contrasting "'dangerous and unusual weapons'" that may be banned with protected "weapons ... 'in common use at the time'"). Second, even in cases where dangerousness might be relevant, the Supreme Judicial Court's test sweeps far too broadly. *Heller* defined the 'Arms' covered by the Second Amendment to include "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 554 U.S., at 581, 128 S.Ct. 2783. Under the decision below, however, virtually every covered arm would qualify as "dangerous."

*Id.* at 418 (some citations omitted; emphasis added).

Now we get to the part where Justice Alito said the very opposite of what the district court concluded. He wrote:

> Were there any doubt on this point, one need only look at the court's first example of "dangerous per se" weapons: "firearms." *If Heller tells us anything, it is that firearms cannot be categorically prohibited just because they are dangerous*. 554 U.S., at 636, 128 S.Ct. 2783.

*Id*. (some citations omitted; emphasis added).

Justice Alito made three main points relevant to this case.

1. The "dangerous and unusual" test is conjunctive. "A weapon may not be banned unless it is *both* dangerous *and* unusual." *Id*. at 417 (emphasis in the original).

2. If a weapon is in common use, its "relative dangerousness" is simply irrelevant. *Id*. at 418. Such a weapon cannot be both dangerous and unusual because, by definition, it is not unusual.

3. "If *Heller* tells us anything, it is that firearms cannot be categorically prohibited just because they are dangerous." *Id*. Again, to ban a weapon, it must be both dangerous *and* unusual.

Thus, *pace* the district court, it got the matter exactly wrong. Every firearm is dangerous. But as Justice Alito observed, the "dangerous and unusual" test is merely the flip side of the "in common use" test, and if a

weapon is in common use, it cannot also be dangerous and unusual. As demonstrated above, the weapons banned by Massachusetts are owned by millions of Americans for lawful purposes. They are in common use. It follows they cannot be banned because they are dangerous and unusual.

Moreover, whether an arm is "unreasonably dangerous" or "reasonably dangerous" is surely a "difficult empirical judgment" of the sort that *Bruen* expressly prohibited courts from making in Second Amendment cases. 597 U.S. at 26. All weapons are dangerous, and if the Second Amendment does not protect a weapon merely because a reviewing court finds a way to hang the epithet "unreasonably" onto "dangerous," we are back to the pre-*Bruen* regimen where the Second Amendment was considered a second-class right that effectively protected nothing at all.

The district court's "suitability" argument fares no better. The court argues that the Commonwealth's ban should be upheld because, in its view, the banned firearms are not as "suitable" as other weapons for self-defense. Addm. 29. But as Professor Smith has explained, this "suitability" argument "acts as an open invitation to courts to assess whether individuals really need the banned firearms, or whether their features are, in the judgment of experts and the courts, well-suited to the self-defense

needs of Americans. But *Heller* made clear that such questions are not for expert or even court decision. Rather, it is the judgment of the American people that matters and 'whatever the reason' that they choose certain weapons, that they choose them is enough." Smith, *supra*, 12. Again, interest-balancing of this kind is expressly forbidden by *Bruen*. 597 U.S. at 26.

## V.     On Second Thought, The District Court Was Not That Stealthy

In the previous section, Plaintiffs suggested that the district court engaged in "stealth" interest-balancing. That is not really accurate, because the district court's interest-balancing was not particularly stealthy. Plaintiffs urge the Court to compare the meat of the district court's opinion where it explains the reasons the Statutes are consistent with the Nation's history and tradition of firearms regulation (Addendum pages 25 to 29) to this Court's intermediate scrutiny analysis in *Worman* at 922 F.3d 38-40. The district court's "history and tradition" analysis is, for practical purposes, identical to *Worman's* intermediate scrutiny analysis. *Bruen* warned against this very tactic. 597 U.S. at 29, n.7 (courts may not "engage in independent means-end scrutiny under the guise" of the historical inquiry). Is getting around *Bruen* really as simple as ignoring

27

the Court's warning and repackaging *Worman's* intermediate scrutiny interest-balancing analysis as a "dangerous and unusual" analysis? Plaintiffs respectfully suggest that it is not.

## VI. *Heller* Rejected "Dangerousness" Arguments Practically Identical to Those Advanced by the District Court

The district court engaged in an extensive discussion of empirical data regarding the "relative dangerousness" of the banned arms and whether they are "suitable" for self-defense. Addm. 25-29; 37. For the reasons set forth above, the district court's ersatz "dangerous and unusual" test must be rejected. The problem with the district court's approach becomes clear when one realizes that practically identical arguments could have been made in *Heller*. Indeed, practically identical arguments were made in *Heller*, and the arguments were obviously rejected.

Professor Smith has summarized several of the "dangerousness" arguments advanced by D.C. and its amici in *Heller*:

- "In the recent Virginia Tech shooting, a single student with two **handguns** discharged over 170 rounds in nine minutes, killing 32 people and wounding 25 more." [Brief for Petitioner at 53]

- "When more rounds are fired and guns can be more quickly reloaded, the likelihood of inflicting wounds, and the severity of the resulting injuries, increases. *This unfortunate fact is illustrated all too often in mass shootings* in America's schools, malls, places of worship, and other public arenas." [Brief of

Violence Pol'y Ctr. *et al.* as Amicus Curiae Supporting Petitioner at 16-17 (emphasis added)]

- "**Handguns** also are used in an extraordinary percentage of this country's well-publicized shootings, including the *large majority of mass shootings*. A review of 50 high-profile shootings over the past four decades revealed that from 1980 onward the bulk of such incidents (39) were mass shootings. A **handgun** was used in 74 percent of these mass shootings as the only or primary weapon." [*Id.* at 24 (emphasis added)]

- "The [D.C.] Council targeted **handguns** because they are disproportionately linked to violent and deadly crime .... [The Council found that] '**handguns** are used in roughly 54% of all murders, 60% of robberies, 26% of assaults and 87% of all murders of law enforcement officials.' **Handguns** were also particularly deadly in other contexts: 'A crime committed with a pistol is 7 times more likely to be lethal than a crime committed with any other weapon.'" [Brief for Petitioner at 4]

- "The District considered evidence indicating that murders, robberies, and assaults were more likely to be committed with a handgun. Based on this evidence, the District concluded that **handguns** were uniquely dangerous and that it was necessary to prohibit the possession and use of such guns, while still permitting access to other weaponry if licensed and stored safely." [Brief of D.C. Appleseed Ctr. et al. as Amicus Curiae Supporting Petitioner at 22]

- "**Handguns** for the civilian market now fire ammunition capable of piercing body armor--the last line of defense responsible for saving thousands of police officers' lives." [Brief of Violence Pol'y Ctr. *et al.* as Amicus Curiae Supporting Petitioner at 18]

(emphasis added).

D.C. and its amici argued vociferously that handguns are a scourge on society and long guns are much better for self-defense. *Heller*, 554 U.S. at 629. Now the Commonwealth argues that handguns are great for self-defense and rifles like the AR-15 are wholly unsuitable for that purpose. "In short, arms-ban advocates switched their pre-*Heller* strategy of 'rifles good, handguns bad' to a post-*Heller* strategy of 'handguns good, rifles bad.'" *Id*. If those arguments failed in *Heller*, there is no reason they should succeed now.

## VII. The District Court's Historical Analysis is Directly Contrary to *Heller* and *Bruen*

The district court wrote, "it is surely true that where technological changes have been extreme, precise historical analogues become less useful except at a high (or categorical) level." Addm. 23. But *Bruen* warned against this very tactic when the Court wrote that at a high enough level of generality, "everything is similar in infinite ways to everything else." 597 U.S. at 29 (cleaned up). Thus, the district court's seeming belief that it could dispense with pointing to Founding-era regulations that were "relevantly similar" to the Massachusetts arms bans because the banned arms represent an advance in technology is wrong.

The fact that a weapon is the product of new technology does not, *ipso facto*, mean that it can be absolutely banned. "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Bruen*, 597 U.S. at 28 (*quoting Heller*, 554 U.S. at 582). The fact that the semi-automatic firearms and magazines banned by the Defendant represent an advance in technology does not mean they do not fall under *Heller's* rule.[11] In *Heller v. D.C.*, 670 F.3d 1244 (D.C. Cir. 2011), then-Judge Kavanaugh put the matter this way when considering D.C.'s ban on AR-15s: "D.C. asks this Court to find that the Second Amendment protects semi-automatic handguns but not semi-automatic rifles. There is no basis in *Heller* for drawing a constitutional distinction between semi-automatic handguns and semi-automatic rifles." *Id.*, at 1286 (Kavanaugh, J., dissenting). Judge Kavanaugh then got to the crux of the matter:

---

[11] *See* Smith, *supra*, at 6 ("Because *Bruen's* discussion of societal concerns and technological changes applies only in non-arms-ban cases, arguments about alleged societal concerns and technological changes are not relevant in arms-ban cases because *Heller* provides the relevant legal test.").

[A line between semi-automatic handguns and semi-automatic rifles] might be drawn out of a bare desire to restrict *Heller* as much as possible or to limit it to its facts, but that is not a sensible or principled constitutional line for a lower court to draw or a fair reading of [*Heller*].

*Id.*, n.14.

Modern semi-automatic handguns and the magazines that make them possible are the product of exactly the same technological innovation that produced the modern semi-automatic rifles and magazines banned by Massachusetts. In *Heller*, the Court held that D.C.'s ban on the former was unconstitutional because it was an extreme historical outlier. *Id.*, 554 U.S. at 629. The same is true of Massachusetts's ban on the latter.

## VIII. All Magazines Are Protected by the Plain Text

The district court correctly held (or at least assumed for the purposes of its opinion) that magazines as a general class are covered by the plain text because they are integral to the operation of all semi-automatic firearms. Addm. 32-33. And it correctly held that "a total ban on magazines would almost surely fall afoul of the Second Amendment." Addm. 33. Nevertheless, the court was puzzled as to whether magazines over a certain capacity are covered by the plain text. *Id*. It need not have

been. If a magazine of a certain size is an arm covered by the plain text, how does increasing the capacity of that magazine by one round (and thus tipping it into the "LCM" category) make it not an arm? The district court's puzzlement results from confusing the first step of the *Bruen* test (text) with the second step (history). Under the first step, a magazine of *any capacity* is an "instrument" that "facilitate[s] armed self-defense," and therefore covered by the plain text. *Bruen*, 597 U.S. at 28. Does the fact that all magazines are covered by the plain text mean that in principle a state cannot ban any magazines? Of course not. Just as all firearms are covered by the plain text, some firearms may nevertheless be banned if they are "dangerous and unusual."

In this case, large capacity magazines are covered by the plain text and are therefore "presumptively" protected by the Second Amendment. The word "presumptively" in step one of the *Bruen* test is important. It means that the fact that a weapon is covered by the plain text is not the end of the analysis. At step two, the government may rebut that presumption if it can demonstrate that its regulation banning large capacity magazines is "consistent with the Nation's historical tradition of firearm regulation." And if it rebuts the presumption, it can ban them. Otherwise,

33

it cannot. As demonstrated above, the banned magazines are in common use, and therefore Defendant cannot rebut the presumption and therefore cannot ban them.

## IX. Massachusetts' Policy Goals Are Not Relevant to the Analysis

The district court pointed to the Commonwealth's asserted interest in preventing mass shootings as a justification for upholding its arms ban. Addm. 37. Again, that a court believes that a statute advances a laudable policy goal is irrelevant to the Second Amendment analysis. *Bruen*, 597 U.S. at 17. Moreover, while mass shootings are undoubtedly tragic, they remain relatively rare. The Commonwealth's expert, Dr. Klarevas, asserted there were 928 deaths due to mass shootings in the 33 years between 1990 and 2022 (on average, 28 deaths per year). App. 776-778. Surely, in a nation of 330 million people, 928 deaths in 33 years cannot serve as the basis for depriving law-abiding citizens of the right to possess arms that are owned by literally millions of their fellow citizens.

This conclusion is reinforced by *Heller* itself. The 2007 Virginia Tech massacre was an example of semi-automatic weapons put to tragic use. And in *Heller*, D.C. pointed to that shooting in its arguments. It informed the Court that at Virginia Tech "a single student with two

*handguns* discharged over 170 rounds in nine minutes, killing 32 people and wounding 25 more." Brief of Petitioners, *D.C. v. Heller*, 2008 WL 102223, 53 (emphasis added). D.C.'s point was the same point Massachusetts makes, i.e. weapons that can be used in mass shootings should not be constitutionally protected. But the Supreme Court rejected D.C.'s argument. The Court wrote: "We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised …" *Id.*, 554 U.S. at 636. "But the enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of [commonly possessed arms] held and used for self-defense in the home." *Id.*

Thus, when it decided *Heller*, the Court was acutely aware of the potentially devastating capabilities of modern semi-automatic weapons in the hands of a single madman. But it nevertheless held that millions of law-abiding citizens may not be deprived of weapons in common use on the ground that those weapons are sometimes abused by non-law-abiding citizens.

In summary, a few dozen people have used arms like those banned under the challenged Statutes to commit horrific mass shootings. But the

arms used in these events account for less than one one-hundredth of a percent of the tens of millions of such arms owned by law-abiding citizens. The question before the Court, therefore, is whether millions of citizens' rights should yield because of the bad acts of dozens? Defendant answers, yes, they should. But *Heller* answered no, they should not. Plaintiffs urge the Court to answer in the same way *Heller* did.

## X.     The "Common Use" Test is Not Circular

*Heller* held that a firearm in common use may not be absolutely banned. 554 U.S. at 628-29. The district court criticized *Heller's* "common use" test as "circular," Addm. 14, and "tautological" App. 2057, and declined to apply it. In *Heller* itself, Justice Breyer also thought the Court was wrong and for the same reason. *See* 554 U.S. 720–21 (Bryer, J., dissenting). He argued the Court had employed faulty logic, and "[t]here is no basis for believing that the Framers intended such *circular reasoning*." *Id.* (emphasis added). In *Bevis*, the Seventh Circuit rejected the "common use" test as circular and implicitly, if not expressly, adopted Justice Bryer's *Heller* dissent in its stead. 85 F.4th 1190.

In his dissent in *Bevis*, Judge Brennan properly took his colleagues to task on this point. First, he explained how the "common use" test,

properly understood, is not circular at all. 85 F.4th at 1211. And then he observed that no matter how he and his colleagues feel about the Supreme Court's reasoning, "[w]e are not free to ignore the Court's instruction as to the role of 'in common use' in the Second Amendment analysis." *Id*. at 1212. Judge Brennan was undoubtedly correct, which is why the district court erred when it ignored the "common use" test in favor of its ersatz "dangerous and unusual" test.

## XI.   A Weapon Can Change from Uncommon to Common

Part of the district court's problem with the "common use" test was its reluctance to accept the proposition that a weapon's status can change from unprotected to protected as it becomes more commonly used. App. 2049, 19-23. The Seventh Circuit also criticized *Heller* on this ground. 85 F.4th at 1199. Again, the district court's and the Seventh Circuit's analysis runs headlong into clear Supreme Court precedent. *Bruen* specifically stated that a weapon's status could change over time. Handguns are unquestionably protected under *Heller*, and *Bruen* stated that even if handguns were once "dangerous and unusual," they "are unquestionably in common use today" and therefore receive robust Second Amendment protection. 597 U.S. at 47.

## XII.  This is Not a "Nuanced" Case

The district court held that under *Bruen* the historical inquiry in this case is "nuanced." Addm. 19-20. This is wrong. Under *Heller's* simple "common use" test, this is a "straightforward" case. The passage in *Bruen* to which the court alluded states in full: "While the historical analogies here and in *Heller* are relatively simple to draw, *other cases* implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." 597 U.S. 27 (emphasis added). The Court made as plain as it could that the "nuanced approach" did not apply in a case like *Heller*. It applied only in "other cases."

Second Amendment cases are divided into two categories: (1) laws that ban weapons in common use; and (2) laws that otherwise regulate the sale or use of arms. *See* Smith, *supra*, at 2. In its discussion of how to apply its historical analogue approach, *Bruen* noted that unlike the relatively straightforward case presented by *Heller*, "other cases" involving unprecedented societal concerns or dramatic technological changes may require a more nuanced approach. *Id*. "But this consideration comes into play only when a court is engaged in examining analogues in non-arms-ban cases for which *Heller* does not provide the binding rule of decision."

*Id.* This is such a case. The Defendant's ban of arms in common use implicates *Heller's* "straightforward" and simple rule. This is not a non-arms-ban case that might call for a more "nuanced" approach.

## XIII. None of the Laws Listed by Defendant Come Close to Being Analogous to the Statutes

### A.     Introduction

As discussed above, this is not a "nuanced" case. Bans of arms in common use fall under *Heller's* simple test. The Supreme Court has already done the "history and tradition" analysis with respect to such bans and determined that they are categorially unconstitutional. There is no need to repeat that analysis in this case. Nevertheless, Defendant offered a list of several laws that it argued really are analogous to its absolute ban of commonly possessed arms. In this section, Plaintiffs will demonstrate why Defendant is wrong. As in *Heller*, the laws the Commonwealth advances are not "remotely" analogous to its ban.

Massachusetts offers the declaration of Robert Spitzer in an attempt to carry its burden of demonstrating historical laws that are analogous to its arms ban. App. 1206. Dr. Spitzer also worked for California in *Duncan v. Bonta ("Duncan I")*, 2023 WL 6180472 (S.D. Cal. Sept. 22, 2023) (appeal filed), and Defendant offers much the same list of laws that

were rejected as relevant historical analogues in that case. Judge Benitez engaged in a months-long painstaking analysis of each and every one of the 316 laws submitted for review by California. *Duncan I,* at *22. Plaintiffs respectfully suggest that the Court would benefit from a detailed review of his exhaustive analysis, much of which is summarized in the pages that follow.

### B.  There Were *Zero* Prohibitions on Possessing Firearms in the Founding Era

The history and tradition of the United States evinces widespread gun ownership and expertise. "[T]hose who sought to carry firearms publicly and peaceably in antebellum America were generally free to do so." *Bruen*, 597 U.S. at 52. "Before, during, and after the Revolution, no state banned any type of arm, ammunition, or accessory." David B. Kopel and Joseph G.S. Greenlee, *This History of Bans on Types of Arms Before 1900*, 50 Journal of Legislation, Vol. 50, No. 2, 45-46 (2024) (available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4393197) (emphasis added). Nor did the federal government. *Id*.

This conclusion is borne out by Defendant's inability to identify any laws from the Founding era – any laws whatsoever – that banned firearms. This is not surprising. In *Heller*, D.C. was not able to point to any

early firearm bans either and the historical record has not changed in the intervening 16 years. Judge Benitez wrote in a companion case to *Duncan I*:

> It is remarkable to discover that there were no outright prohibitions on keeping or possessing guns. No laws of any kind. Based on a close review of the State's law list and the Court's own analysis, there are no Founding-era categorical bans on firearms in this nation's history. . . . *the State has not identified any law, anywhere, at any time, between 1791 and 1868* that prohibited simple possession of a gun.

*Miller v. Bonta*, 2023 WL 6929336, at *13 (S.D. Cal. Oct. 19, 2023) (appeal filed) (emphasis added).

The history and tradition of the northern states was to leave firearm ownership and use completely unregulated. *Duncan I*, at *26. Among the southern states, there were many laws restricting firearms for slaves, African-Americans, and Indians. *Id*. Setting aside that obviously unconstitutional tradition, among the southern states firearm ownership was largely unregulated for at least the first 50 years after 1791. *Id*. Significantly, the first restriction on a dangerous and unusual firearm did not occur until 1868, the year the Fourteenth Amendment was adopted, when Alabama prohibited carrying a "rifle walking cane." *Id.* at *27.

In light of this history, *Bruen* concluded that "[n]one of these historical limitations on the right to bear arms approach New York's proper-

cause requirement because none operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." 597 U.S. at 60. The same can be said about the Statutes. *cf. Duncan I* at \*29. No regulation from the Founding era remotely approaches Defendant's complete ban on mere possession of common arms even within the confines of one's home for the purpose of self-defense.

### C. The Regulation of the "Use" of Guns, Knives, Clubs, and Trap Guns is Not Analogous to an Absolute Ban on Mere Possession in the Home

Defendant cannot point to a single law in the Founding era that banned possession of *any* firearm. Therefore, it points to historic regulations of weapons such as bladed weapons, melee weapons, blunt weapons, or leaded weapons. But these regulations are not analogous to Defendant's absolute ban. In *Bruen*, the Court wrote that in assessing whether a historic regulation is relevantly similar to a present regulation, courts should examine "*how and why* the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29 (emphasis added). The vast majority of the nineteenth-century regulations advanced by Professor Spitzer regulated the public carry of weapons. In other words, the "how" of the regulations was to regulate the *manner of*

*use* of these weapons in public. There was no widespread tradition of absolutely banning these weapons. *See, e.g.,* David Kopel, *Bowie Knife Statutes 1837-1899*, available at bit.ly/3RNRpQD (last visited Feb. 29, 2024). After an exhaustive review of all nineteenth-century state and territorial statutes, Professor Kopel concluded: "As of 1899, there were 46 States in the Union; of these, 32 had at some point enacted a statute containing the words 'bowie knife' or variant. … At the end of the 19th century*, no state prohibited possession of Bowie knives.*" *Id.* (emphasis added).

Indeed, last week Dr. Spitzer admitted this in a declaration submitted in *NAGR v. Polis*, 24-cv-1, District of Colorado. Dr. Spitzer outlined several Bowie knife regulations. 24-cv-001, ECF 23-1 ¶ 56. Then, he admitted that no of the regulations prohibited mere possession of the weapons. *Id.* ¶ 57.

It should go without saying that regulating the manner of use of a weapon in public is not analogous to prohibiting the mere possession of the weapon, especially for self-defense in the home. In other words, the two types of laws answer the "how" question completely differently. In *Bruen*, the Court acknowledged the existence of prohibitions on concealed carry. But it held that none of these historical limitations on the manner

43

of use was analogous to a law prohibiting public carry altogether. 597 U.S. at 60. If laws banning concealed carry are not even analogous to a law prohibiting open carry, *a fortiori* they are not analogous to a law prohibiting mere possession in the home. *See also Heller*, 554 U.S. at 629 (prohibition on concealed carry not analogous to – i.e., not nearly as severe as – ban on commonly possessed arm).

The district court disagrees with *Heller* and *Bruen*. It held that the distinction between the regulation of concealed or public carry as opposed to mere possession is "irrelevant." Addm. 23, n.15. This holding cannot be reconciled with the Supreme Court's precedents.

The burden of restricting carry in public is indeed not comparable to absolutely prohibiting possession even in the home. This is obviously true as a matter of logic. It is also true as a matter of history. For example, in *Andrews v. State*, 50 Tenn. 165, 185-86 (1871), the Tennessee Supreme Court considered the Tennessee statute that prohibited a person from publicly or privately carrying revolvers. *Id.*, at 171. In resolving the case, the court articulated the fundamental difference between the regulatory burden of a carry restriction and the regulatory burden of a ban on possession in the home. The court stated:

44

It will be seen the statute ... in effect is an absolute prohibition against keeping such a weapon, and not a regulation of the use of it. ... Under this statute, *if a man should carry such a weapon about his own home, or on his own premises ... he would be subjected to the severe penalties* of fine and imprisonment prescribed in the statute. In a word, as we have said, the statute amounts to a prohibition to keep and use such weapon for any and all purposes. *It therefore, in this respect, violates the constitutional right* to keep arms ... If the Legislature think proper, they may by a proper law regulate the carrying of this weapon publicly ... We only hold that, as to this weapon, the prohibition is too broad to be sustained.

*Id.*, 50 Tenn. at 187–88 (emphasis added).

In a word, the Tennessee Supreme Court recognized that the burden imposed by a regulation of public carry is not, as the district court contends, relevantly similar to an absolute prohibition of possession even in the home. *Andrews* considered the former to be permissible and the latter to be so severe as to be constitutionally intolerable.

*Andrews* also illustrates why the "why" of the Statutes is not relevantly similar to the "why" of laws regulating public carry. Regarding that issue, the court wrote:

The principle on which all right to regulate the use in public of these articles of property, is, that no man can so use his own as to violate the rights of others, or of the community of which he is a member. ... [N]o law can punish him for [using] such arms at home or on his own premises; he may do with his own as he will, while doing no wrong to others. *Yet, when he carries his property abroad, goes among the people in public assemblages where others are to be affected by his conduct, then he brings himself within the pale of public*

45

*regulation*, and must submit to such restriction on the mode of using or carrying his property as the people through their Legislature, shall see fit to impose for the general good.

*Id.*, 50 Tenn. at 185–86 (emphasis added).

No law can punish a citizen for keeping and using a common arm in his own home for self-defense. But when the same citizen carries his weapon in public, he subjects himself to a higher degree of regulation. Why? Because it is hardly any of the government's business what a citizen does in the privacy of his home. But when he goes into the public, his conduct impacts his fellow citizens, and the government does have something to say about that. It is just plain common sense that the scope of the government's regulatory powers over a person is far narrower when he is in his home than when he is on a crowded public street. That is why the district court clearly erred when it stated that the distinction between regulating public carry and banning mere possession is irrelevant.

Finally, it is questionable whether knife regulations are relevant in the first place. The Supreme Court did not look to laws regulating knives and clubs when reviewing a restriction about guns in *Bruen*. Three different times *Bruen* repeats the specific phrase "tradition of *firearm regulation*": 597 U.S. at 17, 24, 34 (emphasis added). In contrast, the *Bruen*

46

majority opinion did not mention knives and clubs at all. Thus, it is clear that the Court did not consider regulation of knives and clubs and other melee weapons to be analogous to firearms regulations.

Professor Spitzer's final category is "Trap guns," which were devices rigged to fire without the presence of a person. Again, these laws regulated the manner of use of a weapon as a trap, not its possession in the home for self-defense, and are therefore not analogous to an absolute ban. In other words, the weapons themselves were not banned. The laws merely prohibited using the weapons to set a trap.

### D.    Multi-Shot Arms Have Existed for Centuries

Multi-shot firearms have existed for centuries. David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 852 (2015). Such weapons had become widespread by the mid-19th century. *Id*. at 855. For example, with seventeen rounds in the magazine and one in the chamber, the Winchester Model 1866 could fire eighteen rounds in nine seconds. *Id*. The gun was a particularly big seller in the American West, with over 170,000 produced. *Id*. Despite the existence of multi-shot weapons going back to the Founding era and beyond, there

were no bans on the firearms or their ammunition capacity during the Founding era or even during Reconstruction.[12]

### E. The Early Militia Laws Completely Foreclose the Possibility That Defendant Will Find an Analogous Founding-Era Regulation

During the Founding era, both the federal and state governments enacted laws for the formation and maintenance of citizen militias. These laws did not ban firearms or restrict firing capacity. They did just the opposite by mandating the acquisition of firearms and a minimum firing capacity, i.e., the laws required citizens to arm themselves with a minimum quantity of bullets and gunpowder. For example, Congress passed the Militia Act in 1792. 1 Stat. 271, 2 Cong. Ch. 33. The law required a citizen to acquire a firearm and be equipped to fire at least 20 to 24 shots. Every state had a similar law. See *Fraser v. Bureau of Alcohol, Tobacco,*

---

[12] Plaintiffs do not concede that laws from the Reconstruction era are relevant to the Second Amendment inquiry. Indeed, they are not because they are too late. In *Bruen*, the Court noted that "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*'" *Id.*, 597 U.S. at 34, *citing Heller*, 554 U.S. at 634-35 (emphasis in the original). The Second Amendment was adopted in 1791. 1868 is far too late to be relevant to the meaning of the text. There is no need for the Court to determine this issue in this case, however, because, like *Bruen*, there are no analogous laws in either period.

48

*Firearms & Explosives*, No. 3:22-CV-410, 2023 WL 3355339 at *17, n.31 (E.D. Va. May 10, 2023) (collecting state militia laws).

The Founding-era militia laws demonstrate that, contrary to the idea of a firearm ban or a firing-capacity ceiling, there was a firearm *requirement* and a firing-capacity floor in the Founding era. It follows that far from being analogous to a Founding-era law, the Statutes would have been unthinkable under the understanding of the Second Amendment at the time of the Founding.

### F.    Twentieth-Century Laws Are Irrelevant

To make up for the lack of Founding-era laws analogous to the Statutes, Defendant turns to twentieth-century laws regulating or banning machine guns and argues that these are analogous to the Statutes. App. 41. The problem for Defendant is that these laws come far too late to shed any light on the meaning of the Second Amendment. Defendant's argument ignores the Supreme Court's holding in *Bruen* where New York also advanced twentieth-century laws to support its case. The Court simply ignored these late laws as irrelevant, writing that such evidence did "not provide insight into the meaning of the Second Amendment." *Id.*, 597 U.S. at 66, n. 28.

49

To the extent later history contradicts the earlier record, the earlier record controls. 597 U.S. at 37. "Liquidating indeterminacies in written laws is far removed from expanding or altering them." *Id.* (cleaned up). Thus, the Court should reject Defendant's effort to make up for the lack of Founding-era analogues by pointing to twentieth-century analogues. Indeed, if analogues from the twentieth century were relevant, both *Heller* and *Bruen* would have surely come out the other way.

## XIV. Defendant Misunderstands *Heller's* Reference to Weapons "Most Useful in Military Service"

Defendant argued that the Statutes should be upheld because the arms it has banned are "most useful in military service," and may therefore be banned. App. 74 (*quoting Heller*, 554 U.S. at 627). This argument mischaracterizes *Heller*. Indeed, the very passage from *Heller* cited by Defendant demonstrates why its argument is wrong. In that passage, the Court held that specialized military arms like M16 machine guns "that are highly unusual in society at large" are not protected for civilian use by the Second Amendment. *Heller*, 554 U.S. at 627. *See also id*. at 625 (contrasting machine guns, which may be banned, with weapons in common use which may not be banned). Thus, by definition, the passage cited

50

by Defendant does not apply to weapons in common use like those banned by the Statutes.

Moreover, Defendant seems to be arguing that *Heller's* reference to military arms must mean that any arm that could be used in warfare is not protected. But *Heller* said the very opposite. In the same passage, it held that weapons in common use brought to militia service by members of the militia are protected by the Second Amendment. *Id*. What do militia members do with those weapons when they bring them to militia service? They fight wars.[13] It would be extremely anomalous, therefore, if *Heller* were interpreted to mean simultaneously that (1) weapons brought by militia members for fighting wars are protected by the Second Amendment, and (2) all weapons used for fighting wars are not protected by the Second Amendment. This is not the law. Rather, "*Miller* and *Heller* [merely] recognized that militia members traditionally reported for duty carrying 'the sorts of lawful weapons that they possessed at home,' and that the Second Amendment therefore protects such weapons as a class, regardless of any particular weapon's suitability for military use."

---

[13] *See* U.S. Const. amend. V (referring to "the Militia, when in actual service in time of War").

51

*Caetano v. Massachusetts*, 577 U.S. 411, 419 (2016) (Alito, J., concurring). *See also Kolbe v. Hogan*, 849 F.3d 114, 156 (4th Cir. 2017) (Traxler, J., dissenting) (calling an arm a "weapon of war" is irrelevant, because under *Heller* "weapons that are most useful for military service" does not include "weapons typically possessed by law-abiding citizens.").

The district court properly rejected Defendant's "useful in military service" argument. Addm. 12, 26. Unfortunately, in *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175 (7th Cir. 2023), the majority adopted a version of the argument. In *Bevis*, the court held that the word "arms" in the Second Amendment has an idiomatic meaning that includes only firearms that are not too "militaristic." *Id.* 85 F.4th at 1199. *Bevis'* holding cannot be reconciled with *Heller's* admonition that the plain text analysis focuses on the "normal and ordinary" meaning of the words in the constitutional text. *Id.*, 554 U.S. at 576. "Normal meaning may of course include an idiomatic meaning ...," *id.* at 576-77, but the existence of the idiom must be demonstrated, and a court cannot impose on the text an idiomatic definition that "[n]o dictionary has ever adopted." *Id.* at 586. For obvious reasons, *Bevis* never attempted to justify its idiomatic

interpretation of the word "arms," and the district court quite properly did not follow its approach.

## XV.  The Difference Between Semi-Automatic AR-15s and Automatic M16s is Legally Significant

Defendant argued that AR-15s may be banned because they are legally indistinguishable from the military M16, App. 86, and the district court seemed to agree. Addm. 25. This is not correct. The difference between the semi-automatic AR-15 and the automatic M16 is legally significant, as the Supreme Court held in *Staples v. United States*, 511 U.S. 600 (1994). There, the Court contrasted machineguns such as the M16 with semi-automatic weapons such as the AR-15 and noted that the latter "traditionally have been *widely accepted as lawful possessions*." *Id.*, at 612 (emphasis added).

## XVI. The Commonwealth's Handgun Ban is Glaringly Unconstitutional

The D.C. ordinance challenged in *Heller* banned the possession of handguns even for self-defense in the home. The Court invalidated the ordinance, writing "banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family [fails] constitutional muster." 554 U.S. at 628-29 (cleaned up). Applying this

rule to the present case, there cannot be the slightest doubt that laws absolutely banning handguns are unconstitutional.

The district court acknowledged that the Statutes ban certain handguns (i.e., certain pistols). Addm. 3. And it acknowledged that *Heller* struck down a ban on handguns. Addm. 5. Having acknowledged these points, one would expect the district court to address the issue further and demonstrate how the Commonwealth's handgun ban is somehow distinguishable from the handgun ban invalidated in *Heller*. But it did not. Thus, the district court's ruling upholding the handgun ban cannot be reconciled with *Heller*.

## XVII.  The Statutes Ban a Class of Weapons

The district court seemed to suggest that it was not necessary to find a close historical analogue to the Commonwealth's arms ban because the Statutes do not ban a "class of weapons." Rather, according to the district court, the Statutes target only a "group" of weapons. Addm. 23, n. 14; 24. This makes no sense. The district court never explained the difference between a "class" of weapons and a "group" of weapons. Moreover, the Statutes do in fact ban a class of weapons, i.e., those weapons classified as "assault weapons."

The district court seems to have been trying to argue that it is permissible to ban certain weapons so long as other weapons are left available. Addm. 24. The problem with the "alternatives remain" argument is that it has "no limiting principle and would justify incremental firearm bans until there is only a single-shot derringer remaining for lawful self-defense. *Heller* demolished that argument . . . *Heller* said quite clearly that it is no constitutional answer for government to say that it is permissible to ban some guns so long as other guns are allowed." *Miller*, *supra*, at *5, *citing Heller*, 554 U.S. at 629.

## XVIII.  The Other Factors Weigh in Favor of Injunctive Relief

Having reached its conclusion on the merits, the district court declined to consider the other preliminary injunction factors. Addm. 37. But those factors weigh in favor of injunctive relief. "The loss of [constitutional] freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). This principle applies with equal force when Second Amendment freedoms are lost. *See Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011). That is why in *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1 (1st Cir. 2012), this Court held that where there is a

strong showing of likelihood of success on the merits of a constitutional claim, the irreparable injury component of preliminary injunction analysis is necessarily satisfied. *Id.*, 699 F.3d at 15, *citing Elrod. Bruen* makes clear that the loss of Second Amendment rights should be treated in the same way. *Id.*, 597 U.S. at 70 (Second Amendment protection not less than First Amendment protection). Plaintiffs have made a strong showing of likelihood of success on the merits of their Second Amendment claim; therefore, the irreparable injury component of preliminary injunction analysis is necessarily satisfied.

"[O]bviously, should the statute be unconstitutional, the public interest would be adversely affected by denial of such an injunction." *Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 854 (1st Cir. 1988). For the same reason, the balance of harm factor is satisfied, because the "public interest" and "balance of harm" factors merge when the government is the defendant. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

**CONCLUSION**

The Commonwealth's absolute ban on weapons owned by millions of Americans for lawful purposes is categorically unconstitutional under *Heller*. For that reason, the Court should reverse the district court's decision and remand this matter for further proceedings.

*/s/ Barry K. Arrington*

_____

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
(303) 205-7870
barry@arringtonpc.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Local Rule 32.1 because it contains 11,791 words, excluding the parts of the brief exempted by Fed. R. App. P. 32, as determined by the word-counting feature of Microsoft Word.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32 and the typestyle requirements of Fed. R. App. P. 32 because it has been prepared in the proportionally spaced typeface Century Schoolbook using Microsoft Word in 14-point font.

*/s/ Barry K. Arrington*

_____

Barry K. Arrington

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2024, an electronic copy of the foregoing Brief of The Plaintiffs-Appellants was filed with the Clerk of the Court using the ECF system and thereby served upon all counsel appearing in this case.

*/s/ Barry K. Arrington*

_____

Barry K. Arrington

# ADDENDUM

## <u>TABLE OF CONTENTS</u>

| <u>Description of Item</u> | Record<br><u>Entry No.</u> | Addendum<br><u>Page No.</u> |
|---|---|---|
| Memorandum and Order on Plaintiffs' Motion For Preliminary Injunction (12/21/2023)..................... | R.62 | Addm.1 |
| Mass. Gen. Laws ch. 140, § 131M.............................. | | Addm.39 |
| Mass. Gen. Laws ch. 140, § 121 ................................ | | Addm.39 |

**i**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                      )
JOSEPH R. CAPEN and NATIONAL          )
ASSOCIATION FOR GUN RIGHTS,           )
                                      )
         Plaintiffs,                  )
                                      )         Civil Action No.
    v.                                )         22-11431-FDS
                                      )
ANDREA JOY CAMPBELL, in her           )
official capacity as Attorney General )
of the Commonwealth of Massachusetts, )
                                      )
         Defendant.                   )
                                      )
_____)

MEMORANDUM AND ORDER ON PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION

SAYLOR, C.J.

    This case involves a Second Amendment challenge to a Massachusetts statute prohibiting

the possession, sale, and transfer of certain semiautomatic weapons, as well as magazines

capable of holding more than ten rounds of ammunition.  *See* Mass. Gen. Laws ch. 140, §§ 121,

131M.  Plaintiff Joseph R. Capen alleges that, but for the ban, he would acquire the proscribed

firearms and magazines for self-defense and other purposes.  The National Association for Gun

Rights is a non-profit association that alleges that its members are similarly situated to Capen.

    Plaintiffs have moved for preliminary relief enjoining enforcement of the statute.  For the

reasons set forth below, the statute comports with the requirements of the Second Amendment,

and therefore plaintiffs cannot demonstrate a likelihood of success on the merits of their claims.

The motion will accordingly be denied.

I.     **Background**

The Court relies on the memoranda submitted by the parties and four *amici curiae*,

affidavits, and documentary evidence to decide the present motion.[1]

A.     **Factual**

1.     **The Parties**

Joseph R. Capen is a resident of Massachusetts.  (Compl. ¶ 2).  According to the

complaint, he is eligible to receive and possess firearms and magazines and, "but for the credible

threat of prosecution under the challenged laws, would purchase the Banned Firearms and

Banned Magazines to keep in his home for self-defense and other lawful purposes."  (*Id.*).

The National Association for Gun Rights ("NAGR") is a non-profit association organized

under 26 U.S.C. § 501(c)(4).  (*Id.* ¶ 1).  According to the complaint, "NAGR seeks to defend the

right of all law-abiding individuals to keep and bear arms."  (*Id.*).

Andrea Campbell is the Attorney General of Massachusetts and the chief law-

enforcement officer for the Commonwealth.  (*Id.* ¶ 4).[2]

2.     **The Challenged Statutes**

The Massachusetts statute at issue was modeled after the (now-expired) 1994 Public

Safety and Recreational Firearms Use Protection Act, Pub. L. No. 103-322, §§ 110101-06, 108

Stat. 1796, 1996-2010 (1994) (the "federal statute").  That statute banned the manufacture,

transfer, and possession of nineteen specific models of "semiautomatic assault weapons," along

---

[1] The Brady Center to Prevent Gun Violence, March for Our Lives, Giffords Law Center to Prevent Gun Violence, and Everytown for Gun Safety Support Fund submitted *amicus curiae* briefs in support of defendant's opposition to the motion for preliminary injunction.

[2] This suit was originally brought against Charles D. Baker, Jr. and Maura Healey, the Governor and Attorney General of the Commonwealth (respectively) at the time the suit was filed.  The claim against Governor Baker was dismissed on November 1, 2022.  Andrea Campbell is the current Attorney General.

Addm. 2

with copies or duplicates of those firearms. *Id.* § 110102(b), 108 Stat. 1997-98.[3]  It also banned

any semiautomatic rifle, pistol, or shotgun with two or more combat-oriented features as defined

by the statute. *Id.*  Those features included, for example, folding or telescoping stocks,

protruding pistol grips, barrel shrouds, and threaded barrels designed to accept silencers or flash

suppressors. *Id.*

Separately, the federal statute banned "large capacity ammunition feeding devices,"

defined as "a magazine, belt, drum, feed strip, or similar device . . . that has a capacity of, or that

can be readily restored or converted to accept, more than 10 rounds of ammunition." *Id.*

§ 110103(b), 108 Stat. 1999.[4]

In adopting the statute, Congress acknowledged that the prohibited assault weapons had

"a capability for lethality—more wounds, more serious, in more victims—far beyond that of

other firearms in general, including other semiautomatic guns." H.R. Rep. No. 103-489, at 19-20

(1994).  By its terms, the federal statute expired in 2004. *See* Pub. L. No. 103-322, § 110105,

108 Stat. 2000 (1994).

The Massachusetts statute ("the Act"), which was passed in 1998 and made permanent

after the federal statute expired, makes it a crime to sell, transfer, or possess assault weapons.

Mass. Gen. Laws ch. 140, § 121.  The proscribed firearms include both specific models, such as

the Colt AR-15, and unenumerated weapons with two or more of the features identified in the

---

[3] Plaintiffs contend that "assault weapon" is "a rhetorically charged political term meant to stir the emotions of the public." (Pls. Mem. ¶ 1).  They propose using the term "banned firearm" instead.  Because the First Circuit used the term "assault weapon" to refer to the same statute in *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019), this memorandum and order will follow suit.

[4] Again, plaintiffs contend that the term "large-capacity feeding device" is "politically charged rhetoric," as magazines capable of holding more than ten rounds are "standard." (Brown Decl. ¶ 4).  They propose using the term "banned magazine" instead. (Pls. Mem. ¶ 2).  Again, the First Circuit in *Worman* (and most other courts) have used the term "large-capacity magazines (LCMs)," and this memorandum and order will do the same. *See Worman*, 922 F.3d at 30.

**Addm. 3**

federal ban.  *Id.*  The Act also prohibits the sale, transfer, and possession of "large capacity feeding devices" capable of holding more than ten rounds of ammunition or more than five shotgun shells.  Mass. Gen. Laws ch. 140, § 131M.

### B.    **Procedural Background**

The complaint alleges that the Act violates plaintiffs' Second Amendment rights to keep and bear arms by banning firearms and magazines "typically possessed by law-abiding citizens for lawful purposes."  (Compl. ¶ 34-37).  Plaintiffs seek a declaratory judgment under 28 U.S.C. § 2201 that the Act is unconstitutional, a preliminary and permanent injunction enjoining defendant from enforcing the Act, remedies under 42 U.S.C. § 1983, and reasonable attorneys' fees and costs under 42 U.S.C. § 1988.  (*Id.* ¶ 38-40).

## II.    **Legal Standard**

A preliminary injunction is an "extraordinary and drastic remedy" that "is never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (quoting *Yakus v. United States*, 321 U.S. 414, 440 (1944)).  A plaintiff seeking a preliminary injunction must establish that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction serves the public interest.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  A plaintiff's likelihood of success on the merits "weighs most heavily" in the court's determination; without it, the remaining factors "become matters of idle curiosity."  *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020) (citing *New Comm Wireless Servs. v. SprintCom Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)).  "[A]n inquiring court need not conclusively determine the merits of the movant's claim; it is enough for the court simply to evaluate the likelihood . . . that the movant ultimately will prevail on the merits."  *Id.* at 18.

**Addm. 4**

III.   **Likelihood of Success on the Merits**

A.   **Second Amendment Jurisprudence**

The Second Amendment provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  The modern understanding of that amendment has been explored by the Supreme Court in three cases and a brief *per curiam* decision:  *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curiam); and *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

1.   *Heller*

The Supreme Court's "first in-depth examination of the Second Amendment" came in 2008 with its decision in *Heller*, 554 U.S. at 635.  There, the court struck down the District of Columbia's "total ban on handguns, as well as its requirement that firearms in the home be kept nonfunctional even when necessary for self-defense." *Id.* at 576.  The court's opinion directly addressed the question of what kinds of weapons are protected by the Second Amendment.

*Heller* interpreted the Second Amendment as having two constituent parts:  a prefatory clause ("A well regulated militia, being necessary to the security of a free State") and an operative clause ("the right of the people to keep and bear Arms, shall not be infringed"). *Id.* at 579, 595.  Interpreting the latter, the court ruled that the term "arms" applied "to weapons that were not specifically designed for military use and were not employed in a military capacity." *Id.* at 581.  It also confirmed the holding in *Muscarello v. United States*, 524 U.S. 125 (1998), that to "bear arms" meant to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* at 584.

5

**Addm. 5**

The court concluded that the operative clause "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592.  But it also noted:

> Of course the right [is] not unlimited, just as the First Amendment's right of free speech was not.  Thus, we do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose*.

*Id.* at 595 (citation omitted).

The court specifically clarified that one of the limitations of the Second Amendment is that it "extends only to certain types of weapons."  *Id.* at 623.  Among other things, the court discussed its decision in *United States v. Miller*, 307 U.S. 174 (1939), where the court "upheld against a Second Amendment challenge two men's federal indictment for transporting an unregistered short-barreled shotgun in interstate commerce, in violation of the National Firearms Act."  *Heller*, 554 U.S. at 621-22.  The court emphasized that the basis for the *Miller* decision was not that the defendants had been carrying the shotguns for "nonmilitary use," but that "the *type of weapon at issue* was not eligible for Second Amendment protection . . . ."  *Id.* at 622.

The court then observed:

> We may as well consider at this point . . . *what* types of weapons *Miller* permits. Read in isolation, *Miller*'s phrase "part of ordinary military equipment" could mean that only those weapons useful in warfare are protected.  That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns (not challenged in *Miller*) might be unconstitutional, machineguns being useful in warfare in 1939.  We think that *Miller's* "ordinary military equipment" language must be read in tandem with what comes after:  "[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time."  The traditional militia was formed from a pool of men bringing arms "in common use at the time" for lawful purposes like self-defense. . . .  We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.

*Id.* at 624-25 (citations omitted).

**Addm. 6**

Critically, the court then noted the following:

Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. . . . Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those "in common use at the time." We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons."

*Id.* at 626-27 (citation omitted). It went on to say:

[T]he inherent right of self-defense has been central to the Second Amendment right. The handgun ban amounts to a prohibition of an entire class of "arms" that is overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute. Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family," . . . would fail constitutional muster.

It is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed. It is enough to note . . . that the American people have considered the handgun to be the quintessential self-defense weapon. There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police. Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.

*Id.* at 628-29.

Finally, the court concluded that, in substance, the Second Amendment "elevates above

all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth

and home." *Id.* at 635.  It acknowledged, however, that it did not seek "to clarify the entire field" of the Second Amendment, preferring to leave defining those contours for later cases.  *Id.*

      **2.**    ***McDonald* and *Caetano***

Two years later, in *McDonald*, the Supreme Court held that the Second Amendment applies to the states through the Fourteenth Amendment.  561 U.S. at 791.  Among other things, it also reiterated "that individual self-defense is 'the central component' of the Second Amendment right."  *Id.* at 767 (quoting *Heller*, 554 U.S. at 599).

Next, in a *per curiam* opinion in *Caetano*, the court overturned a decision of the Massachusetts Supreme Judicial Court upholding a statute prohibiting the possession of stun guns.  577 U.S. at 411-12.  The SJC had offered three explanations for its holding:  first, that stun guns were not protected because they were not in common use at the time of the Second Amendment's enactment; second, that stun guns were "unusual" (and thus unprotected) because they are "a thoroughly modern invention"; and third, that the record did not suggest that stun guns are "readily adaptable to use in the military."  *Id.*  The Supreme Court noted that all three explanations expressly contradicted *Heller*, and accordingly vacated the judgment.  *Id.*

      **3.**    ***Bruen***

Most recently, in *New York Rifle & Pistol Ass'n v. Bruen*, the Supreme Court struck down a New York statute conditioning the issuance of a firearms license on an individualized showing of special need.  597 U.S. at 70.

The court's analysis began by noting that "[i]n *Heller* and *McDonald*, we held that the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense."  *Id.* at 17.  It then observed that "[i]n the years since, the Courts of Appeals have coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny."  *Id.*  At the first step of that test, "the government

[would] justify its regulation by establishing that the challenged law regulates activity falling outside the scope of the right as originally understood." *Id.* at 18 (quotation omitted). At the second step, the courts would apply strict scrutiny to the "core" Second Amendment right (generally defined as the right to self-defense in the home), and intermediate scrutiny to other aspects of the right, which required the government to show that the regulation was substantially related to achieving an important governmental interest. *Id.* at 18-19.

The Supreme Court expressly rejected that analytical framework. *Id.* at 19-24. Instead, it announced the following rule:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Id.* at 17 (quotation and citation omitted).

The court was clear that this "methodological approach" to the Second Amendment embraced the one taken in *Heller*, particularly its emphasis on interpreting the amendment in light of its text, history, and tradition. *Id.* at 19-20. During that discussion, it noted that in *Heller* it had concluded that "the right secured by the Second Amendment is not unlimited," and that "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 21. It added: "For example, [the court] found it 'fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons' that the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'" *Id.* (quoting *Heller*, 554 U.S. at 627).

After explicating the role of history and tradition in interpreting the amendment, the court

**Addm. 9**

reiterated its formulation of the applicable test. *Id.* at 22-27. After some discussion, it stated:

> The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding. In some cases, that inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century.

*Id.* at 26. But if the challenged laws address "unprecedented societal concerns or dramatic technological changes," the historical analysis requires a "more nuanced approach." *Id.* at 27.[5]

The court stated that reasoning by analogy from the historical record applies "the balance struck by the founding generation to modern circumstances." *Id.* at 29 n.7. In particular, "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar." *Id.* at 28-29 (quotation omitted). Such an analogue must bear more than a remote resemblance, but a "government [need only] identify a well-established and representative historical analogue, not a historical *twin*." *Id.* at 30. Among other things, it observed:

> While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense. As we stated in *Heller* and repeated in *McDonald*, "individual self-defense is 'the central component' of the Second Amendment right." Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are "central" considerations when engaging in an analogical inquiry.

*Id.* at 29 (citations omitted).

---

[5] The court was clear, however, that the simple fact that a weapon was modern was not sufficient to amount to a "dramatic technological change":

> We . . . recognized in *Heller* at least one way in which the Second Amendment's historically fixed meaning applies to new circumstances: Its reference to "arms" does not apply "only [to] those arms in existence in the 18th century." . . . Thus, even though the Second Amendment's definition of "arms" is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.

*Id.* at 28 (citations omitted).

**Addm. 10**

The court then applied that framework to the New York statute at issue, concluding that the "proper cause" requirement was unconstitutional. *Id.* at 70. Specifically, it decided that the statute "violate[d] the Fourteenth Amendment in that it prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 71.

Justice Alito, in a concurring opinion, stated that the majority did not "decide anything about the kinds of weapons that people may possess," and noted that *Heller* and *McDonald* retain their significance. *Id.* at 72 (Alito, J., concurring). Similarly, Justice Kavanaugh, also concurring and joined by Chief Justice Roberts, reiterated that the opinion did not disturb the conclusions of *Heller* and *McDonald* that certain firearm regulations—including those prohibitions on carrying dangerous and unusual weapons—were permissible. *See id.* at 80-81 (Kavanaugh, J., concurring).[6]

## B.   The Analytic Framework

The present case involves a challenge to restrictions on particular types of weapons and magazines. Again, the basic analytical framework is set forth in *Bruen*: first, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct"; and second, if the presumption applies, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 17. While there are many aspects of that framework that are unresolved, it is useful to begin by identifying several guideposts that have been clearly established by the Supreme Court.

---

[6] After *Heller* and *McDonald*, the First Circuit, along with nearly every other circuit court, had adopted a two-step interest-balancing framework for analyzing Second Amendment challenges. *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019). As noted, *Bruen* explicitly rejected that two-step framework. 597 U.S. at 19. In doing so, it cited *Worman* as one of the cases that improperly applied that test. *Id.* at 19 n.4.

Accordingly, while the First Circuit itself has not abrogated *Worman*, it is clear that the central holding, including the adoption of the two-step framework, is no longer good law. Nonetheless, to the extent that *Worman* contains analysis that is not inconsistent with *Bruen*, it may be considered as persuasive.

### 1.  <u>Basic Principles</u>

First, "individual self-defense is the *central component* of the Second Amendment right." *Bruen*, 597 U.S. at 29 (quoting *Heller*, 554 U.S. at 599).

Second, the regulation of certain types of weapons is permissible.  *See Heller*, 554 U.S. at 623 ("*Miller* stands . . . for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons.").  Some firearms may be regulated either (1) because they are not in "common use"—that is, not "typically possessed by law-abiding citizens for lawful purposes," like self-defense—and therefore fall outside the scope of the Second Amendment, or (2) because they are historically subject to regulation, such as "dangerous and unusual" weapons.  *Heller*, 554 U.S. at 625-28.  *Heller* made that clear, and nothing in *McDonald, Caetano*, or *Bruen* altered, or even cast doubt on, that basic proposition.  *See, e.g.*, *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627) (reiterating that there are historical analogues for regulating "dangerous and unusual" weapons).

Third, the protection of the Second Amendment is not limited to arms that existed at the time of the founding.  *Bruen*, 597 U.S. at 28; *Heller*, 554 U.S. at 582; *Caetano*, 577 U.S. at 412.

Fourth, the protection of the Second Amendment is not limited to arms that are useful for military purposes.  *Heller*, 554 U.S. at 589; *Caetano*, 577 U.S. at 412.

Fifth, handguns are the "quintessential self-defense weapon."  *Heller*, 554 U.S. at 629.  It seems likely, therefore, that legislatures have some greater degree of latitude when regulating firearms that are not handguns.

Sixth, it appears to be clear—although the Supreme Court has not directly addressed the issue in its recent cases—that the Second Amendment does not protect either short-barreled

**Addm. 12**

shotguns or machine guns. *See Heller*, 554 U.S. at 622-24 (discussing *Miller*).[7] Those firearms are therefore examples of the types of weapons that can be prohibited without violating the Second Amendment.

    With those principles as a starting point, the Court will turn to two unresolved issues concerning the analytical framework.

       2.     **"In Common Use"**

    Both *Heller* and *Bruen* stated, in multiple contexts, that the Second Amendment applies to firearms that are "in common use." *See, e.g.*, *Heller*, 554 U.S. at 627 ("*Miller* said, as we have explained, that the sorts of weapons protected were those 'in common use at the time.' We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"); *Bruen*, 597 U.S. at 32 ("Nor does any party dispute that handguns are weapons 'in common use' today for self-defense."). That has led to considerable confusion among courts and commentators over the meaning and application of the phrase "in common use" and the interplay between the phrases "in common use" and "dangerous and unusual" weapons.[8]

    Plaintiffs contend that if a weapon is popular—that is, if thousands or even millions of copies of that weapon have been sold—then, by definition, it is "in common use" and is protected by the Second Amendment. Put simply, in their view, if a firearm is currently in

---

[7] The discussion in *Heller* concerning the *Miller* case contained no suggestion or hint that the regulation of short-barreled shotguns or machine guns might be constitutionally infirm. As to short-barreled shotguns, the court simply accepted the validity of the holding in *Miller*. *See Heller*, 554 U.S. at 625 ("We . . . read *Miller* to say . . . that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns."). As to machine guns, the court went even further; it said that it "would be a startling reading of [*Miller*]" to conclude that only military weapons were protected, "since it would mean that the National Firearms Act's restrictions on machineguns . . . might be unconstitutional." *Id.* at 624.

[8] The First Circuit noted this difficulty in *Worman*, but simply assumed that the proscribed weapons fell "somewhere within the compass of the Second Amendment" before proceeding to examine the Act under the intermediate scrutiny standard, employing the now-defunct interest-balancing approach. 922 F.3d at 35-36.

**Addm. 13**

"common use," its sale and possession are protected and no further analysis is required.

Whatever the meaning of "common use," that contention cannot be correct. Such a rule would lead to a host of absurd results. Among other things, the constitutionality of the regulation of different firearms would ebb and flow with their sales receipts. Weapons that unquestionably would have been considered within the ambit of the Second Amendment at the time of ratification (such as a smooth-bore, muzzle-loading musket) would lose their protection because of their relative rarity today. Conversely, an entirely novel weapon that achieved rapid popularity could be rendered beyond the reach of regulation if innovation and sales outstripped legislation. *See Kolbe v. Hogan*, 849 F.3d 114, 141 (4th Cir. 2017) (under the "popularity" approach, any "new weapon would need only be flooded on the market prior to any governmental prohibition in order to ensure it constitutional protection").

Moreover, the constitutional analysis would be trapped in an infinite circularity: a weapon may be banned because it is not in common use, and it is not in common use because it is banned. *See Worman*, 922 F.3d at 35 n.5 (citing *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) (acknowledging that assessing the constitutionality of firearms legislation based on "how common a weapon is at the time of litigation would be circular")).

Finally, that proposed application of a "common use" standard would effectively ignore an important underpinning of *Bruen*: that the meaning of the Second Amendment should be grounded in text, history, and tradition, not shifting modern attitudes, and that its protection should be categorical. *See Bruen*, 597 U.S. at 79 (Kavanaugh, J., concurring).

In any event, there are at least two possible approaches to considering the issue of "common use." One approach—which is perhaps the most in keeping with the language and reasoning of *Heller* and *Bruen*—is to ask first whether the firearm is the *general* type of weapon

that is in common use by ordinary citizens for lawful purposes such as self-defense.  If the answer is yes, the Second Amendment presumptively applies.  However, certain *specific* types of such weapons may still be subject to regulation if they are "dangerous and unusual," consistent with text, history, and tradition.  Put another way, the first step (that is, what is presumptively protected by the Second Amendment) addresses broad categories, and the second step (that is, what may be regulated) applies to specific types of weapons (or, in appropriate cases, specific persons who cannot possess weapons or specific places where weapons cannot be carried).

Under that framework, handguns, rifles, and shotguns are the general types of firearms that are in common use by ordinary citizens for lawful purposes.  Machine guns are not.  Nor, for that matter, are mortars, rocket launchers, or shoulder-fired missile systems.  Even so, some types of handguns, rifles, or shotguns might be subject to government regulation if that restriction is consistent with the historical tradition of governing "dangerous and unusual" weapons.  Thus, for example, while shotguns as a general class of firearms might warrant presumptive protection, *short-barreled* shotguns are "dangerous and unusual," and therefore may be regulated.  *See Heller*, 554 U.S. at 625.

Alternatively, because the terms "common use" and "unusual" are essentially opposites, it is possible that the analysis may involve only a single question:  whether the challenged regulation comports with the tradition of regulating "dangerous and unusual" weapons.

Under either approach, the result here is the same.  Both sides agree that the weapons at issue are presumptively protected by the Second Amendment, therefore the Court does not need to resolve the meaning of "in common use."  The question thus becomes whether "the regulation is consistent with this Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 17.

15

**Addm. 15**

3. **"Dangerous and Unusual"**

Although the Supreme Court has made clear that there is a historical tradition of regulating "dangerous and unusual weapons," it has not yet had occasion to address the contours of that principle.[9]

At minimum, however, it seems evident that the "dangerous and unusual" exception must be considered not only in light of history and tradition, but also the fundamental purpose of the Second Amendment—that is, protecting the right to "armed self-defense." *See Bruen*, 597 U.S. at 29 ("whether modern and historical regulations impose a comparable burden *on the right of armed self-defense* and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry" (quotation omitted) (emphasis added)). Indeed, if the meaning of the term "dangerous and unusual" is not considered in light of that purpose, it is difficult to give it any coherent analytic significance.

First, all firearms, by intention and design, are "dangerous." All are designed to kill or inflict serious injury. Accordingly, for the term "dangerous" to have any meaning at all, it must be refined in some way, or it will simply apply to every type of firearm. *See Caetano*, 577 U.S. at 418 (Alito, J., concurring) (noting that if the standard for defining "dangerous" included all weapons that were designed and constructed to produce death or great bodily harm, "virtually every covered arm would qualify as 'dangerous.'").

_____

[9] In *Heller*, the Supreme Court alluded to William Blackstone's statement that "[t]he offense of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land." 4 WILLIAM BLACKSTONE, COMMENTARIES *148-49 (emphasis added). Although the original note described "dangerous *or* unusual" weapons, the Supreme Court has expressly stated in *Heller* and *Bruen* that the relevant tradition is one of regulating "dangerous *and* unusual weapons." *See Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 47; *see also Caetano*, 577 U.S. at 417 (Alito, J., concurring) ("[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual."); *Delaware State Sportsmen's Ass'n, v. Delaware Dep't of Safety & Homeland Sec.*, 2023 WL 2655150, at *7 (D. Del. Mar. 27, 2023).

Furthermore, because all firearms are "dangerous," all firearms are potentially useful for self-defense. Again, unless the term applies to every firearm, there must be a feature of a weapon that makes it *unreasonably* dangerous for self-defense and other lawful purposes. A light machine gun, for example, can fire many hundreds of rounds per minute, which is a useful characteristic on a battlefield. But a private home bristling with machine guns at every corner—although it might be considered well-defended—obviously poses a danger to others that goes far beyond the reasonable requirements of self-defense.[10]

Finally, and as discussed, it would add nothing to the analytic framework if an "unusual" weapon were simply deemed to be one not "in common use." Assuming the term "unusual" has an independent meaning, it must likewise derive at least in part from the essential purpose of the Second Amendment.

The language of *Heller* is instructive. There, the court stated that "the American people have considered the handgun to be the quintessential self-defense weapon," and outlined several reasons why:

> [It is] easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; [and] it can be pointed at a burglar with one hand while the other hand dials the police.

554 U.S. at 629. If a handgun has features that make it *more* suitable for self-defense, it follows that other firearms may have features—including not only capabilities, but also size, length, and weight—that make them *less* suitable for that purpose. Thus, for example, while a machine gun certainly could have self-defense uses, it would be a highly unusual weapon to carry on a city sidewalk or to keep at a bedside in case of an intruder, even if it were legal to possess one.

---

[10] Again, it seems clear that machine guns are not protected by the Second Amendment. *See Heller*, 554 U.S. at 624-26.

In short, the tradition that permits the regulation of "dangerous and unusual" weapons must be interpreted in light of the essential purpose of the Second Amendment. For a weapon to fit within that exception, and therefore be subject to regulation, a weapon must be *unreasonably* dangerous and unusual for ordinary citizens to use for lawful purposes, particularly self-defense.

With that prelude, the Court will turn to the constitutionality of the Act at issue here.

### C.  **The Challenged Statute – the Prohibited Firearms**

The first set of issues concerns the prohibition on certain types of assault weapons.

#### 1.  **The Nature of the Restriction**

The Act prohibits two classes of weapons:  nineteen specific models (or their duplicates), and any weapons using two or more prohibited features. Mass. Gen. Laws ch. 140, § 121. The prohibited weapons all use a semiautomatic action and include various types of rifles, shotguns, and pistols.

It is important to make clear what the Act does not do. Plaintiffs appear to conflate the Act's prohibition on specific assault weapons with a prohibition on all semiautomatic weapons as a class. (Pl. Reply at 3-4). That is incorrect. The Act does not prohibit weapons based on their semiautomatic function; it only bans *some* semiautomatic weapons, based either on their specific make and model, or through an enumerated list of features, not their firing mechanism.[11] Indeed, as then-Judge Kavanaugh noted in *Heller II*, it would be incoherent to prohibit a class of firearms based on their semiautomatic function when semiautomatic handguns are afforded constitutional protection. *See Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). Still, the fact that some semiautomatic weapons

---

[11] Plaintiffs appear to concede as much, as they state in their complaint that the Act applies only to "certain semi-automatic firearms." (Compl. ¶ 13). Similarly, and as discussed below, plaintiffs claim that a ban on large-capacity magazines is equivalent to a ban on all magazines, which is also clearly inaccurate. (*See* Section III.D.1).

**Addm. 18**

are entitled to a level of constitutional protection does not require the conclusion that all semiautomatic weapons must be entitled to the same. *See Worman*, 922 F.3d at 32 n.2 (discussing the circularity of characterizing the "assault weapons" as a class of arms).

Plaintiffs have focused almost exclusively on the Act's prohibition of a particular model of semiautomatic rifle—specifically, the Colt AR-15. This memorandum and order will accordingly follow suit.[12]

### 2.    Step One:  Whether the Conduct is Within the Scope of the Second Amendment

As discussed, the Court will assume, without deciding, that the weapons proscribed by the Act are bearable arms that fall "somewhere within the compass of the Second Amendment." *Worman*, 922 F.3d at 36.

### 3.    Step Two:  Whether the Regulation is Consistent with Historical Tradition

The next step is to determine whether the Act "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

#### a.    "Dramatic Technological Changes" and "Unprecedented Societal Concerns"

The initial question is the role of historical analogues in the analytic framework. The *Bruen* court directed that when "a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. However, where there have been "unprecedented societal concerns or dramatic technological changes," a "more nuanced

---

[12] If there are relevant differences between the AR-15 and any other prohibited weapons that require different treatment for purposes of addressing the constitutionality of the Act, plaintiffs have not called them to the attention of the Court.

**Addm. 19**

approach" may be required. *Id.* at 27. Under that approach, courts are directed to "[r]eason[] by analogy" to determine whether the modern regulation is "relevantly similar" to historical regulations. *Id.* at 29.

The parties disagree as to whether the advent of assault weapons constitutes a "dramatic technological change" for those purposes. *Bruen*, 597 U.S. at 27-29. Similarly, they disagree as to whether the modern increase in mass shootings is an "unprecedented societal concern." *Id.*

Plaintiffs contend that this is a straightforward case involving an outright ban on a class of weapons that (they claim) existed prior to the founding and were in common use by the time the Second Amendment was adopted. They contend that the first firearm able to fire more than ten rounds without reloading was invented in 1580, and that firearms capable of shooting 18 or 24 shots before reloading, such as the "pepperbox-style" pistol, were available before the ratification of the Fourteenth Amendment. (Pls. Mem. at 19). Repeating rifles, like the Winchester 66 and 73, could shoot more than 10 rounds from a cartridge and sold more than a million copies between 1873 and 1941. (*Id.*). According to plaintiffs, the apparent prevalence of such weapons means that there has been no dramatic technological change, and, along with a lack of laws restricting them at the time of the adoption of the Second or Fourteenth Amendments, is evidence that the Act is unconstitutional.

Defendant, on the other hand, contends that development of modern assault weapons marks a dramatic technological shift that, in turn, has created unprecedented social problems, particularly the risk of mass shootings. According to defendant's experts, guns during the colonial and founding eras were mainly muskets and fowling pieces that could fire single shots

and had to be manually reloaded. (Roth ¶ 15-16).[13] Firearms capable of firing more than ten rounds did technically exist, but they were "anything but common, ordinary, or found in general circulation." (Spitzer ¶¶ 38-53). It was not until after World War I that automatic and semiautomatic weapons became commercially available. (Spitzer ¶ 48; Roth ¶¶ 28, 31-33). Assault weapons, such as the AR-15, did not become popular with civilians until the present century. (Donahue ¶¶ 103-06; Roth ¶ 49; Busse ¶¶ 23-25).

Moreover, defendant contends that "[t]he spread of assault weapons . . . has created a modern phenomenon of mass shootings that would have been unimaginable to prior generations." (Def. Opp'n at 29). Homicide rates during the founding era were low, guns were not frequently used in homicides, and as a practical matter individuals could not go on killing sprees. (Roth ¶¶ 14-17, 41; Cornell ¶¶ 19-21). High-fatality homicide events committed by individuals only became possible after the development of assault weapons. (Spitzer ¶¶ 13-22; Roth ¶¶ 44-46). According to defendant, because modern-day assault weapons represent a dramatic shift from the technology that existed in the founding era, the absence of historical regulations banning such weapons is not determinative of the Act's constitutionality.

It seems clear—indeed beyond reasonable dispute—that there has been a "dramatic technological change" from a pepperbox-style pistol to a modern AR-15. The features of modern assault weapons—particularly the AR-15's radical increases in muzzle velocity, range, accuracy, and functionality—along with the types of injuries they can inflict are so different from colonial firearms that the two are not reasonably comparable. Even without considering the threats posed by mass shooting events, the Court is satisfied at this stage that defendant has met

---

[13] Unless otherwise noted, citations to defendant's experts and their exhibits refer to the affidavits attached to her opposition to plaintiffs' motion. (ECF No. 21).

**Addm. 21**

her burden of showing that there has been a "dramatic technological change" that, in turn, requires reasoning by analogy from the historical record. *See Bruen*, 597 U.S. at 27-29.

The next step is to determine whether there are "relevantly similar" historical precedents to the challenged regulation. *Id.*

### b.     <u>The Regulatory Tradition</u>

As discussed, the Supreme Court has already determined that there is a history and tradition of regulating "dangerous and unusual" weapons. That finding somewhat simplifies the task of considering appropriate historical analogues, because the existence of the categorical principle, if not its specific outline, has already been made clear.

Defendant points to "an established tradition throughout American history of targeting specific unusually dangerous weapons and accessories when they have contributed to rising homicide and other crime without a corresponding utility for self-defense." (Def. Opp'n at 31). Her experts have submitted evidence that from the founding era, states have regulated fighting knives, concealable pistols, Bowie knives, and multi-shot revolvers, all of which were widely used in unlawful behavior and contributed to rising crime rates. (Roth ¶¶ 26-28; Spitzer ¶¶ 50, 64-73; Rivas ¶¶ 20-28; *see also* Spitzer Ex. E, "Dangerous Weapons Laws"). Bowie knives, in particular, were "extensive and ubiquitous," and were subject to regulation by 49 states because of the dangers they posed to ordinary citizens. (Spitzer ¶¶ 71-73).

Regulation of automatic and semiautomatic weapons began to occur in the early 20th century, when their "uniquely destructive capabilities" became apparent as they found their way into civilian life. (Spitzer ¶¶ 16-30; Roth ¶ 47; *see also* Spitzer Ex. D, "Machine Gun and Semi-Automatic Firearms Laws").

Plaintiffs contest some of the proffered analogues.[14]  But their effort to distinguish the proffered analogues from the Act is, in substance, the same argument they make throughout: that restrictions on "dangerous and unusual weapons" cannot apply to the proscribed firearms because they are "in common use" today.[15]

In any event, although certain regulations offered by defendant may be closer to the Act than others, she need only identify "a well-established and representative historical analogue, not a historical *twin*."  *Bruen*, 597 U.S. at 30.  The relevant history affirms the principle that in 1791, as now, there was a tradition of regulating "dangerous and unusual" weapons—specifically, those that are not reasonably necessary for self-defense.

Furthermore, it is surely true that where technological changes have been extreme, precise historical analogues become less useful except at a high (or categorical) level.  Here, there is a recognized categorical principle—the "dangerous and unusual" exception.  The Court must bear in mind that the purpose of the exercise is not to perform a technical comparison for its own sake, but to determine whether the challenged regulation comports with the fundamental purpose of the Second Amendment—that is, protecting the right to "armed self-defense."  *See Bruen*, 597 U.S. at 29 ("whether modern and historical regulations impose a comparable burden *on the right of armed self-defense* and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry" (quotation omitted) (emphasis added)).

---

[14] For example, defendant points to a series of laws regulating the proper storage of gunpowder in the late-18th century.  (Def. Opp'n 31-32).  Plaintiffs respond that the Supreme Court in *Heller*, in response to the dissent's invocation of the same historical laws, noted that they "do not remotely burden the right of self-defense as much as an absolute ban on handguns."  *Heller*, 554 U.S. at 632.  Clearly, however, the Act is not an absolute ban on any class of weapons, let alone a "quintessential" self-defense weapon.

[15] Plaintiffs also contend that some of the historical statutes prohibited public or concealed carry, rather than possession, and are therefore inapplicable.  That distinction is irrelevant when considering the types of weapons being regulated, rather than the manner they are carried.

Here, the historical tradition of regulating "dangerous and unusual" weapons is "relevantly similar" to the Act because both the historical analogues and the Act pose a similar burden on the right to bear arms and are comparably justified. *See Bruen*, 597 U.S. at 29.

First, both the proffered analogues and the Act impose a minimal burden on the right of self-defense. Both narrowly target a specific group of dangerous weapons rather than an entire class. As set forth in greater detail below, the proscribed weapons are not reasonably suitable for self-defense under normal circumstances, nor are they normally used for that purpose. *See Worman*, 922 F.3d at 37; *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 260 (2d Cir. 2015) (assault weapons ban was "substantially less burdensome" than complete handgun ban because it regulated only "a limited subset of semiautomatic firearms"); *Heller II*, 670 F.3d at 1262 (assault weapons ban "d[id] not effectively disarm individuals or substantially affect their ability to defend themselves"); *Kolbe*, 849 F.3d at 138 (same); *Assoc. of New Jersey Rifle & Pistol Clubs (ANJRPC) v. Attorney Gen. of New Jersey*, 910 F.3d 106, 117-18 (3d Cir. 2018) (same).[16] Ordinary citizens remain free, in both cases, to possess weapons for self-defense that are reasonably suited for that purpose—most notably, handguns (the "quintessential" weapon of self-defense). *See Worman*, 922 F.3d at 37.

Second, the Act and its historical analogues are "comparably justified" as efforts to respond to threats to public safety. While the historical weapons at issue were less lethal than modern-day assault weapons, both historical and modern regulations addressing dangerous and unusual weapons were adopted in response to rising crime, public violence, and disorder. Unlike

---

[16] The cited cases, which predate *Bruen*, analyzed the burden imposed by the challenged regulations on the Second Amendment right to determine what level of scrutiny applied. While *Bruen* made clear that means-end scrutiny is not appropriate in Second Amendment cases, it also directed that courts compare the burden imposed by relevant historical analogues to that imposed by modern regulations. Therefore, the Court considers these cases to be persuasive authority on the subject of how to assess that comparative burden.

**Addm. 24**

handguns, assault weapons are uniquely dangerous to law enforcement because their features allow shooters to engage targets from far greater distances, to do so more accurately, and to penetrate body armor.  (Donohue ¶ 44; Yurgealitis ¶ 92).  As a result, assault weapons are disproportionately used to kill police officers.  (Donohue ¶ 44).  And, as set forth below, they pose a unique danger to the public, among other reasons due to their destructive power.  Those concerns—the protection of law enforcement and the public—have animated the states to pass regulations on dangerous weapons throughout the nation's history.

In short, the Act and the analogous historical regulations impose comparable burdens on the right to armed self-defense, and those burdens are comparably justified.[17]

### c.     **"Dangerous and Unusual"**

The final question is whether the proscribed arms qualify as "dangerous and unusual" within the context of that historical tradition—that is, whether they are unreasonably dangerous and unusual for ordinary citizens to use for lawful purposes, particularly self-defense.

To begin, there can be little serious question that assault weapons, such as the AR-15, have characteristics that give them capabilities far beyond those of a typical handgun.  *See Worman*, 922 F.3d at 37 (considering that question under the Act and noting that "wielding the proscribed weapons for self-defense within the home is tantamount to using a sledgehammer to crack open the shell of a peanut").  For example, the AR-15 has substantially greater range and muzzle velocity than a 9mm handgun.  (Roth ¶¶ 49-50).  Assault rifles were developed for modern military combat, not self-defense.  (*Id.* ¶¶ 49, 92-95).  Indeed, the AR-15 is functionally identical to its military counterparts, the M16 and its carbine version, the M4, which have the

---

[17] Other district courts have reached similar conclusions when faced with the same task of identifying historical analogues to modern assault-weapons regulations.  *See Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, at *9-13; *Bevis v. City of Naperville*, 2023 WL 2077392, at *10-16 (N.D. Ill. Feb. 17, 2023); *Grant v. Lamont*, 2023 WL 5533522, at *6-8 (D. Conn. Aug. 28, 2023).

**Addm. 25**

same basic structure, operation, near-equivalent muzzle velocities (3300 feet per second), and rates of effective fire (45 rounds per minute).  (*Id.* ¶¶ 49, 85).

The primary difference between the AR-15 and the M16/M4 is that the latter originally had a fully automatic function.  That is a feature that the U.S. Marine Corps discarded in favor of a maximum setting of a three-round burst—a decision made to *enhance* lethality by slowing the rate of fire, conserving ammunition, and improving accuracy.  (*Id.* ¶ 49).  The U.S. Army Manual on Advanced Rifle Marksmanship for the M16/M4 series weapons likewise notes that "[a]utomatic or burst fire is inherently less accurate than semiautomatic fire."  (Gohlke Ex. 10).

In short, the AR-15 is a weapon with the same basic characteristics, functionality, capabilities, and potential for injury as the standard-issue rifle for infantry troops.  It can be fired in the same way that military forces recommend that it be used for maximum effectiveness.  Without question, it is a "weapon[] . . . most useful in military service" rather than in self-defense.  *Heller*, 554 U.S. at 627; *see also Kolbe*, 849 F.3d at 135 (determining that because the banned assault weapons were "like M-16 rifles . . . they are among those arms that the Second Amendment does not shield").

Of course, the fact that the AR-15 was developed as a military weapon does not alone render it "dangerous and unusual."  *Heller*, 554 U.S. at 624-25.  Rather, it is the fact that the design and features of an AR-15, compared to a typical handgun, makes it an unreasonably dangerous and unusual weapon for ordinary self-defense purposes.

First, the intrinsic characteristics of assault weapons make them poor self-defense weapons.  AR-15s are physically unsuited to typical self-defense scenarios.  They are significantly heavier and longer than typical handguns, making them less concealable, more difficult to use, and less readily accessible, particularly for an inexperienced user.  (*See*

Yurgealitis ¶ 82-91 (discussing several disadvantages of assault weapons in a self-defense

context)).  They are not generally useful or appropriate weapons for ordinary citizens to keep at

their bedsides, or to carry on city streets as they go about their daily business.

The firepower of an AR-15 also contributes to making it generally unsuitable for self-

defense.  The muzzle velocity of rounds fired by an AR-15 is 3200-3300 feet per second, nearly

double that of an ordinary 9mm handgun.  (Yurgealitis ¶ 83; Roth ¶ 49).  That muzzle velocity

means that its fired rounds can cause more damage due to their higher speed.  (Gohlke Ex. 24

at 855-56).  They pose a serious risk of "over-penetration"—that is, passing through their

intended target and impacting a point beyond it.  Rounds from an AR-15 can pass through most

construction materials, even at ranges of 350 yards.  (Yurgealitis ¶¶ 83-84).  The danger of over-

penetration increases the risk, even if the weapons are employed properly, to bystanders, family

members, or other innocent persons well outside the intended target area.  (*Id.* ¶ 84; Donohue

¶ 155); *see also Worman*, 922 F.3d at 37 (noting that assault weapons "can fire through walls,

risking the lives of those in nearby apartments or on the street").

Although most center-fire rifles have muzzle velocities that are at least comparable to the

AR-15 (although typically lower), AR-15s pair that high muzzle velocity with a comparatively

low level of kinetic energy per round due to its relatively small bullet.  (Gohlke Ex. 25).  Indeed,

a round fired from an AR-15 distributes less than half of the kinetic energy of one fired from a

hunting rifle.  (*Id.*).  In other weapons, the higher kinetic energy is distributed, in part, to the

shooter as recoil, which necessarily disrupts follow-on shots.  (*Id.*; Gohlke Ex. 24 at 864).  In an

AR-15, however, the lower kinetic energy means that rounds fired with a high muzzle velocity

can also be fired in rapid succession on a precise target, even while standing or moving, because

a shooter's position is relatively unaffected by the recoil of each shot.  (Gohlke Ex. 24 at 865 and

Ex. 25).  Less recoil translates into "more rounds on target," and thus greater lethality.  (Gohlke

Ex. 24 at 865).  That combination of high muzzle velocity and low kinetic energy contributes to

making the AR-15 uniquely dangerous.

Beyond their intrinsic characteristics, the injuries inflicted by assault weapons can be

catastrophic, again far surpassing the destructive power of typical semiautomatic handguns.  *See*

*Worman*, 922 F.3d at 39-40 (listing accounts of injuries caused by assault weapons); Gohlke Exs.

19-22 (containing articles written by doctors recounting their experiences treating victims shot

by assault weapons).  The ballistic effects of high-velocity rounds on a human body are severe.

(Gohlke Exs. 23-24).  Unlike lower-velocity rounds, bullets from assault rifles create

"cavitation" in the penetrated tissues, inflicting catastrophic bleeding, breaking bones, and

causing irreversible tissue damage.  (Gohlke Ex. 23).  "For example, a typical 9mm wound to the

liver will produce a pathway of tissue destruction in the order of [one inch] to [two inches].  In

comparison, an AR 15 will literally pulverize the liver, perhaps best described as dropping a

watermelon onto concrete."  (Gohlke Ex. 25).  These injuries—inflicted with precision from

hundreds of yards away—go far beyond the reasonable requirements of self-defense.[18]

Plaintiffs do not seriously challenge the proposition that AR-15s are not useful for

ordinary self-defense purposes.  Their only responses are to reiterate that the banned weapons are

in "common use" within the United States; that the "common use" determination should be

based on sales numbers; and to argue that there are potentially some self-defense applications for

the proscribed weapons.  Again, as to the first two objections, it is insufficient that a weapon

merely be "common" for regulation to be impermissible.  As to the third, while it may be true

---

[18] To be clear, the issue is not whether there is a single particular characteristic of the proscribed weapons that renders them "dangerous and unusual," but their features considered in combination.

that an AR-15 *could* be useful in *some* self-defense scenarios, so too could an open-bolt machine gun or an automatic grenade launcher, or indeed any firearm of any size, shape, or description. The mere *possibility* that a firearm could be used for self-defense therefore has no real significance in the constitutional analysis.

In short, the weapons proscribed by the Act are not suitable for ordinary self-defense purposes, and pose substantial dangers far beyond those inherent in the design of ordinary firearms. Under the circumstances, the weapons qualify as "dangerous and unusual" within the meaning of the analytical framework of the Second Amendment.

### d.   Conclusion

For the foregoing reasons, the Court finds that the prohibitions on certain assault weapons in the Act comports with the nation's historical tradition of weapons regulation. The banned weapons are "dangerous," because they are unreasonably dangerous for ordinary purposes of self-defense due to their extreme lethality and high potential for collateral harm, and they are "unusual," because it would be unusual for an ordinary citizen to carry such a weapon on his person on the street for self-defense, or to use it in the home to confront invaders or to protect against personal violence. Plaintiffs have therefore failed to establish a likelihood of success on the merits of their Second Amendment claim as to the proscribed firearms.

### D.   The Challenged Statute – the Prohibited Magazines

The second set of issues concerns the prohibition on large-capacity magazines ("LCMs").

### 1.   The Nature of the Restriction

Along with the ban on assault weapons, the Act also prohibits the sale, transfer, or possession of any "large capacity feeding device," which is defined as "a fixed or detachable magazine, box, drum, feed strip or similar device capable of accepting, or that can be readily converted to accept, more than ten rounds of ammunition or more than five shotgun shells."

Mass. Gen. L. ch. 140 §§ 121, 131M.  That ten-round limit applies to all magazines, including those used in semiautomatic handguns.  The Act does not prohibit the use of magazines capable of holding fewer than ten rounds.

### 2.   Step One:  Whether the Conduct Is Within the Scope of the Second Amendment

The first step in the constitutional analysis is to determine whether LCMs are "arms" within the meaning of the Second Amendment.[19]  An object may be a bearable "arm" within the textual meaning of the amendment if it is a "[w]eapon[] of offence, or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."  *Heller*, 554 U.S. at 581 (citations omitted).

### a.   Whether Magazines Are "Arms"

No magazine, regardless of capacity, is itself an "arm" within the plain meaning of that term.  A magazine is a mechanical device that enables the functioning of a semiautomatic weapon by feeding a round into the weapon's chamber after each preceding round is fired. (Busse ¶ 14).  It has no use independent of its attachment to a firearm.  *See Ocean State Tactical v. Rhode Island*, 646 F. Supp. 3d 368, 387 (D.R.I. Dec. 14, 2022).

The historical record likewise suggests that a magazine is not an "arm."  According to defendant's expert, there was a clear distinction between "arms" and "accoutrements" during the founding and reconstruction eras.  (Baron ¶ 30).  The term "arms" referred generally to weapons, while "accoutrements" referred to accessories such as ammunition, ammunition containers, flints, scabbards, holsters, armor, and shields.  (*Id.* ¶ 9, 31-32).  The closest founding-era

---

[19] The issue of whether LCMs are "arms" was raised by *amici* in *Worman*, and for that reason the court "assumed without deciding" that LCMs were "arms" for Second Amendment purposes.  *Worman*, 922 F.3d at 33 n.3, 30; *see also New York State Rifle & Pistol Ass'n*, 804 F.3d at 263 n.127.

**Addm. 30**

analogues to modern-day magazines were "cartridge boxes" or "cartouch boxes," which were almost always mentioned in lists of accoutrements and not known as weapons.  (*Id.* ¶ 32-34).  Based on that evidence, magazines would not fall within the founding-era definition of a bearable "arm."  *See Ocean State Tactical*, 646 F. Supp. 3d at 386-87 ("LCMs, like other accessories to weapons, are not used in a way that 'cast[s] at or strike[s] another.'" (quoting *Heller*, 554 U.S. at 582)); *Duncan v. Bonta*, 19 F.4th 1087, 1104-05 (9th Cir. 2021) (en banc) ("On its own, a magazine is practically harmless and poses no threat to life or limb").  Plaintiffs do not offer a competing historical narrative.

Under the circumstances, it seems clear that LCMs are not "arms" within the textual meaning of the Second Amendment.  *See Oregon Firearms Fed'n v. Brown*, 644 F. Supp. 3d 782, 798-802 (D. Or. 2022); *Ocean State Tactical*, 646 F. Supp. 3d at 384-88.  But even if they are not, that does not end the inquiry.  A firearm by itself is useless; it can only function with certain additional external components or accessories, most notably ammunition.  That raises the issue of how the Second Amendment applies to those items.

> **b.**     **Firearm Components and Accessories**

There is no question that because some kinds of firearms are constitutionally protected, the components and accessories of protected firearms that are integral to their function must also be protected.

Ammunition is the most obvious example.  *See, e.g.*, *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("A regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose."); *Miller*, 307 U.S. at 180 ("The possession of arms also implied the possession of ammunition, and the authorities paid quite as much attention to the latter as to the former."); *cf. Heller*, 554 U.S. at 630 (invalidating a regulation that required firearms be "rendered and kept

inoperable at all times" in the home because it "ma[de] it impossible for citizens to use them for the core lawful purpose of self-defense.").

On the other hand, some accessories, such as silencers, do not affect the essential operation of a weapon and so do not fall within the scope of the Second Amendment's protection. *See United States v. Hasson*, 2019 WL 4573424, at *4-5 (D. Md. Sept. 20, 2019), *aff'd*, 26 F.4th 610 (4th Cir. 2022); *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("A silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence').").

Magazines occupy something of a middle ground. For a semiautomatic weapon to function as designed, ammunition must generally be fed into it by a magazine. (Busse ¶ 14). In that sense, a magazine is an essential part of the weapon, and some courts have therefore determined that the Second Amendment's protections extend to them. *See Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) ("[T]o the extent that certain firearms capable of use with a magazine . . . are commonly possessed by law-abiding citizens for lawful purposes, our case law supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines necessary to render those firearms operable."); *ANJRPC*, 910 F.3d at 116 ("Because magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment."); *Duncan v. Becerra*, 970 F.3d 1133, 1146 (9th Cir. 2020) ("Without a magazine, many weapons would be useless, including 'quintessential' self-defense weapons like the handgun."); *Hanson v. District of Columbia*, 2023 WL 3019777, at *7 (D.D.C. Apr. 20, 2023).

But while magazines as a general class might be owed constitutional protection, LCMs as a specific subset of that class are never necessary for a firearm to function. *See Oregon Firearms Fed'n v. Kotek Oregon All. for Gun Safety*, 2023 WL 4541027, at *26 (D. Or. July 14, 2023). As

defendant points out, and plaintiffs do not contest, any semiautomatic weapon using a detachable magazine can accept one that holds ten rounds or fewer. (*See* Busse ¶ 14; Yurgealitis ¶ 61).

It seems clear, then, that a total ban on magazines would almost surely fall afoul of the Second Amendment. But it is entirely unclear why that principle—that *some* magazines should be accorded constitutional protection—requires protection of *all* magazines, regardless of capacity. If there is a reason why that should be so, plaintiffs have not supplied it.

On balance, the Court is persuaded that plaintiffs have not demonstrated that all magazines, regardless of capacity, fall within the protection of the Second Amendment. It is uncertain what precise analytic framework should be employed to consider the issue of the constitutionality of *limits* on magazine capacity. Without more specific guidance from the Supreme Court or the First Circuit, the Court will consider, as it would with a restriction on a weapon, whether the Act's prohibition of LCMs aligns with the nation's historical tradition.

### 3.   Step Two:  Whether the Regulation Is Consistent with Historical Tradition

#### a.   "Dramatic Technological Changes" and "Unprecedented Societal Concerns"

The parties dispute whether the advent of LCMs represents a "dramatic technological change" and whether the modern increase in mass shootings is an "unprecedented societal concern." *Bruen*, 597 U.S. at 27. Plaintiffs assert that magazines with the capacity for more than ten rounds "have been available for centuries," but they offer no historical support for that conclusion. (Def. Mot. at 21). They also contend that "multi-shot firearms" have existed since the time of the founding, pointing to weapons such as the pepperbox-style pistol and—leaping to 1866—the Winchester 66, a cartridge-fed repeating rifle. (*Id.* at 19).

As a technological matter, plaintiffs' examples are inapposite. None of the "multi-shot" weapons they allude to were semiautomatic; that capability was not developed until the late 19th

33

**Addm. 33**

century.  The pepperbox-style pistol, for example, could fire multiple shots only because it included several bundled individual barrels, not because it was fed ammunition from any magazine.  (Spitzer ¶ 45).  Similarly, the Winchester Repeaters were lever-action rifles, which had to be manually reloaded after each shot, rather than automatically fed by a magazine.  (Spitzer ¶ 48; Vorenberg ¶ 21).  Neither of those technologies is analogous to the modern semiautomatic action, which loads automatically from a magazine every time a shot is fired.[20]  LCMs therefore represent a dramatic change in firearm technology.

Defendant has also presented evidence that mass shootings are an "unprecedented societal concern," and that LCMs play a pivotal role in those events because they allow perpetrators to fire more rounds before pausing to reload—an interval that might allow victims to escape and law enforcement or others to intervene.  *See Worman*, 922 F.3d at 39 (citing *Heller II*, 670 F.3d at 1264) (discussing the use of LCMs in mass shootings).

There were, of course, homicides in 1791.  No doubt, some portion of those homicides were perpetrated by people using firearms.  But there is no evidence that there were *any* single-event, single-perpetrator mass homicides, much less homicides of that nature on a regular basis.  Again, while the Court need not reach the issue of whether such homicides are an "unprecedented societal concern," the truth of that proposition nonetheless seems obvious.

In any event, because defendant has met her burden of showing that there has been a "dramatic technological change," the Court may reason by analogy to evaluate historical analogues to the Act.

---

[20] Automatic weapons will continue to fire as long as the trigger is depressed, while a semiautomatic weapon will fire a single shot for every press of the trigger.  Both types of weapons *load* automatically because of their design.

**Addm. 34**

b.    **The Regulatory Tradition**

To a substantial extent, the same regulatory history that applies to assault weapons also applies to LCMs, given that LCMs are not arms themselves but are a component of such weapons.  However, defendant has also submitted evidence of other analogues that bear discussion.

Gunpowder, for example, was regulated extensively very early in the nation's history, despite being essential to the function of early firearms.  (Cornell ¶¶ 29-30).  A 1783 Massachusetts law forbade any person to "take into any Dwelling-House, Stable, Barn, Outhouse, Warehouse, Store, Shop, or other Building, within the Town of Boston, any . . . Fire-Arm, loaded with, or having Gun-Powder," and permitted the seizure of any loaded firearm that "shall be found" there.  1782 Mass. Acts 119, ch. 46 (Gohlke Ex. 12).

Defendant also cites to regulations passed in the early 20th century that addressed magazine capacities or limits on the number of rounds a weapon could fire before reloading.  (Spitzer ¶¶ 24-31).  Twenty-three states passed such laws between 1917 and 1934.  (Spitzer Table 1).  Massachusetts, for example, passed a law that prohibited any firearm that reloaded automatically after a single shot.  1927 Mass. Acts 413, 416 (Spitzer Ex. D at 13) (designating such weapons as "machine guns").

Plaintiffs contest the consideration of this more modern history on the ground that it does not offer any insight into the meaning of the Second Amendment in either 1791 or 1868.  While there is an "ongoing scholarly debate" over precisely which era should inform the historical analysis, the Court need not reach that issue here.  *Bruen*, 597 U.S. at 37.  None of the statutes offered by defendant "contradicts earlier evidence."  *Id.* at 66.  And while it would be unreasonable to expect identical laws to have existed before LCMs were even invented, the more modern laws did not conflict with any existing laws at the time they were passed.  *Id.*

35

**Addm. 35**

Thus, for example, machine guns did not exist until the late 19th century, at which point laws were passed to regulate them. While there was, understandably, a lack of machine gun regulation prior to their invention, that absence did not "contradict" the new laws, and thus had no impact on the government's ability to regulate machine guns. *See Heller*, 554 U.S. at 624.

Furthermore, defendant's offered historical regulations are "relevantly similar" to the Act because they pose a similar burden and are comparably justified. *See Bruen*, 597 U.S. at 29.

First, the Act poses a minimal burden on self-defense. It does not prohibit all magazines, only those that can hold more than ten rounds. Again, any semiautomatic weapon using a detachable magazine can accept one that holds ten rounds or fewer. And there is no restriction on the number of magazines that an individual may own or carry.

If there is a reason why an eleven-round magazine, rather than a ten-round magazine, is reasonably necessary for purposes of self-defense, it is not apparent from the record. Ordinary citizens undertaking lawful activities do not typically engage in extended firefights. To the contrary, defendant has provided substantial evidence that, in typical self-defense scenarios, a defender will only fire two or three shots. (Allen ¶¶ 10, 18). To the extent that the ten-round limit burdens the use of a semiautomatic firearm at all, it is because a brief pause to reload a new magazine would be required before the next round can be fired. Indeed, plaintiffs have not pointed to a single case where the ability to fire more than ten rounds without reloading has been essential to self-defense.

Plaintiffs again simply fall back on their assertion that magazines capable of holding more than ten rounds are "in common use," and therefore deserve protection. They have not, however, provided any evidence at this stage that a magazine that can hold more than ten rounds is necessary, useful, or even desirable for self-defense purposes. Based on the record, therefore,

**Addm. 36**

the burden of the Act on the reasonable requirements of ordinary citizens for self-defense is minimal at best.

Second, the prohibition on LCMs is comparably justified to respond to threats to public safety, particularly mass shootings.   In mass shooting events, the average number of shots fired is upward of 99 rounds. (Allen ¶ 38).  Out of 115 such events, where the type of magazine was known, 73 involved the use of an LCM.  (Allen ¶ 35).  In the same dataset, there was an average of 25 casualties when an LCM was involved, versus 9 without one.  (*Id.*).  That data supports the government's proffered reasoning that the regulation of LCMs is justified based on their role in these incidents.

In short, and in simple terms, the limit on magazine capacity imposes virtually no burden on self-defense, and is comparably justified to historical regulations.

### c.   <u>Conclusion</u>

In summary, the Court finds that the prohibition on LCMs in the Act comports with the nation's historical tradition of weapons regulations.  Even if they may be considered "arms" within the meaning of the Second Amendment, the historical record demonstrates that the Act's restrictions pose a minimal burden on the right to self-defense and are comparably justified to historical regulation.  Plaintiffs have therefore failed to establish a likelihood of success on the merits of their Second Amendment claim as to the prohibited magazines.

## IV.   <u>Other Requirements for Preliminary Relief</u>

When a plaintiff fails to meet his burden to show a likelihood of success on the merits, "failure to do so is itself preclusive of the requested relief."  *Bayley's Campground Inc. v. Mills*, 985 F.3d 153, 158 (1st Cir. 2021).  The Court, therefore, will not address the remaining requirements for obtaining preliminary injunctive relief.

## V.    **<u>Conclusion</u>**

For the foregoing reasons, plaintiffs have not shown a likelihood of success on the merits of their claims.  Accordingly, plaintiffs' motion for a preliminary injunction is DENIED.

**So Ordered.**


                                                    /s/  F. Dennis Saylor IV
                                                    F. Dennis Saylor IV
Dated:  December 21, 2023                            Chief Judge, United States District Court

## THE STATUTES

Mass. Gen. Laws ch. 140, § 131M states:

No person shall sell, offer for sale, transfer or possess an assault
weapon or a large capacity feeding device that was not otherwise
lawfully possessed on September 13, 1994. Whoever not being licensed
under the provisions of section 122 violates the provisions of this section
shall be punished, for a first offense, by a fine of not less than $1,000
nor more than $10,000 or by imprisonment for not less than one year
nor more than ten years, or by both such fine and imprisonment, and
for a second offense, by a fine of not less than $5,000 nor more than
$15,000 or by imprisonment for not less than five years nor more than
15 years, or by both such fine and imprisonment.
The provisions of this section shall not apply to: (i) the possession by a
law enforcement officer; or (ii) the possession by an individual who is
retired from service with a law enforcement agency and is not otherwise
prohibited from receiving such a weapon or feeding device from such
agency upon retirement.

Mass. Gen. Laws ch. 140, § 121 states in pertinent part:

"Assault weapon", shall have the same meaning as a semiautomatic
assault weapon as defined in the federal Public Safety and Recreational
Firearms Use Protection Act, 18 U.S.C. section 921(a)(30) as appearing
in such section on September 13, 1994, and shall include, but not be
limited to, any of the weapons, or copies or duplicates of the weapons, of
any caliber, known as: (i) Avtomat Kalashnikov (AK) (all models); (ii)
Action Arms Israeli Military Industries UZI and Galil; (iii) Beretta Ar70
(SC-70); (iv) Colt AR-15; (v) Fabrique National FN/FAL, FN/LAR and
FNC; (vi) SWD M-10, M-11, M-11/9 and M-12; (vi) Steyr AUG; (vii)
INTRATEC TEC-9, TEC-DC9 and TEC-22; and (viii) revolving cylinder
shotguns, such as, or similar to, the Street Sweeper and Striker 12;
provided, however, that the term assault weapon shall not include: (i)
any of the weapons, or replicas or duplicates of such weapons, specified
in appendix A to 18 U.S.C. section 922 as appearing in such appendix
on September 13, 1994, as such weapons were manufactured on October

1, 1993; (ii) any weapon that is operated by manual bolt, pump, lever or slide action; (iii) any weapon that has been rendered permanently inoperable or otherwise rendered permanently unable to be designated a semiautomatic assault weapon; (iv) any weapon that was manufactured prior to the year 1899; (v) any weapon that is an antique or relic, theatrical prop or other weapon that is not capable of firing a projectile and which is not intended for use as a functional weapon and cannot be readily modified through a combination of available parts into an operable assault weapon; (vi) any semiautomatic rifle that cannot accept a detachable magazine that holds more than five rounds of ammunition; or (vii) any semiautomatic shotgun that cannot hold more than five rounds of ammunition in a fixed or detachable magazine.


"Large capacity feeding device", (i) a fixed or detachable magazine, box, drum, feed strip or similar device capable of accepting, or that can be readily converted to accept, more than ten rounds of ammunition or more than five shotgun shells; or (ii) a large capacity ammunition feeding device as defined in the federal Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. section 921(a)(31) as appearing in such section on September 13, 1994. The term "large capacity feeding device" shall not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber ammunition.