No. 24-1061

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

————————

JOSEPH R. CAPEN; NATIONAL ASSOCIATION FOR GUN RIGHTS,

*Plaintiffs-Appellants*,

v.

ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts,

*Defendant-Appellee*,

Charles D. Baker, in his official capacity as Governor of the Commonwealth of Massachusetts,

*Defendant.*

————————

On Appeal from the United States District Court
for the District of Massachusetts

————————

### BRIEF OF *AMICUS CURIAE* NATIONAL SHOOTING SPORTS FOUNDATION IN SUPPORT OF PLAINTIFFS-APPELLANTS AND SUPPORTING REVERSAL

————————

LAWRENCE G. KEANE
NATIONAL SHOOTING SPORTS
 FOUNDATION, INC.
400 N. Capitol Street, NW
Washington, DC 20001

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN[*]
MARIEL A. BROOKINS[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

[*] Supervised by principals of the firm who are
 members of the Virginia bar

*Counsel for* Amicus Curiae *National Shooting Sports Foundation*

March 20, 2024

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), *amicus curiae* National Shooting Sports Foundation certifies that it does not have a parent corporation and no publicly held corporation owns more than ten percent of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES.................................................................................. iii

STATEMENT OF INTEREST AND INTRODUCTION ........................................ 1

BACKGROUND ................................................................................................... 4

ARGUMENT ......................................................................................................... 6

I.     The Firearms And Magazines Massachusetts Bans Are "Arms" ................. 6

II.    The Arms That Massachusetts Has Banned Are Typically Possessed By Law-Abiding Citizens For Lawful Purposes, Including Self-Defense ...................................................................................................... 10

      A.    The Firearms and Feeding Devices the Act Outlaws Are Unquestionably in Common Use ........................................................11

      B.    How Criminals May Misuse Arms Does Not Alter the Calculus ....................................................................................... 16

      C.    Neither Legislatures nor Courts Are Free to Override the Choices of the American People Based on Their Independent Assessment of What Makes an Arm Suited for Self-Defense .......... 17

III.   There Is No Historical Tradition In This Country Of Banning Arms That Millions Of Law-Abiding Citizens Own For Lawful Purposes........... 20

IV.   Massachusetts Cannot Save The Act By Pointing To Some Dramatic Technological Change Or Novel Societal Problem ...................................... 23

CONCLUSION ..................................................................................................... 27

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen.*,
910 F.3d 106 (3d Cir. 2018) ...............................................................10

*Barnett v. Raoul*,
671 F.Supp.3d 928 (S.D. Ill. 2023) ...................................................17

*Caetano v. Massachusetts*,
577 U.S. 411 (2016) ........................................................................ 13

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ................................................................. *passim*

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) ............................................................18

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) ........................................................23

*Jackson v. City & Cnty. of S.F.*,
746 F.3d 953 (9th Cir. 2014) ..............................................................9

*Kolbe v. Hogan*,
849 F.3d 114 (4th Cir. 2017) ............................................................18

*Miller v. Bonta*,
542 F.Supp.3d 1009 (S.D. Cal. 2021) ..............................................26

*Mitchell Arms, Inc. v. United States*,
7 F.3d 212 (Fed. Cir. 1993) ..............................................................19

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022) .................................................................... *passim*

*Nat'l Rifle Ass'n v. Bondi*,
61 F.4th 1317 (11th Cir. 2023) .........................................................25

*Ocean State Tactical, LLC v. Rhode Island*,
No. 23-1072 (1st Cir. Mar. 7, 2024) ...................................... 14, 15, 20

*Se. Promotions Ltd. v. Conrad*,
    420 U.S. 546 (1975)..........................................................................17

*Staples v. United States*,
    511 U.S. 600 (1994)......................................................................2, 11

*Stenberg v. Carhart*,
    530 U.S. 914 (2000).........................................................................19

*Worman v. Healey*,
    293 F.Supp.3d 251 (D. Mass. 2018) ...............................................4

*Worman v. Healey*,
    922 F.3d 26 (1st Cir. 2019) .............................................................22

**Constitutional Provision**

U.S. Const. amend. II ..................................................................... 7, 15

**Statutes**

18 U.S.C. §921(a)(30) (1994) ........................................................ 4, 5, 7

18 U.S.C. §921(a)(31) (1994) ...............................................................5

1998 Mass. Acts ch.180, §§1-80...........................................................4

Mass. Gen. Laws ch.140, §121 ................................................. 4, 5, 7, 24

Mass. Gen. Laws ch.140, §131M .......................................................5, 7

Pub. L. No. 103-322, 108 Stat. 1796 (1994)...........................................4

Pub. L. No. 58-152, 33 Stat. 986 (1905)...............................................24

**Other Authorities**

William English, PhD, *2021 National Firearms Survey: Updated
    Analysis Including Types of Firearms Owned* (May 13, 2022),
    https://bit.ly/3HaqmKv ........................................................ 12, 13, 19

Brett Foote, *There Are Currently 16.1 Million Ford F-Series Pickups
    on U.S. Roads*, Ford Auth. (Apr. 9, 2021), https://bit.ly/3GLUtaB ...................12

Harold E. Johnson, *Small Arms Identification & Operation Guide* (1980) ...........................................................................................19

Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* (2d ed. 2018) ....................................................................... 26

Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003*, U.S. Dep't of Justice (2004), *available at* https://bit.ly/3wUdGRE ...................................................................... 25

Lot 1249, Rock Island Auctions Co. (Sept. 8, 2018), http://tinyurl.com/yurawrwx ...........................................................24

NSSF, *2021 Firearms Retailer Survey Report*, https://bit.ly/3CXJwC1 ..................5

NSSF, *Firearm Production in the United States* (2020), https://bit.ly/3LwJvKh ...........................................................13

NSSF, *Firearm Production in the United States* (2023), https://bit.ly/42qYo7k ...........................................................12

NSSF, *Modern Sporting Rifle Comprehensive Consumer Report* (July 14, 2022), https://bit.ly/3GLmErS ............................................13

Wash. Post Staff, *Sept. 30-Oct. 11, 2022, Washington Post-Ipsos poll of AR-15 owners*, https://wapo.st/3KrUouy (Mar. 26, 2023).............................12

## STATEMENT OF INTEREST[1] AND INTRODUCTION

The National Shooting Sports Foundation ("NSSF") is the national trade association for the firearm, ammunition, hunting, and shooting sports industry. NSSF's membership includes manufacturers, distributors, and retailers of firearms, ammunition, and shooting- and hunting-related goods and services; sportsmen's organizations; and more. NSSF's interest in this case is manifest. Massachusetts outlaws the manufacture, sale, and even possession of firearms and feeding devices widely owned (and even more widely desired) by law-abiding citizens for lawful purposes. Among NSSF's members are the leading manufacturers of these and other constitutionally protected products—which is why NSSF has filed suit to challenge the constitutionality of materially similar laws in other states.

Massachusetts' sweeping ban on common arms is no more valid than those that NSSF has challenged directly. *Bruen* made crystal clear that "the Second Amendment protects the possession and use of weapons that are 'in common use.'" *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 21 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)). The firearms that Massachusetts bans are more common than the most popular truck in the United States, and the feeding devices it bans are ten times more common than even that. These are not

---

[1] No party's counsel authored any part of this brief, and no one other than amicus contributed to its preparation or submission. All parties have consented to this filing.

newfangled innovations that demand novel government intervention. Semiautomatic rifles, pistols, and shotguns have been around for generations, as have magazines that hold more than 10 rounds. And as recently as just a few decades ago, it was common ground that these common arms are "lawful." *Staples v. United States*, 511 U.S. 600, 612 (1994). Slapping the term "assault weapon" on firearms lawfully owned by millions of Americans does not remove their constitutional protection. Nor does labeling standard-issue magazines "large capacity feeding device[s]" change the fact that tens of millions of Americans own hundreds of millions of them as integral components of arms kept and borne for self-defense and other lawful purposes. The arms that Massachusetts has banned are not just in common use today; they are ubiquitous. That puts Massachusetts' sweeping, criminal prohibition far out of step with our Nation's history of firearm regulation.

Massachusetts asserts that the arms it outlaws are more dangerous than other common arms and thus that the need to prohibit their possession is more acute. The factual premise of that argument is incorrect. But even putting that aside, it is not open to states (or this Court) to withhold constitutional protection based on the relative "dangerousness" of arms when used for *un*lawful purposes. The only question under *Bruen* and *Heller* is whether *law-abiding* citizens typically possess and use the arms at issue for *law-abiding* purposes. And when it comes to the exceedingly broad range of arms that Massachusetts bans, the answer is plainly yes.

Under a proper application of *Bruen*, the analysis ends there. But even if further historical or analogical inquiry were required, the result would be the same. Almost none of the historical laws on which the district court relied prohibited the general public from possessing anything; nearly all of them restricted only carrying dangerous and unusual weapons not commonly used for lawful ends. *Bruen* itself makes clear why those laws provide no support for the one challenged here. The key "metrics" in determining whether "regulations [are] relevantly similar under the Second Amendment" are "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. Laws that restrict only carrying (and generally only concealed carrying at that) are not remotely analogous in the "how" to laws that prohibit even mere possession. Nor are laws that regulated only "dangerous and unusual" arms analogous to a ban on America's most popular rifle (and hundreds of other common arms). The Supreme Court has been clear: When it comes to arms that law-abiding citizens *have* overwhelmingly chosen for lawful purposes, "American governments simply have not broadly prohibited [even] the[ir] public carry," let alone their mere private possession. *Id.* at 70.

In short, while there is a long tradition of law-abiding citizens possessing for lawful purposes the arms Massachusetts prohibits, there is no similar tradition of government regulation of these commonly owned arms—let alone of outright bans. Neither the decision below nor Massachusetts' statute can be reconciled with *Bruen*.

## BACKGROUND

In 1998, Massachusetts enacted "An Act Relative to Gun Control in the Commonwealth," which outlaws the sale, transfer, or possession of an array of semiautomatic rifles, pistols, and shotguns.   1998 Mass. Acts ch.180, §§1-80 (codified in Mass. Gen. Laws ("MGL") ch.140 *et seq.*) (the "Act").  The Act was modeled on the now-defunct federal "assault weapons" ban; in fact, the scope of what the Act prohibits as an "assault weapon" is defined in large part by cross-reference to the "defin[ition] in the federal [statute]."  MGL ch.140, §121; *see* Pub. L. No. 103-322, §110102(b), 108 Stat. 1796, 1997-98 (1994) (originally codified at 18 U.S.C. §921(a)(30)).  But there is at least one key difference between the Act and its federal forebear:  Whereas Congress allowed the federal ban to expire in 2004, the Massachusetts legislature "declined to let the Act expire and instead made it permanent in [2004]."  *Worman v. Healey*, 293 F.Supp.3d 251, 256 (D. Mass. 2018).

As with the federal statute, the Act's "[a]ssault weapon" definition sweeps broadly.  First, a semiautomatic rifle qualifies as a prohibited "assault weapon" if it is capable of accepting a detachable magazine and has two or more of the following features: a folding or telescoping stock; a pistol grip; a bayonet mount; a flash suppressor or threaded barrel designed to accommodate a flash suppressor; or a grenade launcher.  MGL ch.140, §121; 18 U.S.C. §921(a)(30) (1994).  The Act also lists various models of banned "assault weapons" by name, including, most notably,

the Colt AR-15 and any "copies or duplicates."  MGL ch.140, §121.  The Act thus bans America's most popular rifle twice over.  *See* NSSF, *2021 Firearms Retailer Survey Report* 9, https://bit.ly/3CXJwC1 (majority of rifles sold in U.S. in 2020, and 20% of all firearms, were AR-platform rifles).

Not content with banning most modern rifles, the Act also bans many common pistols and shotguns.  All semiautomatic pistols that can accept a detachable magazine (which nearly all modern handguns can) are banned if they are a semiautomatic version of an automatic firearm or have two or more of the following: a magazine that attaches outside of the pistol grip; a threaded barrel; a barrel shroud; or an unloaded weight of 50 ounces or more.  All shotguns with a revolving cylinder are prohibited as "assault weapons," as are semiautomatic shotguns that have two or more of the following:  a folding or telescoping stock; a pistol grip; a fixed magazine that holds more than five rounds; or the ability to accept a detachable magazine.  MGL ch.140, §121; 18 U.S.C. §921(a)(30) (1994).

Finally, the Act bans any feeding device that can accept "more than ten rounds of ammunition or more than five shotgun shells," which is dubbed a "[l]arge capacity feeding device."  MGL ch.140, §121; *see also* 18 U.S.C. §921(a)(31) (1994).

Possessing an "assault weapon" or a "large capacity feeding device" is a felony punishable by 1-10 years in prison for a first offense and 5-15 years for a subsequent offense, plus a hefty fine.  MGL ch.140, §131M.

**ARGUMENT**

## I.    The Firearms And Magazines Massachusetts Bans Are "Arms."

Under *Bruen*, the threshold question in any Second Amendment case is whether "the Second Amendment's plain text covers an individual's conduct." 597 U.S. at 17. If the answer is yes, then "the Constitution presumptively protects that conduct," and the state bears the burden to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* A state's historical-tradition burden under this regime is a heavy one. Just as no state may deprive an individual of life or property without due process, a state may not deprive an individual of her constitutionally protected liberties unless it can satisfy a court that the deprivation is consistent with "a well-established" tradition. *Id.* at 30.

On the flip side, a challenger's threshold-textual burden is slight. Indeed, *Bruen* dispensed with the inquiry into whether the challenged conduct was covered by the plain text and thus presumptively protected in just a few short paragraphs, which principally looked to "the Second Amendment's text" and the definitions that *Heller* had supplied for its key words ("keep," "bear," "arms"). *Id.* at 32-33. Ultimately, *Bruen*'s conclusion on the threshold inquiry boiled down to one sentence: "Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* at 32.

6

The plain text inquiry is equally clear here. Massachusetts prohibits the general public ("the people") from possessing and carrying ("keep[ing] and bear[ing]") hundreds of models of firearms. MGL ch.140, §§121, 131M; 18 U.S.C. §921(a)(30) (1994); *see* U.S. Const. amend. II (protecting "the right of the people to keep and bear Arms"). Because the plain text of the Second Amendment plainly covers "keep[ing] and bear[ing]," U.S. Const. amend. II, the only question at the threshold is whether the rifles, pistols, shotguns, and feeding devices the Act bans are "Arms."

They are. "[E]ven though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 597 U.S. at 28. That is because the term's Founding-era "meaning" "is no different from the meaning today"; "then as now," it broadly encompasses "any thing that a man … takes into his hands, or useth in wrath to cast at or strike another.'" *Heller*, 554 U.S. at 581 (quoting dictionaries from the 1770s). And that "general definition," *Bruen*, 597 U.S. at 28, plainly includes rifles, pistols, and shotguns—no matter whether they fire semiautomatically or are equipped with a pistol grip, a detachable magazine, or any of the other common features Massachusetts deems nefarious. Indeed, *Heller* went out of its way to note that even "one founding-era thesaurus" that offered a relatively "limited" view still "stated that all firearms constituted 'arms.'" 554 U.S. at 581.

7

The inquiry is no more complicated when it comes to the ammunition feeding devices Massachusetts outlaws. As their name connotes, feeding devices are not passive holders of ammunition. They are integral to the design of semiautomatic firearms and the mechanism that makes them work, actively feeding ammunition into the firing chamber. A semiautomatic firearm equipped with a feeding device containing the ammunition necessary to function is thus indisputably a "bearable" instrument that "facilitate[s] armed self-defense." *Bruen*, 597 U.S. at 28. After all, when a citizen takes into her hands a firearm equipped with an ammunition feeding device, she holds both the frame of the firearm and the feeding device attached to it, as well as the bullets within that—all for the lawful purpose of armed self-defense.

Although the district court "assume[d], without deciding" that all of the banned firearms "are bearable arms" and thus presumptively protected at the threshold, Addm.19, it took the extreme position that "[n]o magazine, regardless of capacity, is itself an 'arm' within the plain meaning" of the Second Amendment, Addm.30. In the district court's view, even though a feeding device is unquestionably a bearable instrument, it "has no use independent of its attachment to a firearm." Addm.30. That nothing-but-the-sum-of-its-parts theory would render the Second Amendment a nullity, as the same could be said of virtually any component of a firearm, be it the grip, the barrel, the trigger, or the ammunition.

That theory is particularly misplaced vis-à-vis ammunition feeding devices. "[T]he right to bear arms would be meaningless" "without bullets," *Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014), and the same is true of the devices that feed bullets into firearms. Without a feeding device, semiautomatic firearms can fire, at best, only one round before needing to be manually reloaded. The notion that a device that facilitates reloading does not "facilitate armed self-defense"—and thus fit well within "the Second Amendment's definition of 'arms,'" *Bruen*, 597 U.S. at 28—is fanciful. After all, time spent manually reloading in a self-defense situation is time in which the defender is helpless against an armed assailant.

The district court's suggestion that the ubiquitous feeding devices the Act bans are not covered by the plain text because they are not "necessary" to operate firearms, Addm.32-33, is likewise flawed. The threshold textual inquiry does not ask what is "necessary" for self-defense; it asks whether a bearable instrument "facilitate[s] armed self-defense." *Bruen*, 597 U.S. at 28. Devices that play an integral role in the firing mechanism by actively feeding ammunition to the firing chamber—which is ultimately what allows modern handguns (the "quintessential self-defense weapon," *Heller*, 554 U.S. at 629) to work as intended—plainly fit that bill.[2] It therefore makes no difference whether most semiautomatic rifles, pistols,

---

[2] The district court's effort to analogize modern ammunition feeding devices to Founding-era cartridge boxes, Addm.30-31, blinks reality. Cartridge boxes of yore

and shotguns can accept magazines that hold fewer rounds. The feeding devices the Act bans, no less than the firearms it bans, facilitate armed self-defense, so they are covered by the plain text of the Second Amendment and presumptively protected.

In short, what the Third Circuit held four years before *Bruen* is even more obviously correct in its wake: "Because magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen.*, 910 F.3d 106, 116 (3d Cir. 2018). That is true regardless of how many rounds they hold. *Contra* Addm.32-33. If anything, having more rounds at the ready *better* facilitates a citizen's ability to defend herself in case of confrontation—regardless of whether she ends up needing to expend every round.

## II. The Arms That Massachusetts Has Banned Are Typically Possessed By Law-Abiding Citizens For Lawful Purposes, Including Self-Defense.

Because the firearms and feeding devices the Act prohibits all satisfy the Second Amendment's definition of "Arms," they are "presumptively protect[ed]" by the Second Amendment, and the state bears the burden of justifying its prohibition. *Id.* at 17, 24, 28. Massachusetts cannot meet that heavy burden. The Supreme Court

---

were literally just boxes in which citizens could store ammunition not in use. They were never attached (let alone affixed) to a firearm, and they played no role in its operation. Saying that a cardboard box is analogous to a device that plays an active role in firing because both "hold" ammunition is thus like saying that a gas can is analogous to a carburetor because both "hold" fuel.

has already decided which "Arms" a state may not ban consistent with our Nation's "historical tradition of firearm regulation":  those that are "in common use today," as opposed to "highly unusual in society at large."  *Id.* at 47 (quoting *Heller*, 554 U.S. at 627).  That is the irreducible minimum of the Second Amendment:  The government may not "prohibit[] … an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose."  *Heller*, 554 U.S. at 628.  In the context of a flat ban on arms like Massachusetts', then, the only question is whether the arms that have been banned are "typically possessed by law-abiding citizens for lawful purposes."  *Id.* at 625.  If they are, then the state may not ban them, full stop.  And here, the firearms and feeding devices that Massachusetts bans are the furthest thing from "highly unusual" in modern America.  *See Bruen*, 597 U.S. at 47.

### A.    The Firearms and Feeding Devices the Act Outlaws Are Unquestionably in Common Use.

1. For starters, Massachusetts bans the AR-15 and all its variants.  *See* p.5, *supra*.  The Supreme Court itself has described "AR-15 rifle[s]" as "widely accepted as lawful possessions."  *Staples*, 511 U.S. at 603, 612.  That remains the case in most states.  And these rifles have only become more popular since *Staples*.  Roughly one million Americans lawfully owned one in 1994, before the short-lived federal ban was enacted; today, the number has at *least* sextupled, with somewhere between 6 and 8 million Americans owning more than 28 million of these rifles.  *See* NSSF, *Firearm Production in the United States* 7 (2023),  https://bit.ly/42qYo7k

(28.1 million AR-platform rifles currently in circulation); William English, PhD, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 2 (May 13, 2022), https://bit.ly/3HaqmKv (24 million as of 2022).

It should go without saying that a product lawfully owned by millions of Americans—and 20% of all U.S. gun owners, *see* Wash. Post Staff, *Sept. 30-Oct. 11, 2022, Washington Post-Ipsos poll of AR-15 owners*, https://wapo.st/3KrUouy (Mar. 26, 2023)—is not "highly unusual in society at large," *Bruen*, 597 U.S. at 47. But a few examples help prove the point. The number of lawfully owned AR-platform rifles in America today exceeds the number of Ford F-150s, America's most popular automobile, on the road. *See* Brett Foote, *There Are Currently 16.1 Million Ford F-Series Pickups on U.S. Roads*, Ford Auth. (Apr. 9, 2021), https://bit.ly/3GLUtaB; 1-ER-16-18. Indeed, AR-platform rifles are so common that courts, commentators, and industry members alike often refer to them simply as "modern rifles" (or "modern sporting rifles").

The Act sweeps well beyond just AR-platform rifles, of course. *See* pp.4-5, *supra*. And although few (if any) types of firearms are as overwhelmingly common in modern America as the AR, the notion that the other firearms the Act bans "are highly unusual in society at large," *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627), defies reality—which likely explains why the state has never even tried to make that showing with respect to *any* of the arms the Act bans.

12

The magazines the Act bans are even more common than the firearms it bans. Tens of millions of law-abiding Americans lawfully own *hundreds of millions* of these feeding devices. *See, e.g.*, NSSF, *Firearm Production in the United States* 7 (2020), https://bit.ly/3LwJvKh. Indeed, nearly 40 million Americans—more than 10% of the Nation's total population, and nearly half of all American gun owners— own or have owned feeding devices that hold more than ten rounds of ammunition. English, *supra*, at 22-23. *Cf. Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring in the judgment) (describing "stun guns," which "'approximately 200,000 civilians owned'" at the time, as "widely owned"). And the numbers are trending upward: Recent data show that more than two-thirds of modern rifle magazines have a standard capacity of over ten rounds. NSSF, *Modern Sporting Rifle Comprehensive Consumer Report* 31 (July 14, 2022), https://bit.ly/3GLmErS. That makes sense; America's most popular long gun— namely, the AR-platform rifle—comes standard with a 20- or 30-round magazine.

This ubiquity reflects the fact that the magazines Massachusetts bans have long been lawful in this country (and remain so in most states). It is equally clear that the typical individual who possesses these commonplace arms does so for lawful purposes. Indeed, the most frequently cited reasons by the millions of Americans who own them are target shooting (64.3% of owners), home defense (62.4%), hunting (47%), and defense outside the home (41.7%). English, *supra*, at 23. This

13

is for good reason: When a firearm being used for defense is out of ammunition, the defender no longer has a functional firearm. It is little surprise, then, that law-abiding citizens tend to prefer magazines that will run out of ammunition less often.

2. Despite—or perhaps because of—the ubiquity of these arms, this Court's recent opinion in *Ocean State Tactical, LLC v. Rhode Island* ("*OST*"), No. 23-1072 (1st Cir. Mar. 7, 2024), dismissed the relevance of the American people's overwhelming choices of how to equip themselves. According to *OST*, all that matters is that civilians rarely fire more than 10 rounds in self-defense situations. *OST*.Op.11-13. Respectfully, that view is inconsistent with *Heller* and *Bruen*.

First, *Heller* made clear that the only arms "the Second Amendment does not protect" are those that are "not typically *possessed* by law-abiding citizens for lawful purposes." 554 U.S. at 625 (emphasis added). The focus of the inquiry is on what law-abiding citizens "typically possess[]." *Id.* Any doubt on that score should have been erased by *Bruen*, which went out of its way to explain that the only Arms a state may ban consistent with historical tradition are "those that '*are* highly unusual in society at large.'" *Bruen*, 597 U.S. at 47 (emphasis added) (quoting *Heller*, 554 U.S. at 627). That explains why *Heller* held that citizens have a fundamental right to keep handguns, and *Bruen* held that they have a fundamental right to carry them, without ever even asking how frequently people fire them in actual self-defense situations. It sufficed in both cases that "handguns are the most popular weapon

14

chosen by Americans for self-defense." *Heller*, 554 U.S. at 629; *see also Bruen*, 597 U.S. at 47.  In short, how frequently people keep versus carry firearms, or fire them at ranges versus at attackers, is legally irrelevant; an individual lawfully "uses" her firearm anytime she does any of those things.

The *OST* Court thought that what people possess is not as relevant as how often people fire what they possess in self-defense.  That mode of analysis is just interest-balancing through the back door.  *But see Bruen*, 597 U.S. at 29 n.7 (emphasizing that courts may no longer "engage in independent means-end scrutiny under the guise of an analogical inquiry").  It is also inconsistent with the terms of the Second Amendment, which protects the right "to keep and bear Arms," not just to fire them when the need for self-defense arises.  U.S. Const. amend. II.  That is precisely why the Supreme Court has held that "bear[ing] arms" includes not just firing them at would-be attackers, but "carry[ing]" arms equipped with ammunition "for the purpose … of being armed and ready for offensive or defensive action." *Bruen*, 597 U.S. at 32 (ellipsis in original) (quoting *Heller*, 554 U.S. at 584).  A citizen uses her arm for the Second Amendment's *ne plus ultra* purpose of "armed self-defense" every time she has it "at the ready for self-defense," whether or not she fires it.  *Id.* at 29, 32.  *Contra OST*.Op.22-23.  Any other conclusion would render the Second Amendment meaningless, as most individuals fortunately never have to fire *any* of their arms in an actual self-defense situation.

In short, the arms the Act outlaws are "typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625, which suffices to demonstrate that they are "unquestionably in common use today," *Bruen*, 597 U.S. at 47.

### B.     How Criminals May Misuse Arms Does Not Alter the Calculus.

As with any arms, the unfortunate reality is that some people misuse the types of arms the Act outlaws for unlawful—indeed, awful—purposes. But the same could be said of the handguns at issue in *Heller*; indeed, it *was* said by the *Heller* dissenters. The *Heller* dissenters protested that handguns "are specially linked to urban gun deaths and injuries" and "are the overwhelmingly favorite weapon of armed criminals." *Heller*, 554 U.S. at 682 (Breyer, J., dissenting). The majority did not dispute these points; it just found them irrelevant to whether handguns are constitutionally protected, because that question does not turn on how often arms are misused by criminals. It turns on whether law-abiding citizens commonly keep and bear them for lawful purposes. That is why it was enough in *Heller* that handguns are *typically* possessed for lawful purposes. *See id.* at 624-25 (majority op.).

What was true in *Heller* is no less true here, given the millions of law-abiding Americans who own the firearms and feeding devices that Massachusetts has banned. Just as in *Heller*, then, that flat ban is unconstitutional. After all, blanket bans violate the foundational principle that "a free society prefers to punish the few

who abuse [their] rights … after they break the law than to throttle them and all others beforehand." *Se. Promotions Ltd. v. Conrad*, 420 U.S. 546, 559 (1975).

### C. Neither Legislatures nor Courts Are Free to Override the Choices of the American People Based on Their Independent Assessment of What Makes an Arm Suited for Self-Defense.

The district court inverted the commonality inquiry and held that the banned arms are "unreasonably dangerous and unusual" because their "intrinsic characteristics" purportedly make them "poor self-defense weapons." Addm.26. Apparently the district court believed that any arm with "capabilities far beyond those of a typical handgun" is "unreasonably dangerous" and thus may be banned without violating the Second Amendment. Addm.26. That is both wrong and irrelevant—and it invites the very government interest-balancing *Bruen* forbids.

First, it is "uncontroverted that many of the banned [features], including but not limited to pistol grips, … flash suppressors, and [barrel] shrouds, have legitimate purposes that assist law-abiding citizens in their ability to defend themselves." *Barnett v. Raoul*, 671 F.Supp.3d 928, 947 (S.D. Ill. 2023), *vacated sub nom. Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023). And it is incontrovertible that the features that render an otherwise-lawful firearm an unlawful "assault weapon" in Massachusetts have meaningful self-defense benefits. For instance, while the district court considered a high "rate[] of effective fire" a bad thing, Addm.25-26, "[t]he defensive application" of being able to fire accurately and rapidly "is obvious,

as is the public safety advantage in preventing stray shots." *Kolbe v. Hogan*, 849 F.3d 114, 159 (4th Cir. 2017) (en banc) (Traxler, J., dissenting). Little wonder, then, that even jurists who take a dim view of the Second Amendment have acknowledged that the types of arms Massachusetts bans "can be beneficial for self-defense." *Friedman v. City of Highland Park*, 784 F.3d 406, 411 (7th Cir. 2015).

But in the end, it does not matter whether *Massachusetts* thinks the arms its citizens have selected are particularly well-suited for self-defense. The whole point of the common-use test is to leave exceedingly difficult judgment calls about which arms are best suited for self-defense to the citizenry. And "[w]hatever the reason," *Heller*, 554 U.S. at 629, overwhelming numbers of people have chosen the arms that Massachusetts has banned. That forecloses its effort to do so.

The district court's too-much-like-a-machinegun test fails for all the same reasons—and then some. In the district court's eyes, what matters is not what the people whose rights the Second Amendment protects choose for their own defense, but its own independent (and incorrect) assessment that the "AR-15 is functionally identical to … the M16." Addm.25. According to the district court (and the Massachusetts legislature by extension), because "[a]ssault rifles were developed for modern military combat, not self-defense," they may be banned. Addm.25. But that Freudian slip just underscores why courts should not be in the business of second-guessing the people. "True assault *rifles* typically have selectable fire modes,

including a fully automatic mode." *Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 213 n.2 (Fed. Cir. 1993) (emphasis added); *accord* Harold E. Johnson, *Small Arms Identification & Operation Guide* 105 (1980) ("Assault rifles are short, compact, selective fire weapons that fire a cartridge intermediate in power between submachinegun and rifle cartridges. Assault rifles … are capable of delivering effective full automatic fire …."). The dysphemism "assault *weapon*," by contrast, "is a political term, developed by anti-gun publicists to expand the category of 'assault rifles' so as to allow an attack on as many additional firearms as possible on the basis of undefined 'evil' appearance." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting). And it should go without saying that a legislator or court's emotional reaction to an arm's appearance is no match for the fundamental right the Second Amendment secures for the people.

In short, whether *Massachusetts* thinks particular arms are suited to self-defense is beside the point; what matters is how the *typical owners* of such arms actually use them. And on that score, the record could hardly be clearer. Purchasers consistently report that self-defense, hunting, and sport shooting are the most important reasons why they buy rifles on the AR-15 platform and the 20- or 30-round feeding devices that come standard with them. *See* English, *supra*, at 33-34. The case-specific evidence introduced below confirms the point, showing that but-

for the Act, Massachusetts "residents … would acquire Banned Firearms and Banned Magazines to keep in their homes for self-defense."  App.37, 60.

## III. There Is No Historical Tradition In This Country Of Banning Arms That Millions Of Law-Abiding Citizens Own For Lawful Purposes.

The Court can and should end its analysis there.  "[T]he traditions of the American people … demand[] our unqualified deference," *Bruen*, 597 U.S. at 26, and the tradition of the American people is that law-abiding citizens may keep and bear arms that are commonly possessed for lawful purposes like self-defense.  When it comes to a flat ban on the acquisition or even possession of classes of arms, that *is* the historical test.  And it forecloses the state's effort to ban these common arms.

Nevertheless, even if further historical inquiry were necessary, Massachusetts has not come close to meeting its burden of demonstrating any historical tradition of prohibiting semiautomatic firearms with the features it singles out.[3]  Indeed, the very fact that millions of Americans have chosen these arms in the tens of millions confirms that there is not, and never has been, any tradition of banning them outright. To the contrary, the historical record reveals a long tradition of welcoming technological advancements aimed at improving the speed, firing capacity, accuracy, and functionality of firearms kept and born by civilians.

---

[3] The *OST* Court reached a contrary conclusion with respect to feeding devices indistinguishable from those prohibited here.  *See OST*.Op.17-23.  While NSSF respectfully disagrees with that decision, it nonetheless focuses on the firearm side.

To be sure, historical laws *regulated* common arms, such as by prohibiting the concealed carry of certain arms. But in analyzing "how … regulations burden a law-abiding citizen's right to armed self-defense," 597 U.S. at 29, the critical question is *how the laws actually regulated*. *Bruen* did not deny that "the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Id.* But it deemed such historic regulations insufficient to "justify[] New York's proper-cause requirement" because, unlike those historic regulations, New York's law "broadly prohibit[ed] the public carry of commonly used firearms," either openly or concealed. *Id.* at 38-39. If historical bans on *concealed* carry are insufficiently analogous to support bans on *all* carry (as *Bruen* explicitly held), then *a fortiori* such laws cannot begin to justify a possession ban like Massachusetts'.

The district court's reliance on carry regulations to justify the Act's sweeping ban on possession of common arms defies not just *Bruen*, but *Heller* as well. *See* Addm.22 (crediting evidence from Massachusetts' experts showing "states have regulated fighting knives, concealable pistols, Bowie knives, and multi-shot revolvers"); Addm.35 (concluding that "the same regulatory history … applies" to magazines). After all, if the mere existence of historical laws regulating concealed carry, or gunpowder storage, or other facets of keeping and bearing arms sufficed to

21

justify a modern law banning a class of arms or magazines, then *Heller* should have come out the other way.  Perhaps that is why the district court tried to reframe the Act as "not an absolute ban on any class of weapons."  Addm.23 n.14.  But this Court has correctly viewed the Act as a ban for years, *see Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019), and it should continue to call it what it is.[4]

The district court brushed all of that aside in a footnote, reasoning that the "distinction" between an outright ban on possession and a restriction on concealed carry is "irrelevant when considering the types of weapons being regulated, rather than the manner they are carried."  Addm.23 n.15.  As explained, that approach ignores *Bruen*'s instruction to compare the "how" and "why" of modern and historical laws.  597 U.S. at 29.  More fundamentally, it is impossible to square with *Bruen*'s explicit holding that even a historical tradition of banning the concealed carry *of handguns* could not justify a modern ban on carrying handguns in any manner at all.  *Id.* at 47.  Indeed, if the mere fact that historical laws "regulated" a particular type of arm in *some* way sufficed to justify banning even its bare possession, then *Heller* would have come out the other way.

---

[4] The D.C. law at issue in *Heller* likewise came with some exceptions, yet that did not stop the Supreme Court from calling it a "total ban" or invalidating it as such. *See Heller*, 554 U.S. at 575 n.1, 576 (recognizing that D.C.'s "prohibitions" had "exceptions," but still describing the general ban as a "total ban on handguns").

IV.    **Massachusetts Cannot Save The Act By Pointing To Some Dramatic Technological Change Or Novel Societal Problem.**

The district court leaned heavily on *Bruen*'s dictum that a "more nuanced approach" to drawing "historical analog[i]es" may be warranted when a case presents "unprecedented societal concerns or dramatic technological changes." *Id.* at 27. But *Bruen* nowhere suggested that historical tradition goes out the window when such considerations are at play. And no amount of nuance can change the fact that American states and municipalities in the eighteenth and nineteenth centuries did not prohibit law-abiding citizens from possessing arms that were commonly kept and borne for lawful purposes just because they were especially dangerous in the hands of criminals. In all events, this case does not implicate the types of novel issues *Bruen* had in mind.

1. The lack of any historical tradition supporting the state's ban is certainly not owing to any "dramatic technological changes." *Contra* Addm.19-22; 33-34. Most of the arms Massachusetts bans have been around for decades, and their critical technology has been around since at least the end of the *nineteenth* century.

Semiautomatic firearms have been a mainstay in this country for more than a century. The semiautomatic action was invented in 1885; the first semiautomatic pistols date back to 1896; and many of the early-twentieth-century semiautomatics had features the Act singles out. *See Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("Many of the

early semi-automatic rifles were available with pistol grips."); *see also* Pub. L. No. 58-152, 33 Stat. 986, 987 (1905) (authorizing the sale of "magazine rifles … for the use of rifle clubs").  In short, it is indisputable (and undisputed) that semiautomatic firearms equipped with detachable magazines and features like a pistol grip have been in civilian hands in this country for over a hundred years.[5]

Nevertheless, the earliest state laws treating features like pistol grips, collapsible stocks, or barrel shrouds as sufficient to convert an otherwise-lawful semiautomatic firearm into a so-called "assault weapon" date back to only 1989—which is far too late to serve as an indicator of a historical tradition.  *See Bruen*, 597 U.S. at 36-37.  As for the federal government, it did not restrict semiautomatic firearms or feeding devices *at all* until 1994, when Congress adopted the nationwide ban that served as the basis for the Act.  And, as explained, Congress allowed that law to expire in 2004 after a Justice Department study revealed that it had produced "no discernible reduction" in violence committed with firearms.  Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts*

---

[5] In addition to common semiautomatics, the Act also bans shotguns that operate with a revolving cylinder.  *See* MGL ch.140, §121.  These arms are even *less* novel than semiautomatics; Samuel Colt himself manufactured shotguns with revolving cylinders before the Civil War.  *See, e.g.*, Lot 1249, Rock Island Auctions Co. (Sept. 8, 2018), http://tinyurl.com/yurawrwx (selling an "original example of a Colt Model 1839 Revolving Shotgun that was manufactured at Samuel Colt's Paterson, New Jersey, factory c. 1839-1841").

*on Gun Markets & Gun Violence, 1994-2003*, U.S. Dep't of Justice 96 (2004), *available at* https://bit.ly/3wUdGRE; *see* p.4, *supra*.

To be sure, modern firearms are more accurate and more capable of quickly firing more rounds than their Founding-era (or even early-twentieth-century) predecessors. But that does not make them any less linear descendants of the "small-arms weapons used by militiamen … in defense of person and home" when the Second Amendment was ratified. *Heller*, 554 U.S. at 624-25. After all, it would be perverse to confine the people whose rights the Second Amendment protects to arms that are less accurate, efficient, and reliable for self-defense—which likely explains why no such historical tradition exists. *See Bruen*, 597 U.S. at 70.

2. To the extent Massachusetts seeks to excuse the relative novelty of "assault weapons" bans as owing to some "unprecedented societal concern[]," *Bruen*, 597 U.S. at 27; *see* Addm.20-21, 34, that argument fails too. Even accepting the dubious proposition that there is some causal link between semiautomatic firearms that have been around for the better part of a century and the recent and horrific acts on which the district court focused, the unfortunate reality is that mass murder has been a fact of life in the United States for a very long time. *See Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1319 (11th Cir. 2023). Nevertheless, before "the 1990's, there was no national history of banning weapons because they were equipped with furniture like pistol grips, collapsible stocks, flash hiders, … or barrel shrouds," *Miller v. Bonta*,

542 F.Supp.3d 1009, 1024 (S.D. Cal. 2021), *vacated and remanded*, 2022 WL 3095986 (9th Cir. Aug. 1, 2022), and there were almost no efforts to restrict the firing capacity of semiautomatic arms.

This was not because such firearms were adopted only by militaries. *Contra* Addm.25. In fact, the types of semiautomatic firearms Massachusetts bans were popular with civilians long before they gained traction militarily. *See* Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 463, 519 (2d ed. 2018).

Nor, more importantly, has there ever been any historical tradition of banning arms that *law-abiding* citizens typically keep and use for *lawful* purposes based on the damage they could inflict in the hands of someone bent on misusing them. To the contrary, our historical tradition is one of protecting the rights of law-abiding citizens to defend themselves and others against those who seek to do them harm. *See Bruen*, 597 U.S. at 47; *Heller*, 554 U.S. at 627. Because Massachusetts' ban flies in the face of that historical tradition, it violates the Second Amendment.

## CONCLUSION

For the reasons set forth above, this Court should reverse.

Respectfully submitted,

s/Erin E. Murphy

LAWRENCE G. KEANE
NATIONAL SHOOTING SPORTS
 FOUNDATION, INC.
400 N. Capitol Street, NW
Washington, DC 20001

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN[*]
MARIEL A. BROOKINS[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

[*] Supervised by principals of the firm who are members of the Virginia bar

*Counsel for* Amicus Curiae *National Shooting Sports Foundation*

March 20, 2024

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,454 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Times New Roman size 14-point font with Microsoft 2016.

Date:  March 20, 2024

s/Erin E. Murphy
Erin E. Murphy

**CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Erin E. Murphy</u>
Erin E. Murphy