No. 24-1061

# United States Court of Appeals
## for the First Circuit

———————

JOSEPH R. CAPEN AND NATIONAL ASSOCIATION FOR GUN RIGHTS,

*Plaintiffs-Appellants*,

*v.*

ANDREA JOY CAMPBELL, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF
THE COMMONWEALTH OF MASSACHUSETTS,

*Defendant-Appellee.*

———————

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS DENYING A PRELIMINARY INJUNCTION

———————

**BRIEF OF APPELLEE ANDREA JOY CAMPBELL**

———————

ANDREA JOY CAMPBELL
   *Attorney General of Massachusetts*
Julie E. Green, 1st Cir. No. 93492
Grace Gohlke, 1st Cir. No. 1204282
   *Assistant Attorneys General*
Government Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2085
Julie.Green@mass.gov
Grace.Gohlke@mass.gov

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ............................................................................... 1

STATEMENT OF THE ISSUE ............................................................ 2

STATEMENT OF THE CASE .............................................................. 2

I.    Statutory and Factual Background ................................................. 2

      A.    The Federal Assault Weapons and Large Capacity Magazine
            Ban ................................................................................. 2

      B.    The Massachusetts Assault Weapons and Large Capacity
            Magazine Ban .................................................................. 4

II.   Procedural History .................................................................... 5

SUMMARY OF THE ARGUMENT ..................................................... 6

ARGUMENT ...................................................................................... 8

I.    Standard of Review ................................................................... 8

II.   The Holding and Rationale of *OST* Require Affirmance of the District
      Court's Decision. ...................................................................... 8

      A.    *OST* Supplies the Analytic Framework. ............................... 9

      B.    *OST* is Dispositive as to LCMs. ........................................ 13

      C.    Application of *OST* to Assault Weapons Likewise Compels
            Affirmance ...................................................................... 14

            1.    *OST* Explicitly Rejected the "Popularity Test" at the
                  Heart of Plaintiffs' Challenge. ................................... 15

            2.    *OST* Recognized That Analogical Reasoning is the
                  Correct Mode of Analysis. ........................................ 17

3.    The Act Imposes a Minimal Burden Comparable to That of Other Regulations Within the "Dangerous and Unusual" Tradition.................................................20

   a.    There is a Robust Historical Tradition of Regulating Specific Weapons That Are Unreasonably Dangerous in Relation to their Self-Defensive Utility.............................................21

   b.    The District Court Correctly Found the Act's Burden is Comparably Minimal Because Assault Weapons Are Not Suitable or Actually Used for Self-Defense. .............................................29

4.    Like the Rhode Island Statute, The Act Addresses the Growing Threat of Mass Shootings. .........................................38

5.    Plaintiffs Fail to Rebut the Commonwealth's Showing at Step Two. ..................................................41

III.   Independently, Plaintiffs Did Not Carry Their Burden to Show LCMs or Assault Weapons Are "Arms" Protected by the Second Amendment.................................................45

   A.    The Burden Is on Plaintiffs to Establish Their Proposed Conduct Is Protected by the Text of the Second Amendment. ...........46

   B.    LCMs Fall Outside the Text of the Second Amendment Because They Are Not "Bearable Arms.".............................47

   C.    Assault Weapons and LCMs Fall Outside the Text of the Second Amendment Because Neither Are "Commonly Used" in Self-Defense. ........................................50

IV.   Plaintiffs Failed to Carry their Burden on the Remaining Preliminary Injunction Factors. .............................................52

CONCLUSION..................................................53

CERTIFICATES OF COMPLIANCE AND SERVICE .........................54

ADDENDUM .....................................................1

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Antonyuk v. Chiumento*,
  89 F. 4th 271 (2nd Cir. 2023) ........................................................43

*Aymette v. State*, 21 Tenn. 154 (1840) ....................................................24

*Bayley's Campground, Inc. v. Mills*,
  985 F.3d 153 (1st Cir. 2021) ..........................................................52

*Bevis v. City of Naperville*,
  657 F. Supp. 3d 1052 (N.D. Ill.)..........................................21, 26, 28, 29, 38

*Bevis v. City of Naperville*,
  85 F. 4th 1175 (7th Cir. 2023)................................16, 18, 21, 31, 32

*Brown v. Maryland*, 25 U.S. 419 (1827) ...................................................22

*Clark v. Cmty. for Creative Non-Violence*,
  468 U.S. 288 (1984)....................................................................47

*Commonwealth v. McGann,* 141 N.E. 3d 405 (Mass. 2020)...................................36

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety &*
  *Homeland Sec. (DSSA)*,
  664 F. Supp. 3d 584 (D. Del. 2023) ......................................................21, 38

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)............................................ 15, 19, 30, 31, 33, 47, 48, 51

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015) ...........................................................16

*Hartford v. Ferguson*,
  676 F. Supp. 3d 897 (W.D. Wash. 2023) .......................................................21

*Heller v. District of Columbia,* 670 F.3d 1244 (D.C. Cir. 2011) ...........................37

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2021) ..........................................47

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc) ...........................31, 34, 37

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ........................................29, 51

*Nat'l Ass'n for Gun Rights v. Lamont (NAGR)*,
    --- F. Supp. 3d ---, 2023 WL 4975979
    (D. Conn. Aug. 3, 2023) ...................................................................21, 38, 47

*Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317 (11th Cir. 2023) ....................................20

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022).................................................................................*passim*

*Nunn v. State,* 1 Ga. 243 (1846)..............................................................................25

*Ocean State Tactical, LLC v. Rhode Island*,
    646 Supp. 3d 368 (D.R.I. 2022) ....................................................................48

*Ocean State Tactical, LLC v. Rhode Island*,
    95 F.4th 38 (1st Cir. 2024) ......................................................................*passim*

*Or. Firearms Fed'n v. Kotek Or. All for Gun Safety*,
    --- F. Supp. 3d ---, 2023 WL 4541027
    (D. Or. July 14, 2023)....................................................................................50

*Okla. Tax Comm'n v. Jefferson Lines, Inc.,*
    514 U.S. 175 (1995).......................................................................................23

*Rupp v. Bonta*, No. 17-CV-00746-JLS-JDE,
    2024 WL 1142061 (C.D. Cal. Mar. 15, 2024) ...........................21, 38, 42, 47

*Ryan v. U.S. Immigr. & Customs Enforcement,*
    974 F.3d 9 (1st Cir. 2020)................................................................................8

*Schaffer v. Weast*, 546 U.S. 49 (2005)...................................................................47

*Staples v. United States*, 511 U.S. 600 (1994).......................................................32

iv

*Together Emps. v. Mass. Gen. Brigham Inc.,*
    32 F.4th 82 (1st Cir. 2022) ..............................................................8

*United States v. Alaniz*, 69 F.4th 1124 (9th Cir. 2023).....................................46, 51

*United States v. Barbosa*, 896 F.3d 60 (1st Cir. 2018).............................................9

*United States v. Berger*,
    --- F. Supp. 3d ---, 2024 WL 449247
    (E.D. Pa. Feb. 6, 2024) ............................................................51

*United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018)..............................................49

*United States v. Perez,* 89 F.4th 247 (1st Cir. 2023) ................................................9

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008)................................................8

*Worman v. Healey*,
    922 F.3d 26 (1st Cir. 2019) ................... 13, 16, 17, 19, 33, 35, 36, 38, 39, 40

## **Statutes**

Mass. Gen. Laws c. 140, § 121 .......................................................2, 4, 5, 14, 19, 48

Mass. Gen. Laws c. 140, § 131M .............................................................2, 4, 14, 19

18 U.S.C. § 921(a)(30) (1994) ....................................................................3

18 U.S.C. § 921(a)(31) (1994) ....................................................................4

18 U.S.C. § 922(v) (1994) .........................................................................3

18 U.S.C. § 922(w)(1) (1994).....................................................................4

## **INTRODUCTION**

This case concerns the authority of a State to prohibit civilians from possessing combat-style weapons and accessories that pose an inordinate risk to the safety of the public and the law enforcement officers charged with protecting the public. Since 1998, the Commonwealth has barred civilians from possessing semiautomatic assault weapons and large-capacity ammunition magazines that hold more than ten rounds. These weapons—in particular, AR-15 and AK-47 style rifles—inflict catastrophic injuries and are used disproportionately in mass shootings, and in murders of police officers. These weapons are not made or used for self-defense, but instead make up a narrow class of exceptionally lethal weapons designed for military uses.

Plaintiffs contend the Second Amendment prevents legislatures from banning *any* bearable weapon that is "in common use"—no matter how deadly, destructive, or unsuited to self-defense that weapon may be. The District Court correctly rejected their claim, finding the Massachusetts law is consistent with a long tradition of historical regulations targeting specific weapons that are unusually dangerous in relation to their self-defensive utility. While this appeal was pending, this Court issued *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024), affirming the decision of another district court rejecting a similar challenge to Rhode Island's statute prohibiting possession of large-capacity

magazines.  Because the reasoning in *Ocean State Tactical* applies directly here, the Court should affirm the District Court's decision in this case as well.

## STATEMENT OF THE ISSUE

Whether the District Court abused its discretion in denying Plaintiffs' motion to preliminarily enjoin enforcement of Mass. Gen. Laws c. 140, §§ 121, 131M, barring civilian possession of assault weapons and large-capacity magazines, where, like the Rhode Island statute reviewed in *Ocean State Tactical*, the Act is consistent with the Nation's tradition of restricting specific, unusually dangerous weapons to protect public safety?

## STATEMENT OF THE CASE

### I.   Statutory and Factual Background

#### A.   The Federal Assault Weapons and Large Capacity Magazine Ban

In the early 1990s, Congress determined it was necessary to restrict the spread of especially dangerous guns that were nearly identical to M16 automatic rifles and other military weapons.  These assault weapons, which were being marketed and sold to civilians, A-1541-42[1] (Yurgealitis ¶ 26); A-125-130 (Gohlke Ex. 1, at 21-26), had enhanced "capability for lethality—more wounds, more

---

[1] The Record Appendix is cited herein as "A-[page number]" with, where relevant, the relevant paragraph of the cited declaration.  The Addendum to this brief, including citations to the decision below, is cited as "Add:[page number]." Plaintiffs' brief is cited as "P. Br. at [page number]." The amicus brief submitted by the National Shooting Sports Foundation is cited as "Amicus at [page number]."

2

serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns."  A-157-58 (Gohlke Ex. 2 at 19-20).  Congress found that "[p]ublic concern about semiautomatic assault weapons has grown because of shootings in which large numbers of innocent people have been killed and wounded, and in which law enforcement officers have been murdered."  A-152 (Gohlke Ex. 2 at 14).

The new law (hereinafter the "Federal AWB") "combine[d] two approaches . . . to control semiautomatic assault weapons."  A-158 (Gohlke Ex. 2 at 20).  The first approach, known as the Enumerated Weapons Test, banned the manufacture, transfer, and possession of 19 specific models of semiautomatic weapons, including the Colt AR-15, and "copies or duplicates of th[os]e firearms."  A-198-200 (Gohlke Ex. 3, at 1996-98); codified at 18 U.S.C. §§ 921(a)(30), 922(v) (1994).  The second approach, known as the Features Test, banned any semiautomatic rifle, pistol, or shotgun that had two or more combat-style features, and for rifles and pistols, that also had the ability to accept a detachable magazine. A-200.  For rifles, these combat-style features included folding or telescoping stocks, flash suppressors, grenade launchers, bayonet mounts, and pistol grips that protrude beneath the action on the weapon.  A-200.  The ban did not apply to assault weapons that were possessed lawfully before September 13, 1994.  A-199.

3

It also exempted many weapons, including hundreds of rifles and shotguns commonly used in hunting and target practice.  A-199, A-202-12.

Separately, the law banned "large capacity ammunition feeding devices," also called "large capacity magazines" or "LCMs," defined as "a magazine, belt, drum, feed strip, or similar device" manufactured after September 13, 1994, that has "a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition."  A-200-01; codified at 18 U.S.C. §§ 921(a)(31), 922(w)(1) (1994).  Congress found LCMs "make it possible to fire a large number of rounds without re-loading, then to reload quickly when those rounds are spent," so that "a single person with a single assault weapon can easily fire literally hundreds of rounds within minutes."  A-157 (Gohlke Ex. 2, at 19).

### B.    The Massachusetts Assault Weapons and Large Capacity Magazine Ban

Four years after the Federal AWB went into effect, in 1998, the Massachusetts Legislature enacted a state law that similarly forbade the sale and possession of assault weapons and LCMs, except those lawfully owned before September 13, 1994 (the "Act").  Mass. St. 1998, c. 180, §§ 23, 47, codified at Mass. Gen. Laws c. 140, §§ 121, 131M.  While the bill was pending, then-acting Governor Paul Cellucci, who later signed the Act into law, referred to the prohibited assault weapons as "weapons of mass destruction [that] are designed to kill people."  A-214 (Gohlke Ex. 4).  The Legislature adopted virtually the same

definition of "assault weapon" that Congress had employed in the Federal AWB. Thus, the Act defined assault weapons to include the Enumerated Weapons and "copies or duplicates of th[os]e weapons."  Mass. Gen. Laws c. 140, § 121. Additionally, through reference to the federal ban, the Act separately adopted the Features Test.  *Id*.  The Act's definition of "large capacity feeding device" ("LCMs") and exemptions also tracked the federal ban.  *Id*.

In 2004, when the Federal AWB expired by its own terms, the Massachusetts Legislature made its ban on assault weapons and LCMs permanent. Mass. St. 2004, c. 150, § 1.  Then-Governor Romney emphasized that "[d]eadly assault weapons have no place in Massachusetts" and "are not made for recreation or self-defense."  A-217 (Gohlke Ex. 5).  Instead, "[t]hey are instruments of destruction with the sole purpose of hunting down and killing people."  *Id*.  The Act made the state "safer," he added, while still preserving the rights of the Commonwealth's "great sportsmen."  A-220 (Gohlke Ex. 6).

## II.    Procedural History

Plaintiffs filed the complaint in this action on September 7, 2022, 24 years after the Act was first codified and 18 years after its provisions were made permanent by the Legislature.  A-11.  Plaintiffs bring a single claim for relief, alleging the Act violates their right to keep and bear arms under the Second and Fourteenth Amendments to the United States Constitution.  A-19-20, ¶¶ 33-37.

The individual plaintiff, Joseph Capen, alleges that, but for the Act, he would purchase assault weapons and LCMs "to keep in his home for self-defense and other lawful purposes." A-12, ¶ 2. The organizational plaintiff, the National Association for Gun Rights, alleges that it has members who, but for the Act, would purchase assault weapons and LCMs "to keep in their homes for self-defense and other lawful purposes." A-11-12, ¶ 1.

Two months after filing the complaint, Plaintiffs moved for a preliminary injunction. A-35-58. On December 21, 2023, the District Court denied the Plaintiffs' motion. Add:1-38. Plaintiffs timely appealed.

## SUMMARY OF THE ARGUMENT

This Court should affirm the District Court's denial of a preliminary injunction because Plaintiffs have not shown a likelihood of success on the merits of their Second Amendment challenge to the decades-old Act.

As this Court concluded in *Ocean State Tactical* ("*OST*") less than two months ago, our nation's tradition of firearms regulations includes "prior bans" on "arms found to pose growing threats to public safety." *OST*, 95 F.4th at 50. There, the Court held large-capacity magazines "very likely" fall "well within the realm of devices that have historically been prohibited once their danger became manifest" and so may be banned under the Second Amendment test articulated in

6

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). *Id.* The Court should conclude the same as to the present challenge to the Act's LCM ban.

And the Court's analysis in *OST* applies with equal force to the assault weapons also restricted by the Act when considering the "two metrics" that *Bruen* deemed relevant to an analysis of historical analogues—how and why the regulation burdens the right of armed self-defense. Here, the record evidence reflects that the challenged law's restrictions on assault weapons impose little to no burden on the right to armed self-defense, while responding to an unprecedented societal concern over lethal new firearms technology that involves capabilities designed for military combat and ill-suited to self-defense.

Separately, this Court could affirm the District Court's denial of a preliminary injunction on the ground that Plaintiffs did not make an adequate showing to even get past the first step of the analysis prescribed by *Bruen*: whether the Second Amendment's text covers the proposed conduct. Plaintiffs did not show that LCMs are "arms" at all and did not show that either LCMs or assault weapons are commonly used for self-defense, which is an inquiry properly housed within *Bruen*'s first step, where Plaintiffs bear the burden. And finally, Plaintiffs cannot meet any of the remaining preliminary injunction factors either.

## **ARGUMENT**

### I.     **Standard of Review**

The Court reviews the denial of a preliminary injunction for abuse of discretion.  *OST*, 95 F.4th at 42.  Under that deferential standard, the Court reviews "the district court's factual findings for clear error" and "its legal conclusions de novo."  *Id.*; *see also Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022).  Plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction serves the public interest.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The plaintiffs' likelihood of success on the merits "weighs most heavily" in the court's determination; without it, the remaining factors "become matters of idle curiosity."  *Ryan v. U.S. Immigr. & Customs Enforcement*, 974 F.3d 9, 18 (1st Cir. 2020) (citation omitted).  Additionally, the Court may "affirm [the district court's] decision on any basis supported by the record and the law."  *OST*, 95 F.4th at 43.

### II.     **The Holding and Rationale of *OST* Require Affirmance of the District Court's Decision.**

This Court's recent decision in *OST* is entirely dispositive of Plaintiffs' challenge to the Act's prohibition of LCMs and directly on point as to the remaining issues in this case.  Under the law of the circuit doctrine, "newly

constituted panels must follow the rulings of preceding panels that are 'directly (or even closely) on point,'" with certain rare exceptions not presented here.[2]  *United States v. Perez*, 89 F.4th 247, 250 (1st Cir. 2023) (citation omitted); *see also, e.g., United States v. Barbosa*, 896 F.3d 60, 74 (1st Cir. 2018) (the exceptions are "hen's-teeth-rare").  Much of *OST*'s analysis concerned not only LCMs, but also assault weapons fitted with LCMs, and its conclusions about assault weapons are as much if not more strongly supported by the evidentiary record in this case as they were in *OST*.  And even where *OST* did not speak directly to assault weapons, its interpretation and application of *Bruen*'s governing legal framework compels affirmance of the District Court's decision as applied to the facts in evidence.  Indeed, the District Court's thorough opinion in this case closely parallels *OST*'s analysis in all relevant respects.

### A.    *OST* Supplies the Analytic Framework.

Like this case, *OST* reviewed an order denying a motion to preliminarily enjoin enforcement of a statute on Second Amendment grounds.  Four gun owners and a firearms dealer brought the action to challenge a statute recently enacted by Rhode Island that prohibited possession of large capacity feeding devices or

---

[2] Although Plaintiffs do not address *OST* because they filed their brief the day before that decision issued, they have not requested an opportunity for additional briefing to address it.  The Amicus does address *OST* and acknowledges its relevance.  Amicus at 14, 15, 20.

magazines, which it defined (like the Massachusetts Act) as those holding more than ten rounds of ammunition. *OST*, 95 F.4th at 41; R.I. Gen. Laws § 11-47.1-3. The United States District Court for the District of Rhode Island denied the motion for lack of likelihood of success on the merits, and on appeal, this Court affirmed.[3]

This Court examined the claim under the two-step analysis prescribed by the Supreme Court in *Bruen*, which considers, first, whether "the Second Amendment's plain text covers" the conduct at issue, and second, if it does, whether the regulation is "consistent with this Nation's historical tradition of firearm regulation." *OST*, 95 F.4th at 44; Add:5-11 (reviewing Supreme Court's Second Amendment jurisprudence). In *OST*, the Court assumed without deciding the first consideration was met and analyzed only the second. *OST*, 95 F.4th at 43.

The mode of analysis at the second step related to "history and tradition" depends on the nature of the restriction. *Id.* at 44. Cases involving "a general societal problem that has persisted since the 18th century" entail a "fairly straightforward" analysis, whereas "cases implicating unprecedented societal concerns or dramatic technological changes" call for a "more nuanced approach." *Bruen*, 597 U.S. at 26-27. When confronting the latter category—"modern

---

[3] *OST* also addressed two claims not raised in this action as to which it likewise found a lack a likelihood of success on the merits: a Fifth Amendment takings claim and a Fourteenth Amendment due process claim. *OST*, 95 F.4th at 52-54.

regulations that were unimaginable at the founding"—*Bruen* directs courts to "reason[] by analogy," by examining whether the modern regulation is "relevantly similar" to historical regulations.  *Id.* at 28-29.  *Bruen* identifies "two metrics" by which regulations are to be compared:  "whether modern and historical regulations impose a comparable burden on the right of armed self-defense" and "whether that burden is comparably justified."  *Id.* at 29.  This analogical inquiry is not a "regulatory straightjacket," and does not require the state to identify a "historical *twin*," only a "well-established and representative historical *analogue*";  the modern-day regulation need not be a "dead ringer for historical precursors" to be "analogous enough to pass constitutional muster."  *Id*. at 30 (emphasis in original).

OST determined that the "more nuanced" mode of analysis was required because the Rhode Island statute responded to both dramatic technological change and an unprecedented societal concern.  With regard to technological change, the Court rejected the plaintiffs' argument—identical to that advanced here, P. Br. at 47-48—that firearms capable of firing more than ten rounds without reloading are "nothing new," and explained that "today's semiautomatic weapons fitted with LCMs are more accurate and capable of quickly firing more rounds than their historical predecessors," and "substantially more lethal."  *OST*, 95 F.4th at 44 (internal quotations omitted).  With regard to societal concerns, it found in the record "no direct precedent for the contemporary and growing societal concern that

such weapons have become the preferred tool for murderous individuals intent on killing as many people as possible, as quickly as possible." *Id.* at 44.

Proceeding to analyze historical analogues for "relevant[] similarit[y]," the Court examined "<u>how</u> and <u>why</u> the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 44 (underlining in original) (quoting *Bruen*, 597 U.S. at 29). The "how" inquiry requires "comparing the 'burden on the right of armed self-defense' imposed by the new regulation to the burden imposed by historical regulations." *Id.* at 44-45. The Court conducted this inquiry by examining "the extent to which LCMs are actually used by civilians in self-defense." *Id.* at 45. Because the record showed that civilian self-defense "rarely – if ever – calls for the rapid and uninterrupted discharge of many shots, much less more than ten," the Court concluded that banning LCMs imposes "no meaningful burden" on the right of self-defense. *Id.* at 45. It then compared this burden (or lack thereof) with "the burdens imposed by the regulation of other arms throughout our history," including bans on sawed-off shotguns, restrictions on machine guns, and "the severe restrictions placed on Bowie knives by forty-nine states and the District of Columbia in the nineteenth century once their popularity in the hands of murderers became apparent." *Id.* at 45-46. From this comparison, the Court concluded that the Nation's historical tradition "has tolerated burdens on the right that are

certainly no less than the (at most) negligible burden of having to use more than one magazine to fire more than ten shots." *Id.* at 46.

The "why" inquiry requires "comparing the justification for the modern regulation to the justification for historical regulations." *Id.* at 44-45 (quoting *Bruen*, 597 U.S. at 29). The *OST* Court concluded that both Rhode Island's statute and the historical statutes aimed "to protect against the greater dangers posed by some weapons," particularly when they contribute to rising rates of violent crime. *Id.* at 46-49. The Rhode Island statute responded to the growing societal concern about mass shootings, for which "semiautomatic weapons equipped with LCMs 'have been the weapons of choice.'" *Id.* at 46-47 (quoting *Worman v. Healey*, 922 F.3d 26, 39 (1st Cir. 2019), *abrogated on other grounds by Bruen*, 597 U.S. 1). The historical record showed similar justifications for the historical regulation of a number of specific weapons and accessories: sawed-off shotguns, the Bowie knife, M-16s, and gunpowder. The Court thus concluded that "analogical reasoning very likely places LCMs well within the realm of devices that have historically been prohibited once their danger became manifest" and so the plaintiffs were not likely to succeed in their Second Amendment challenge. *OST*, 95 F.4th at 49-50.

**B.    *OST* is Dispositive as to LCMs.**

*OST* dictates the same result here as to the Act's prohibition of LCMs. The prohibition here is identical in all material respects: the Act prohibits selling,

offering for sale, transferring or possessing large capacity feeding devices, defined as magazines "capable of accepting, or that can be readily converted to accept, more than ten rounds of ammunition or more than five shotgun shells."  Mass. Gen. Laws c. 140, §§ 121, 131M (definition of "large capacity feeding device"). And the Commonwealth enacted it for the same reasons as did Rhode Island:  to "respond to threats to public safety, particularly mass shootings."  Add:37. Accordingly, as to LCMs, *OST* mandates affirmance of the District Court's order.

### C.    Application of *OST* to Assault Weapons Likewise Compels Affirmance.

Applying *OST*'s analytic framework to the Act's prohibition on certain assault weapons compels the same conclusion.  Indeed, although *OST* did not consider a ban on assault weapons, *see* 95 F.4th at 49 n.15, much of *OST*'s analysis expressly concerned not just LCMs, but semiautomatic weapons "fitted with LCMs."  *See, id.* at 44, 46, 47, 58.  And the record in this case supports and confirms each point discerned by *OST* in the factual record in that case.  As the District Court correctly found, the Act imposes a comparable burden on the right of armed self-defense, and is comparably justified, as other historical regulations within the recognized historical tradition of regulating "dangerous and unusual" weapons.  Add:35-37.  The Act stands firmly within that tradition.

1.    ***OST*** **Explicitly Rejected the "Popularity Test" at the Heart of Plaintiffs' Challenge.**

*OST* explicitly rejected the legal argument at the heart of both Plaintiffs' and Amicus's position in this case:  their insistence that once a weapon is in "common use," it cannot be prohibited, and the analysis is at an end.  *Compare OST*, 95 F.4th at 50-51, *with* P. Br. at 18-19, 25-26; Amicus at 2-3, 14, 20 n.3 (acknowledging "[t]he *OST* Court reached a contrary conclusion").  Indeed, much of Plaintiffs' argument in the District Court revolved around this same argument.  *See, e.g.*, Add:23 ("Plaintiffs contest some of the proffered analogues," but their effort "is, in substance, the same argument they make throughout:  that restrictions on 'dangerous and unusual weapons' cannot apply to the proscribed firearms because they are 'in common use' today.'").

*OST* rejected Plaintiffs' proposed "popularity test" as contravening both law and logic.  *OST*, 95 F.4th at 50-51.  It recognized that the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), acknowledged that States may prohibit "dangerous and unusual weapons," and declined to give that phrase the narrow interpretation urged by the plaintiffs that would have limited it to weapons that are "highly unusual in society at large."  *OST*, 95 F.4th at 50.[4]  It particularly

---

[4] The District Court here similarly observed that the Plaintiffs' interpretation would rob the notion of "dangerous and unusual" weapons of all meaning:  "unless the term applies to every firearm, there must be a feature of a weapon that makes it

(footnote continued)

focused on threats created by the advent of new technology, explaining that "[i]t defies reason to say that legislatures can only ban a weapon if they ban it at (or around) the time of its introduction, before its danger becomes manifest" because "[l]aw advances more slowly than the technology it regulates, but must nonetheless be able to respond when the ramifications of a technological development become more apparent over time." *OST*, 95 F.4th at 50.

The District Court below reached the same conclusion, explaining the popularity test would trap the constitutional analysis in an "infinite circularity" in which "a weapon may be banned because it is not in common use, and it is not in common use because it is banned." Add:14; *see also Worman*, 922 F.3d at 35 n.5 ("[M]easuring 'common use' by the sheer number of weapons lawfully owned is somewhat illogical[.]" (citing *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015))). The Seventh Circuit has likewise rejected this theory in a post-*Bruen* decision related to assault weapons and LCMs for the same reason. *Bevis v. City of Naperville*, 85 F.4th 1175, 1198-99 (7th Cir. 2023) (refusing to assess constitutionality "on numbers alone").

---

*unreasonably* dangerous for self-defense and other lawful purposes." Add:17 (emphasis in original). Similarly, for the term "unusual" to have any independent meaning within the analytical framework, it must mean something other than "not 'in common use.'" *Id.*

### 2.    *OST* Recognized That Analogical Reasoning is the Correct Mode of Analysis.

*OST* also effectively resolved the question of which mode of analysis to apply in this case.  The "more nuanced approach" of analogical reasoning is the correct analytic framework because the Act is designed to prevent the unprecedented tragedy of mass shootings that have been made possible only by the technological development of combat-style semiautomatic weapons capable of rapid fire by a lone shooter without reloading.  In *OST*, this Court concluded that the threat posed by assault weapons represents an unprecedented societal concern resulting from a dramatic technological change, reasoning that "today's semiautomatic weapons fitted with LCMs are more accurate and capable of quickly firing more rounds than their historical predecessors," and "substantially more lethal," giving rise to an unprecedented "contemporary and growing societal concern that such weapons have become the preferred tool for murderous individuals intent on killing as many people as possible, as quickly as possible." *OST*, 95 F.4th at 44; *see also Worman*, 922 F.3d at 39-40 (discussing the unique dangers posed by assault weapons in mass shootings).

The record in this case strongly corroborates *OST*'s conclusions as applied to assault weapons.  The District Court correctly rejected Plaintiffs' argument (advanced on appeal as well, P. Br. at 47-48) that comparable multi-shot arms have existed for centuries, finding that "[t]he features of modern assault weapons—

17

particularly the AR-15's radical increases in muzzle velocity, range, accuracy, and functionality—along with the types of injuries they can inflict are so different from colonial firearms that the two are not reasonably comparable." Add:21. As historian Robert Spitzer explains, "the guns of 1830 were essentially what they had been in 1430: single metal tubes or barrels stuffed with combustible powder and projectiles." A-1228-29 (Spitzer ¶ 37). Multi-shot weapons, like the Colt revolver and Winchester repeating rifle, did not become widely available until the end of the 19th century, A-1235-36 (Spitzer ¶ 48); A-1152-53, -1155-57 (Roth ¶¶ 28, 31-33), and it was not until after World War I that automatic and semi-automatic guns, like the Tommy submachine gun, were developed and became widely commercially available. A-1223 (Spitzer ¶ 30); A-1167-70 (Roth ¶¶ 44-46).

Assault weapons are a phenomenon of even more recent vintage. Although the AR-15 was developed for the U.S. military in the late 1950s and put into service in the early 1960s, A-630-31 (Donohue ¶¶ 103-106); A-1171-72 (Roth ¶ 49), it did not spread in large numbers among the civilian public until the late 2000s, in the wake of marketing campaigns by the firearms industry rebranding them as "modern sporting rifles." A-526, -536-38 (Busse ¶¶ 7, 23-25); *see also Bevis*, 85 F.4th at 1199 (observing that "few civilians owned AR-15s" at the time the Federal AWB was enacted in 1994, and these weapons did not increase in popularity until the last two decades).

The Amicus is thus plainly wrong when it asserts that "there is a long tradition of law-abiding citizens possessing for lawful purposes *the arms Massachusetts prohibits*." Amicus at 3 (emphasis added). This assertion appears to deliberately conflate the proscribed *assault weapons* with the entire class *semiautomatic* weapons, which are not prohibited. Amicus at 2 ("[s]emiautomatic rifles, pistols, and shotguns have been around for generations"). Plaintiffs made that same error in the District Court. Add:18 (observing that Plaintiffs conflated assault weapons with all semiautomatic weapons as a class). This Court has recognized that the Act does not ban "an entire class of firearms"; what it proscribes is "only a set of specifically enumerated semiautomatic assault weapons, magazines of a particular capacity, and semiautomatic assault weapons that have certain combat-style features." *Worman*, 922 F.3d at 37.[5]

In sum, the spread of assault weapons equipped with LCMs has created a modern phenomenon of mass shootings that would have been unimaginable to prior generations. *OST*, 95 F.4th at 44. There was no comparable problem in the founding era: homicide rates among colonists were low, A-1140-43 (Roth ¶¶ 14-16); A-557-58 (Cornell ¶¶ 19-21), and when homicides "that grew out of the

---

[5] For this same reason, Plaintiffs' reference to a "handgun ban" is inaccurate. P. Br. at 53-54. The Act prohibits only a subset of semiautomatic pistols that, like the prohibited rifles, are either specifically enumerated or have certain combat-style features. Mass. Gen. Laws c. 140, §§ 121, 131M. It is thus unlike the "absolute ban on handguns" at issue in *Heller*. *See Heller*, 554 U.S. at 632.

tensions of daily life" did occur, "[g]uns were not the weapons of choice " because of the practical limitations of the heavy, single-shot manually loaded firearms of the time.  A-1140-43 (Roth ¶¶ 14-17); *see also* A-557 (Cornell ¶ 19).  And mass murder, when it existed, was a group activity: "The only way to kill a large number of people was to rally like-minded neighbors and go on a rampage," because the weaponry of the time "did not provide individuals or small groups of people the means to inflict mass casualties on their own."  A-1164-65 (Roth ¶ 41).[6]

> ### 3. The Act Imposes a Minimal Burden Comparable to That of Other Regulations Within the "Dangerous and Unusual" Tradition.

In *OST*, this Court recognized that there is a historical tradition of regulating "dangerous and unusual" weapons "to protect against the greater dangers posed by some weapons (as compared to, for example, handguns)."  *OST*, 95 F.4th at 49. The District Court correctly concluded that the Act stands firmly within that tradition, and that the Act's burden on the right of self-defense is comparable to or less than that of the historical regulations within this tradition, because assault weapons are neither suitable, nor actually used, for self-defense.

---

[6] The Amicus, astonishingly, asserts that "mass murder has been a fact of life in the United States for a very long time."  Amicus at 25.  But the Amicus's sole support for this claimed culture of mass murder is *National Rifle Ass'n v. Bondi*, 61 F.4th 1317 (11th Cir.), *reh'g en banc granted, opinion vacated*, 72 F.4th 1346 (11th Cir. 2023), which described the phenomenon of *individual-on-individual* gun homicides committed by 18- to 20-year-olds in the Reconstruction era, not *mass* shootings.  *Id.* at 1319.

a.     **There is a Robust Historical Tradition of Regulating Specific Weapons That Are Unreasonably Dangerous in Relation to their Self-Defensive Utility.**

The District Court in this case correctly relied on the same tradition as described in *OST*, concluding that it encompasses weapons that are "unreasonably dangerous and unusual for ordinary citizens to use for lawful purposes, particularly self-defense." Add:25. Other district courts have reached the same conclusion about the nation's history of weapons regulation.[7] The historical record assembled by the Commonwealth in this case corroborates that conclusion, supplying a number of examples. From the Founding era through the 20th century, states have understood their police powers to permit restricting specific types of weapons and accessories that posed a threat to public safety. Although the particulars of the weapons (and ammunition) described below may differ, the constant is that States have routinely regulated, and sometimes outright banned, specific weapons once it became clear that they posed a unique danger to public safety, including mass deaths and violent crime unrelated to self-defense.

_____

[7] *See, e.g., Rupp v. Bonta*, No. 17-CV-00746-JLS-JDE, 2024 WL 1142061, at *35 (C.D. Cal. Mar. 15, 2024), appeal docketed, No. 24-2583 (9th Cir. Apr. 22, 2024); *Nat'l Ass'n for Gun Rights v. Lamont (NAGR)*, --- F. Supp. 3d ---, 2023 WL 4975979, at *32 (D. Conn. Aug. 3, 2023), appeal docketed, No. 23-1162 (2nd Cir. Aug. 16, 2023); *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec. (DSSA)*, 664 F. Supp. 3d 584, 601 (D. Del. 2023), appeal docketed, No. 23-1633 (3rd Cir. Apr. 7 2023); *Bevis v. City of Naperville*, 657 F. Supp. 3d 1052, 1073 (N.D. Ill.), aff'd on other grounds, 85 F.4th 1175 (7th Cir. 2023); *Hartford v. Ferguson*, 676 F. Supp. 3d 897, 906 (W.D. Wash. 2023).

*Gunpowder.*  In the 18th century, gunpowder posed significant public safety concerns, and as a result, was subject to numerous regulations.  *OST*, 95 F.4th at 49 & n.16 (calling gunpowder storage laws an "especially apt analogy to Rhode Island's LCM ban"); A-563-64 (Cornell ¶¶ 29-30).  Indeed, "the scope of government power to regulate, prohibit, and inspect gunpowder has been among the most far reaching of any exercise of the police power throughout American history."  A-563-64 (Cornell ¶ 30).  A 1782 Massachusetts law, for example, forbade any person to "take into any Dwelling-House, Stable, Barn, Out-house, Ware-house, Store, Shop, or other Building, within the Town of *Boston*, any ... Fire-Arm, loaded with, or having Gun-Powder," and permitted the seizure of any loaded firearm that "shall be found" there.  A-1820-22 (1782 Mass. Acts 119, ch. 46).  A 1784 New York statute limited the possession of gunpowder by individuals to 28 pounds apiece, stored in four separate containers.  1784 N.Y. Laws 627.  Governments frequently set up communal magazines and required that individuals store their gunpowder in those locations.  *See, e.g.,* A-1812 (1706-7 Mass. Acts ch. 4).  Maine not only regulated how much gunpowder could be possessed, but even authorized town selectmen to enter buildings to search for gunpowder.  A-1829-31 (1821 Me. Laws 98, ch. 25, § 5); *see also* A-563-64 (Cornell ¶¶ 29-30); *Brown v. Maryland*, 25 U.S. 419, 443 (1827) ("The power to direct the removal of gunpowder is a branch of the police power, which unquestionably remains, and

ought to remain, with the States."), *abrogated on other grounds by Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175 (1995).

*Trap Guns*.  Another public safety threat in the 18th century was posed by the trap gun, a firearm rigged to fire remotely when triggered.  A-1259-61 (Spitzer ¶¶ 83-86).  Although trap guns were frequently used for defensive purposes—including the protection of businesses, property or possessions— founding-era governments understood them to be unacceptably lethal because they posed a serious threat to innocent people who encountered them.  A-1259-60 (Spitzer ¶ 84).  New Jersey outlawed trap guns in 1771, A-1819 (10 New Jersey 21), and ultimately fifteen states followed, continuing through the early 20th century.  A-1261, -1314-16, -1451-61 (Spitzer ¶ 86, Ex. B (years of enactment) & Ex. F (text of trap gun laws)).

*Bowie Knives.*  Another set of salient analogues are "the severe restrictions placed on Bowie knives by forty-nine states and the District of Columbia in the nineteenth century once their popularity in the hands of murderers became apparent."  *OST*, 95 F.4th at 46.  During the early national period, societal concerns about public safety began to change dramatically due to increasing production of guns, knives, and other deadly weapons as part of the larger industrial revolution of the era.  A-558-59 (Cornell ¶ 22); A-1139-40 (Roth ¶ 13).  This technological development was accompanied by rising murder rates throughout the 19th century.

A-1147-49, -1152-58 (Roth ¶¶ 22-23, 28-34).  States responded by singling out the specific weapons that posed a particular danger and were susceptible to criminal misuse.  A-559 (Cornell ¶ 23); A-1098-99 (Rivas ¶ 20).

One such weapon was the Bowie knife, a knife with a long blade, hand guard, and clipped point designed expressly for fighting, which was invented in the 1820s and proliferated rapidly during the 1830s.  A-1245-48 (Spitzer ¶¶ 64-65); A-1149-50 (Roth ¶¶ 24-25).  Responding to "a growing societal concern about violent crime," state legislatures quickly began "severely restricting the weapons used by its perpetrators."  *OST*, 95 F.4th at 48.  In 1837, Tennessee enacted *An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State*, which prohibited both the sale and the concealed carry of Bowie knives.  A-1853-54 (1837-38 Tenn. Pub. Acts 200-01, ch. 137, §§ 1-2).  This statute was upheld against a constitutional challenge to its concealed carry prohibition.  *Aymette v. State*, 21 Tenn. 154, 158 (1840) (describing Bowie knives as "weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin.").  Also in 1837, Georgia enacted *An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons*, which similarly prohibited the sale or public carry of Bowie knives.  A-1849-50 (1837 Ga. Acts. 90, § 1).  Although the Georgia Supreme Court struck down the portion of the law that prohibited *open* carry, it did not

address the sale prohibition.  *Nunn v. State*, 1 Ga. 243, 251 (1846); A-1114 (Rivas

¶ 41).[8]  In the same year, Alabama enacted *An Act to Suppress the Use of Bowie*

*Knives*, which placed a prohibitively expensive tax of one hundred dollars on

"selling, giving or disposing" of Bowie knives. A-1841 (Act of Jun. 30, 1837, ch.

77, § 2, 1837 Ala. Laws 7).  Florida went one step further with an annual tax of

$200 on selling Bowie knives and $10 on carrying them openly. A-1857 (Act of

February 10, 1838, Pub. L. No. 24 § 1, 1838 Fla. Laws 36).  By the end of the

nineteenth century, 49 states plus the District of Columbia restricted Bowie knives

through a variety of regulatory modes, including many jurisdictions that banned

*both* open *and* concealed carry of Bowie knives.[9]  *OST*, 95 F.4th at 46, 48; A-

1252-53, -1462-64 (Spitzer ¶¶ 71-72 & Ex. H (table of Bowie knife laws by state,

---

[8] In 1874, the Georgia Supreme Court, examining *Nunn*, expressed the view that constitutional protection should not extend to "pistols, dirks, Bowie-knives, and those other weapons of like character, which, as all admit, are the greatest nuisances of our day," but ultimately did not need to reconsider *Nunn*.  *Hill v. State*, 53 Ga. 472, 474 (1874).

[9] *See, e.g.*, Hawaii:  1852 Haw. Sess. Laws 19, § 1 (A-1870); Tennessee:  1871 Tenn. Pub. Acts 81, Ch. 90; Tenn. Pub. Acts (1879), chap. 186, as codified in Tenn. Code (1884), 5533 (A-1891-92); Texas:  1871 Tex. Laws 25 (A-1895-97); Arkansas: 1881 Acts of the General Assembly of Arkansas 191, No. 96 § 1 (1881) (A-1911-12); West Virginia:  1882 W. Va. Acts 421-22, § 7 (A-1915-16); New York:  George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York, as Amended 1882-5 172 (1885) available at The Making of Modern Law: Primary Sources, Carrying, Using Etc., Certain Weapons § 410 (A-1918); Arizona:  1889 Ariz. Sess. Laws 16-17, Act of Mar. 18, 1889, §§ 1, 3 (A-1925-26); Oklahoma:  1890 Okla. Laws 495, art. 47, § 2 (A-1932-33).

date and mode of regulation)).; *see Bevis*, 657 F. Supp. 3d at 1069 n.21 & 22

(collecting representative statutes).

***Clubs and Other Blunt Weapons.*** Clubs and other blunt weapons were also

heavily regulated. A-1254 (Spitzer ¶ 74); *Bevis*, 657 F. Supp. 3d at 1070. Every

state in the nation had laws restricting one or more types of clubs or other blunt

instruments. A-1254 (Spitzer ¶ 74). States particularly singled out billy clubs and

slung shots (a hand-held weapon developed in the 1840s for striking by means of a

piece of metal or stone attached to a flexible strap or handle). A-1255-56 (Spitzer

¶¶ 76, 78). States enacted an array of legislation on these weapons beginning

before the Founding era and continuing into the 20th century. For example, in

1750, Massachusetts enacted a law authorizing the dispersal or seizure of groups of

twelve or more people armed with "clubs or other weapons." A-1815-16 (1750

Mass. Acts 544, chap. 17, § 1). The most common regulatory method during the

19th century was the prohibition of concealed carry, but at or around the time of

Reconstruction, at least three states prohibited the manufacture and/or sale of slung

shots, including Massachusetts in 1850, Florida in 1868, and Minnesota in 1888.[10]

---

[10] Mass. Gen. Law, chap. 194, §§ 1, 2 as codified in Mass. Gen. Stat., chap. 164
(1873) § 11 (A-1867); Fla. Act of Aug. 8, 1868, as codified in Fla. Rev. Stat., tit. 2,
pt. 5 (1892) 2425 (A-1880); George Brooks Young, General Statutes of the State
of Minnesota in Force January 1, 1889, Page 1006, Image 1010 (Vol. 2, 1888)
available at The Making of Modern Law: Primary Sources (A-1918).

Later, states prohibited not only the manufacture but also possession of items like slung shots, billy clubs and bludgeons.[11]

**_Sawed-Off Shotguns and Automatic Weapons._** The relevant historical tradition also "includes bans on sawed-off shotguns . . . [and] restrictions on machine guns, most of which have been effectively banned nationally since 1986." *OST*, 95 F.4th at 46. It was not until the early 20th century that the specific societal concern of mass shootings emerged with the development and proliferation of weapons capable of rapid automatic or semiautomatic fire. A-1167-68 (Roth ¶ 44). The regulations that emerged in this era are significant because they evidence the earliest public response to the specific technological and societal concern addressed by the Act, and they demonstrate a strong tradition that such weapons may be heavily regulated and even banned to protect the public from their unique lethality.[12] Sawed-off shotguns were regulated federally in 1934, "after they became popular with the 'mass shooters of their day'—notorious Prohibition-era gangsters like Bonnie Parker and Clyde Barrow." *OST*, 95 F.4th at 47. Machine guns were also first regulated by Congress in 1934, about fifty years

---

[11] Act of May 4, 1917, ch. 145, §§ 1, 2, 5, 1917 Cal. Sess. Laws 221, 221-22 (A-1942-46); 1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3 (A-1993).

[12] *OST* recognized that, under *Bruen*, late-19th-century and 20th-century historical evidence may be probative if it does not contradict earlier evidence. *OST*, 95 F.4th at 52.

after their invention, *id.* at 50, and "have been effectively banned nationally since 1986," *id.* at 46.

    ***Semiautomatic Weapons and LCMs***:  Around the same time as these restrictions on sawed-off shotguns and machine guns, semiautomatic weapons were banned in eight to eleven jurisdictions in the 1920s and 1930s—typically in the *same legislation* that established the now widely-accepted "tradition" of banning machine guns.  So, for example, Rhode Island in 1927 banned the manufacture, sale, or possession of "any weapon which shoots more than twelve shots *semiautomatically*"; and Congress, for the District of Columbia, in 1932 banned the possession of "any firearm which shoots automatically *or semiautomatically* more than twelve shots without reloading."[13]  *See Bevis*, 657 F. Supp. 3d at 1071 & nn.35-38 (citing representative statutes).  In the same era, regulations limiting magazine capacity were also common:  twenty-three States imposed some limitation on ammunition magazine capacity, restricting the number

---

[13] *See* 1927 R.I. Pub. Laws 256-57, ch. 1052 §§ 1, 4 (A-2001-02) (emphasis added); Act of July 8, 1932, ch. 465, § 1, 47 Stat. 650, 650 (A-2019) (emphasis added); *see also* 1927 Mich. Pub. Acts 888-89, § 3 (A-1993-94); Act of Apr. 10, 1933, ch. 190, § 1, 1933 Minn. Laws 231, 232 (A-2035-36); 1934 Va. Acts 137-40, ch. 96 (A-2039-42).

of rounds to typically between five and eighteen.  A-1223-26 (Spitzer ¶¶ 31-33 &

Table 1); *Bevis*, 657 F. Supp. 3d at 1071 & n.39.[14]

> **b.    The District Court Correctly Found the Act's Burden is Comparably Minimal Because Assault Weapons Are Not Suitable or Actually Used for Self-Defense.**

The District Court correctly concluded that the Act's burden on the right of

armed self-defense is comparable to or less than that of these historical regulations,

for the same reason considered dispositive by *OST* in the case of LCMs:  that they

are not suitable for, nor actually used in, self-defense.  *OST*, 95 F.4th at 45-46;

Add:22-29.[15]  This is significant, because the Supreme Court has repeatedly

identified self-defense as the "central component" of the Second Amendment right.

*Bruen*, 597 U.S. at 29; *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010);

*Heller*, 554 U.S. at 599.  To gauge the relevant burden, *OST* directs courts to focus

on "the extent to which [the regulated weapons] are actually used by civilians in

---

[14] *See, e.g.,* 1923 Vt. Acts and Resolves 127, § 1 (A-1974); 1931 Ill. Laws 452-53 §§ 1-2 (A-2010); Act of July 7, 1932, No. 80, § 1, 1932 La. Acts 336, 337 (A-2023); 1933 Cal. Stat. 1169, 1170 (A-2030).

[15] Situating the Act within this tradition does not constitute "stealth interest-balancing," as Plaintiffs charge.  P. Br. at 20.  It is a matter of historical record that legislatures have long targeted specific weapons for their perceived dangerousness in relation to their self-defensive utility, as described above.  The District Court faithfully applied *Bruen*'s command by examining that historical record to determine whether the Act was consistent with it.  Add:22-25.  In reality, Plaintiffs' complaint of "stealth interest-balancing" is simply a reformulation of their (now rejected) "popularity" test.  P. Br. at 25 ("If a weapon is in common use, its 'relative dangerousness' is simply irrelevant.")

self-defense," because "[d]epriving citizens of a device that is virtually never used in self-defense imposes less of a burden on that right than does banning a weapon that is, in fact, traditionally used in self-defense." *OST*, 95 F.4th at 50. *OST* expressly rejected the plaintiffs' request there to disregard the absence of evidence of actual use and instead focus on mere possession for the "purpose" of being "armed and ready" for offensive or defensive action. *Id.*[16]

The District Court here addressed many of the same points deemed relevant by *OST*. It found that the Act imposes only a "minimal burden on the right of self-defense," both because it targets a specific group of unusually dangerous weapons rather than an entire class, and because the proscribed weapons "are not reasonably suitable for self-defense under normal circumstances, nor are they normally used for that purpose." Add:24. Instead, the District Court held that the weapons proscribed by the Act qualified as "dangerous and unusual" because they "are not suitable for ordinary self-defense purposes, and pose substantial dangers far beyond those inherent in the design of ordinary firearms." Add:29. Specifically, the District Court found "little serious question that assault weapons, such as the

---

[16] The Amicus makes the same argument in this case. Amicus at 14 (acknowledging *OST*'s contrary conclusion). In light of this Court's conclusion in *OST*, this argument will not be addressed further here.

AR-15, have characteristics that give them capabilities far beyond those of a typical handgun."  Add:25.

The record in this case strongly supports the District Court's conclusions. First, the AR-15 is "functionally identical to its military counterparts," like the M-16.  Add:25-26; *see also Heller*, 554 U.S. at 627 (confirming "M-16 rifles and the like" "may be banned" consistent with the Second Amendment).  The two models share their "basic structure, operation, near-equivalent muzzle velocities (3300 feet per second), and rates of effective fire (45 rounds per minute)."  Add:25-26 (citing A-1171-72 (Roth ¶ 49)); *see also Bevis*, 85 F.4th at 1195-96 (noting AR-15s and M-16s "share the same core design, and both rely on the same patented operating system" and "[b]oth models use the same ammunition, deliver the same kinetic energy (1220–1350 foot-pounds), the same muzzle velocity (2800–3100 feet per second), and the same effective range (602–875 yards)").  Indeed, assault rifles "were developed for modern military combat, not self-defense."  Add:25 (citing A-1171-72 (Roth ¶¶ 49)).  As the Fourth Circuit has explained, "[t]he very features that qualify a firearm as a banned assault weapon—such as flash suppressors, barrel shrouds, folding and telescoping stocks, pistol grips, grenade launchers, night sights, and the ability to accept bayonets and large-capacity magazines— 'serve specific, combat-functional ends.'"  *Kolbe v. Hogan*, 849 F.3d 114, 137 (4th Cir. 2017) (en banc), *abrogated on other grounds by Bruen*, 597 U.S. 1; *see also*

A-527-32 (Busse ¶¶ 9-14) (describing military—rather than defensive—value of assault weapon features).

Plaintiffs continue to attach dispositive constitutional significance to the single difference between AR-15s and M-16s:  that M-16s are capable of fully automatic fire.  Pl. Brief at 53.[17]  But as the District Court noted, the M-16's fully automatic function is "a feature that the U.S. Marine Corps discarded in favor of a maximum setting of a three-round burst—a decision made to enhance lethality by slowing the rate of fire, conserving ammunition, and improving accuracy" and the U.S. Army has similarly noted in its Manual on Advanced Rifle Marksmanship that "[a]utomatic or burst fire is inherently less accurate than semiautomatic fire." Add:26 (citing A-1171-72 (Roth ¶ 49), A-269-94 (Gohlke Ex. 10)).  Further, simple modifications can render AR-15s capable of rates matching fully automatic fire.  *Bevis*, 85 F.4th at 1196 ("The similarity between the AR-15 and the M16 only

---

[17] Plaintiffs' reliance on *Staples v. United States*, 511 U.S. 600 (1994), for the supposed legal significance of this distinction is misplaced.  *Staples* "had nothing to do with the Second Amendment, which is mentioned nowhere in the opinion." *Bevis*, 85 F.4th at 1194.  It was a pure statutory construction case about *mens rea* under the National Firearms Act, holding that a conviction for possession of an *automatic* weapon required proof beyond a reasonable doubt that the defendant actually knew his *semiautomatic* weapon had been converted to automatic fire. *Staples*, 511 U.S. at 602.  *Staples*'s comment that AR-15s have been "widely accepted as lawful possessions"—made "with no empirical support," as the Seventh Circuit has noted—was nothing more than a reflection of the then-current legal status of AR-15s, which had not yet been banned by Congress at the time *Staples* was decided.  *See Bevis*, 85 F.4th at 1194.

increases when we take into account how easy it is to modify the AR-15 by adding a 'bump stock' (as the shooter in the 2017 Las Vegas event had done) or auto-sear to it, thereby making it, in essence, a fully automatic weapon"); *see also* A-540 (Busse ¶ 27) ("Most AR-15s and similar firearms now incorporate features designed to accept one or more of dozens of accessories, all of which are designed and marketed to increase the effectiveness of the rifle in live-fire situations."); A-1173-74 (Roth ¶¶ 52-53) (discussing modifications to increase rate of fire).

Second, the District Court compared the "design and features" of an AR-15 with those of a handgun—the "quintessential self-defense weapon." Add:26; *see Heller*, 553 U.S. at 629. In doing so, the District Court found that "AR-15s are physically unsuited to typical self-defense scenarios." Add:26. This Court came to a similar conclusion only five years ago on a full summary judgment record. *See Worman*, 922 F.3d at 37 ("[S]emiautomatic assault weapons do not share the features that make handguns well-suited to self-defense in the home," as the Supreme Court described those features in *Heller,* 554 U.S. at 629).[18] Specifically, AR-15s are "significantly heavier and longer than typical handguns," rendering them "not generally useful or appropriate weapons for ordinary citizens to keep at

---

[18] Although *Worman* examined this question to decide the appropriate level of scrutiny as part of an approach since rejected by *Bruen*, this Court's analysis of the suitability of assault weapons in self-defense bears directly on the analysis mandated by *Bruen* and applied by this Court in *OST*.

their bedsides, or to carry on city streets as they go about their daily business."
Add:26-27 (citing A-1558-62 (Yurgealitis ¶¶ 82-91)).

Further, the "firepower of an AR-15 also contributes to making [an AR-15] generally unsuitable for self-defense." Add:27. The muzzle velocity of an AR-15 (typically 3200-3300 feet per second) is "nearly double that of an ordinary 9mm handgun." Add:27 (citing A-1559-59 (Yurgealitis ¶ 83); A-1171-72 (Roth ¶ 49)). As a result, the rounds fired from an AR-15 "can cause more damage" and pose a serious risk of "over-penetration," meaning the rounds may pass through their intended target—even through solid walls at ranges of 350 yards—and can hit "bystanders, family members, or other innocent persons well outside the intended target area." Add:27 (citing A-1558-59 (Yurgealitis ¶¶ 83-84), A-646 (Donohue ¶ 155)).

Even compared with center-fire rifles of comparable muzzle-velocity, AR-15s are "uniquely dangerous." Add:27-28. That is because AR-15s use "relatively small bullet[s]" and so have a "comparatively low level of kinetic energy per round." Add:27-28 (citing A-413 (Gohlke Ex. 25)). This low kinetic energy translates into "low recoil," which in turn allows the shooter to fire "in rapid succession on a precise target." Add:27-28 (citing A-396-413 (Gohlke Exs. 24 & 25)). The result is "more rounds on target" and "thus greater lethality." Add:27-28; *see also Kolbe*, 849 F.3d at 125 (finding assault weapons are "designed for the

battlefield" and that design "results in 'a capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns'" (quoting H.R. Rep. No. 103-489, at 19-20)).

Relatedly, by design, AR-15s are intended to inflict "catastrophic" injuries that "far surpass[] the destructive power of typical semiautomatic handguns." Add:28 (citing A-357-86 (Gohlke Exs. 19-22)).  The high-velocity rounds shot from an AR-15 "create 'cavitation' in the penetrated tissues, inflicting catastrophic bleeding, breaking bones, and causing irreversible tissue damage."  Add:28 (citing A-388-95 (Gohlke Ex. 23)).  While a typical 9mm handgun creates a one- to two-inch "pathway of tissue destruction," an AR-15 "will literally pulverize the liver, perhaps best described as dropping a watermelon onto concrete."  Add:28 (citing A-413 (Gohlke Ex. 25)).  As one emergency medicine physician who responded to the Newtown, Connecticut elementary school shooting described, unlike many handgun wounds, being shot in the torso by an AR-15 is "not a survivable event." A-370 (Gohlke Ex. 20); *see also Worman*, 922 F.3d at 39 (quoting affidavit of "seasoned trauma surgeon" to find "semiautomatic assault weapons cause wounds that 'tend to be higher in complexity with higher complication rates than those injuries from non-assault weapons'" and "'tend to cause far greater damage to the muscles, bones, soft tissue, and vital organs'").

In combination, these features mean that an AR-15 can inflict "catastrophic" injuries on multiple targets in "rapid succession" "with precision from hundreds of yards away."  Add:27-28. The District Court explained that while no single characteristic might render a firearm "dangerous and unusual," the AR-15 combines characteristics that together create destructive potential "go[ing] far beyond the reasonable requirements of self-defense."  Add:28 & n.18.[19]

Furthermore, the record supports that assault weapons are rarely, if ever, "actually used by civilians in self-defense."  *See OST*, 95 F.4th at 50.  According to information reported by the Heritage Foundation on defensive gun-uses, the use of *any* type of rifle in actual self-defense situations is quite rare—approximately 2-4% of all defensive gun uses.  A-426-27 (Allen ¶ 24).  Plaintiffs have offered no instance where an assault weapon was actually used in self-defense. *See generally* P. Br.; A-35-63, -1571-1640 (Plaintiffs' preliminary injunction materials); *see also Worman*, 922 F.3d at 37 (finding "no indication that the proscribed weapons have commonly been used for home self-defense purposes" and observing that "not one

---

[19] In Massachusetts, self-defense is only legally justified where someone has "used all reasonable means to avoid physical combat" and "the degree of force used was reasonable in the circumstances, with proportionality being the touchstone for assessing reasonableness."  *Commonwealth v. McGann*, 141 N.E.3d 405, 417 (Mass. 2020).  The District Court's finding that AR-15s, as representative of the weapons proscribed by the Act, are not suitable for self-defense is consistent with the law's requirement that self-defense be "reasonable" and "proportional."

of the plaintiffs or their six experts could identify even a single example of the use of an assault weapon for home self-defense").

Conspicuously, Plaintiffs also do not meaningfully dispute the District Court's determinations. They do not challenge the proposition that AR-15s are not useful for ordinary self-defense purposes, nor did they submit any evidence to rebut the Commonwealth's substantial factual showing on this point. Add:28. On appeal, they give no attention to issues of dangerousness or self-defensive utility, beyond a bare assertion that the statistical rate of homicides for *all* types of rifles is low (which provides no insight into assault weapons in terms of *relative* dangerousness, self-defensive utility, or rate of use in mass shootings as compared to other long guns).[20]

Numerous courts around the country have reached the same conclusion that assault weapons are neither suitable, nor used, for self-defense. *See, e.g., Heller v. District of Columbia*, 670 F.3d 1244, 1262 (D.C. Cir. 2011) ("the prohibition of semi-automatic rifles and large-capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves"); *Kolbe*, 849

---

[20] The Amicus devotes a single paragraph to the argument that the features of assault weapons, such as the high rate of effective fire, can be beneficial for self-defense as well as combat, but ultimately dismisses the issue as irrelevant under the proffered popularity test. Amicus at 17-18.

F.3d at 138; *Rupp*, 2024 WL 1142061, at *13; *DSSA*, 664 F. Supp. 3d at 602;

*NAGR*, 2023 WL 4975979, at *26; *Bevis*, 657 F. Supp. 3d at 1075.

Reviewing similar evidence about LCMs in light of the historical record, this Court concluded that "it seems reasonably clear that our historical tradition of regulating arms used for self-defense has tolerated burdens on the right that are certainly no less than the (at most) negligible burden" imposed by Rhode Island's statute. *OST*, 95 F.4th at 46. The above-described evidence about assault weapons compels the same conclusion here.

### 4. Like the Rhode Island Statute, The Act Addresses the Growing Threat of Mass Shootings.

The Act is also justified by the same concern that has driven governmental regulation of specific weapons throughout history: the State's responsibility to protect the public from the danger caused by weapons that create a particular public safety threat. The Act is designed to prevent the unprecedented tragedies that have been made possible only by the technological development of combat-style semiautomatic weapons capable of rapid fire by a lone shooter without reloading. In *Worman* and again in *OST*, this Court recognized the contribution of assault weapons to the modern phenomenon of mass shootings—tragedies in which "semiautomatic firearms equipped with LCMs 'have been the weapons of choice.'" *OST*, 95 F.4th at 46 (quoting *Worman*, 922 F.3d at 39). Assault weapons have been deployed in many of the "deadliest mass shootings in recent history,"

because "[s]emiautomatic firearms fitted with LCMs are highly effective weapons of mass slaughter." *OST*, 95 F.4th at 46 (internal quotations omitted); *Worman*, 922 F.3d at 39. "They are designed to shoot multiple human targets very rapidly and allow the shooter to spray-fire from the hip position." *OST*, 95 F.4th at 46 (internal quotations omitted).

The record in this case strongly reinforces that conclusion. Evidence shows that bans on assault weapons and LCMs save lives. A-748-55 (Klarevas ¶¶ 30-45) (detailing theoretical mechanisms and empirical evidence showing effectiveness of bans). Assault weapons and LCMs pose a public safety threat different in kind from that of firearms suited to self-defense. Mass shootings have become tragically commonplace over the last two decades, and "the deadliest individual acts of intentional criminal violence in the United States since the terrorist attack of September 11, 2001, have all been mass shootings." A-730-31 (Klarevas ¶ 11). Although the United States has only 5% of the world's population, it has experienced "roughly one-third of the public mass shootings across 171 countries since the late 1960s." A-612 (Donohue ¶ 63). Worse, the number of mass shootings is growing at an alarming rate. A-730-36 (Klarevas ¶¶ 11-13). The use of assault weapons and LCMs are major factors in the rise of mass shooting violence. A-732-39 (Klarevas ¶¶ 12-17 & Figs. 3-6). The particular features of assault weapons, especially when combined with LCMs, pose "unique dangers,"

by "permit[ting] a shooter to fire multiple rounds very quickly, allowing him to hit more victims in a shorter period of time." *Worman*, 922 F.3d at 39; *see also* A-1174-78 (Roth ¶¶ 54-60).  These features make them "force multipliers" when used to perpetrate mass shootings:  in the last 32 years, the use of assault weapons and LCMs in high-fatality mass shootings has resulted, respectively, in 67% and 58% increases in average fatalities per incident.  A-738-39 (Klarevas ¶¶ 15-17).

They are also uniquely dangerous to law enforcement because, as the District Court found, "their features allow shooters to engage targets from far greater distances, to do so more accurately, and to penetrate body armor."  Add:25 (citing A-603-04 (Donohue ¶ 44); A-1562 (Yurgealitis ¶ 92)).  They are in fact disproportionately used to kill police officers.  A-603-04 (Donohue ¶ 44).  The May 2022 mass shooting in Uvalde, Texas, where police officers were unwilling or unable to enter the elementary school classroom where the shooter was located during the shooting, vividly underscores how the use of assault weapons can impair the police response.  A-603-04 (Donohue ¶ 44).

Massachusetts thus adopted the Act "to 'help keep the streets and neighborhoods of Massachusetts safe' by 'mak[ing] it harder for criminals to get their hands on these dangerous guns.'"  *Worman*, 922 F.3d at 39; *see also* A-213-221 (Gohlke Exs. 4-6) (reporting comments of then-Governors Cellucci and Romney, including that assault weapons are "weapons of mass destruction" and

"are not made for recreation or self-defense"). This is the same purpose that animated Rhode Island's LCM statute, as well as the historical statutes in the tradition of regulating "dangerous and unusual" weapons. *OST*, 95 F.4th at 47-49. Sawed-off shotguns, for example, were regulated by Congress "after they became popular with the 'mass shooters of their day'" and Bowie knives were singled out for regulation after the country experienced a "nationwide surge of homicides in the nineteenth century," even though Bowie knives "could conceivably be used for self-defense." *Id.* at 47-48. M-16s as well are subject to regulation because "[t]hey are more dangerous, and no more useful for self-defense, than a normal handgun or rifle." *Id.* at 48. Limitations on the storage of gunpowder similarly were motivated by a concern that "large quantities of gunpowder… could kill many people at once if ignited." *Id.* at 49. The Act thus shares the same justification as the Rhode Island statute and the others within this historical tradition that "recognizes the need to protect against the greater dangers posed by some weapons (as compared to, for example, handguns) as a sufficient justification for firearm regulation." *Id.*

### 5. Plaintiffs Fail to Rebut the Commonwealth's Showing at Step Two.

Plaintiffs' main response to the Commonwealth's historical showing is that none of the historical regulations relied on by the Commonwealth are analogous to a ban on possession in the home. P. Br. at 42-47. *OST* effectively resolved that

issue when it recognized the analogy between the same historical tradition and Rhode Island's LCM ban.  *OST*, 95 F.4th at 49-50.  Nevertheless, to the extent more is required, Plaintiffs' argument fails on its own merits for several reasons.  First, Plaintiffs are wrong that there were no bans on sale or possession in the Founding era.  When eighteenth-century legislators did perceive a widespread public safety threat, they regulated through prohibitions, as with gunpowder and trap guns.  *See* Section II(C)(3)(a), above.  *See also Rupp*, 2024 WL 1142061, at *35.  Legislatures throughout the early national and Reconstruction periods did the same in the case of Bowie knives and slung shots.  *Id.*

But even if Plaintiffs were correct about the historical record, their insistence that only a Founding-era ban will satisfy the Commonwealth's burden is inconsistent with *Bruen*, because Plaintiffs' interpretation would demand a "historical twin," rather than "historical analogue," and would amount to the "regulatory straightjacket" that *Bruen* rejects.  *Bruen*, 597 U.S. at 30.  And Plaintiffs' effort to distinguish laws prohibiting public carry from those prohibiting "possession in the home" also founders on *Bruen*'s recognition that "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms."  *Id.* at 32.

Further, under Plaintiffs' interpretation of the text-and-history test, a legislature could never ban *any* bearable weapon once it was owned in some

unspecified number.  This reasoning lacks any limiting principle, and it cannot be

correct, because some weapons, like sawed-off shotguns and machine guns, plainly

may be banned.  If Plaintiffs were right that history precludes a weapon-specific

ban, then prohibitions on these and other weapons would be invalid (or at least,

their validity would be determined solely based on the bare number in circulation,

as Plaintiffs urge).  Indeed, any new weapon, no matter how lethal, would become

immune from prohibition as soon as it was sold in sufficient numbers—a

conclusion this Court rejected as "def[ying] reason." *OST*, 95 F.4th at 50.

    The evidence in the record explains why firearm-specific bans were rare in

the 18th and early 19th centuries:  neither the relevant weapons, nor the social

problems, nor the regulatory resources existed yet.  Legislatures do not generally

legislate to their constitutional limits, and "[t]he paucity of eighteenth century gun

control laws might have reflected a lack of political demand rather than

constitutional limitations." *Antonyuk v. Chiumento*, 89 F.4th 271, 301 (2nd Cir.

2023).  The 18th century did not have any analogously lethal new firearms

technology.  The firearms of the period were single-shot flintlock muzzle-loading

guns, like muskets and fowling pieces, that were little changed from those of

previous centuries.  A-1229-40 (Spitzer ¶¶ 38-53); A-1140-42 (Roth ¶¶ 14-17); A-

557-59 (Cornell ¶¶ 20-22).  It was not until the early national period that lethal new

weapons began to proliferate, at which point state legislatures acted swiftly to

contain them through a variety of regulatory modes, including bans on sale and bans on all public carry. *See* Section II(C)(3)(a), above. And there was no analogous social problem in the 18th century: homicide rates were low, guns were not the weapon of choice for homicide, and mass shootings by a lone individual were technologically impossible. A-1140-42, -1164-65 (Roth ¶¶ 14-17, 41); A-557 (Cornell ¶ 19). Finally, young governments lacked the regulatory resources to implement weapon-specific bans. A-1253 (Spitzer ¶ 73) (early governments relied for law enforcement on "a haphazard mix of the watch system, constables, militias and vigilantes"). Importantly, Plaintiffs do not dispute this historical evidence or submit any countervailing evidence of their own. While the early efforts to curb specific weapons may have employed different regulatory tools at different times, driven by the specific nature of the threat and the regulatory resources available, the historical record shows that the right of self-defense has never been understood to prevent legislatures from acting to suppress specific limited categories of weapons that are unusually lethal and that are not typical self-defense weapons.

Nor is it correct, as Plaintiffs contend, that the Supreme Court "has already done the 'history and tradition' analysis" and determined that regulations like this one are "categorically unconstitutional." P. Br. at 39. Neither *Heller* nor *Bruen* resolved the issues raised by this case. *See Bruen*, 597 U.S. at 72 (Alito, J., concurring) ("Our holding decides nothing . . . about the kinds of weapons that

44

people may possess.").  Plaintiffs go to great lengths to obfuscate a central holding

of *Heller* and *Bruen*—that handguns are protected as a category of "arms" under

the Second Amendment, and so cannot be completely prohibited or their public

carry effectively foreclosed, because they "are weapons 'in common use' today *for

self-defense*."  *Bruen*, 597 U.S. at 32 (emphasis added).  But assault weapons are

not ordinary handguns, and they are not in common use for self-defense.  *See id.* at

21 (noting the Second Amendment does not secure "a right to keep and carry any

weapon whatsoever.").  The public understanding of the Second Amendment has

always recognized the right of legislatures to regulate specific weapons that present

special dangers to society.

### III.    Independently, Plaintiffs Did Not Carry Their Burden to Show LCMs or Assault Weapons Are "Arms" Protected by the Second Amendment.

This Court in *OST* "assume[d] that LCMs are 'arms' within the scope of the

Second Amendment" and concluded Rhode Island's LCM ban was nonetheless

consistent with the Nation's history and tradition of firearms regulation.  *OST,* 95

F.4th at 43.  As a result, this Court has had no occasion to apply the first step of the

*Bruen* framework, *i.e.,* whether "the Second Amendment's plain text covers" the

regulated conduct.  *See id.* (quoting *Bruen*, 597 U.S. at 17).  This Court's analysis of the Act could start and end with that first step.[21]

Whether a particular instrument, device, or weapon is protected by the plain text of the Second Amendment involves an examination of whether it is a "bearable arm[]" at all, and, if so, whether it is commonly used for the purpose of self-defense.  *Bruen* 597 U.S. at 28; *see also United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) ("*Bruen* step one involves a threshold inquiry . . . determining . . . whether the weapon at issue is '"in common use" today for self-defense,'" among other elements of the operative clause (quoting *Bruen*, 597 U.S. at 32)).  Here, LCMs are not "bearable arms" at all, and, further, Plaintiffs did not establish that either assault weapons or LCMs are in common use for self-defense.  Thus, their proposed conduct is not protected by the text of the Second Amendment.

## A. The Burden Is on Plaintiffs to Establish Their Proposed Conduct Is Protected by the Text of the Second Amendment.

Under *Bruen*'s "text-and-history" standard, the party challenging a restriction must first demonstrate that the law regulates conduct protected by the

---

[21] The District Court's statement that the parties agreed "the weapons at issue are presumptively protected by the Second Amendment" was mistaken.  Add:15. Defendant consistently took the position below, and maintains on appeal, that Plaintiffs cannot show their proposed conduct is covered by the text of the Second Amendment.  *See, e.g.,* A-77-92, A-1644-54.

"plain text" of the Second Amendment. *Bruen*, 597 U.S. at 32. While *Bruen* did not explicitly address which party bears the burden at this first step, courts post-*Bruen* have routinely allocated that burden to plaintiffs. *See, e.g., Rupp*, 2024 WL 1142061, at *8 & n.5 (holding plaintiff "bears the burden" to show at the "step-one, plain-text stage" that "a weapon is in common use today for self-defense" and, in footnote, collecting cases holding the same); *NAGR*, 2023 WL 4975979, at *15.

That allocation is consistent with the "ordinary default rule," *see Schaffer v. Weast*, 546 U.S. 49, 56 (2005) (absent contrary allocation, "plaintiffs bear the risk of failing to prove their claims"), and with the Supreme Court's analysis of other constitutional rights, like the First Amendment, *see Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) (plaintiffs who assert free speech claims are "oblig[ed]" to "demonstrate that the First Amendment even applies" to their "assertedly expressive conduct"); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2021) (plaintiff making free exercise claim must show that the government "has burdened his sincere religious practice").

### B. LCMs Fall Outside the Text of the Second Amendment Because They Are Not "Bearable Arms."

The "object" of the Second Amendment is "Arms." *Heller*, 554 U.S. at 581. Because LCMs are accessories, not arms, they fall outside the plain text of the Second Amendment. Plaintiffs' assertion that magazines are "covered arms" is incorrect. P. Br. at 16.

"Arms," as used in the Second Amendment, refers to weapons. *Heller*, 554 U.S. at 581 (citing 1 Dictionary of the English Language 106 (4th ed.) (1773) and defining "arms" as "[w]eapons of offence, or armour of defence")).  Magazines, also called ammunition feeding devices, hold ammunition and enable a shooter to fire without reloading until the capacity of the magazine is spent.  A-530 (Busse ¶ 14).  As defined by Massachusetts law, an LCM is a magazine with a capacity of more than 10 rounds.  Mass. Gen. Laws c. 140, § 121.  LCMs cannot, by themselves, be used offensively or—more importantly for Second Amendment purposes—defensively.  *See Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 386-87 (D.R.I. 2022) ("LCMs, like other accessories to weapons, are not used in a way that 'cast[s] at or strike[s] another.'") (quoting *Heller*, 554 U.S. at 582), *aff'd on other grounds*, 95 F.4th 38 (1st Cir. 2024).

From the Founding Era, there has been a distinction between weapons and arms, on the one hand, and related accessories, on the other.  As an analysis of the meaning and usage of words from the Founding and Reconstruction Eras confirms, the term "arms" historically referred *only* to weapons, and did not encompass items like cartridge cases or boxes, scabbards, or flints, which were separately identified as "accoutrements"—"ancillary equipment associated with soldiering, or service in the military."  A-477, -484 (Baron ¶¶ 10, 25).  Magazines, including LCMs, fall within the category of "accoutrements" and not "arms."  *See* A-508 (Baron ¶ 78)

(finding "virtually no lexical data" that the term "arms" includes "magazines").[22] The Tenth Circuit has recognized this same distinction in holding that silencers are not protected, bearable arms. *See United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("[a] silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defense')").

Plaintiffs' attempt to extend the term "arms" past its plain meaning with reference to out-of-circuit authority is unavailing. P. Br. at 16. Although some courts have extended the Second Amendment's protections to accessories that are *necessary* to operate a firearm, such as ammunition, that extension beyond "bearable arms" does not apply where an accessory is *not* necessary to operate a firearm. *See, e.g.*, *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("[T]he right to possess firearms for protection implies a corresponding right to obtain the bullets *necessary* to use them.") (internal citation omitted) (emphasis added), *abrogated on other grounds by Bruen*, 597 U.S. 1; *Cox*, 906 F.3d at 1196 (Hartz, J., concurring) (noting holding that silencers are not protected arms did not extend to "items that are not themselves bearable arms *but*

---

[22] Today, firearms sellers list magazines under the "accessories" sections of their websites. *Compare* Firearms, Guns.com, https://www.guns.com/firearms (listing handguns, rifles, and shotguns for sale), *with* Accessories, Guns.com, https://www.guns.com/accessories (listing magazines for sale). *See also* A-532-533 (Busse ¶ 15) (noting magazines are often produced by "accessory makers" who supply them to gun manufacturers).

49

*are necessary to the operation of a firearm* (think ammunition)" (emphasis added)).  In other words, the state could not functionally deny an individual's Second Amendment right by entirely banning an accessory that is necessary to operate a firearm, but that does not render the accessory an "arm" subject to the full panoply of Second Amendment protections and certainly does not extend to accessories that are unnecessary to secure the right to armed self-defense.

It is undisputed that LCMs are not necessary to use any firearm; an ammunition feeding device of lesser capacity will work just as well.  A-531 (Busse ¶ 14); A-1553 (Yurgealitis ¶ 61); *see also Or. Firearms Fed'n v. Kotek Or. All. for Gun Safety*, --- F. Supp.3d ---, 2023 WL 4541027, at *26 (D. Or. July 14, 2023), appeal docketed, No. 23-35479 (9th Cir. July 17, 2023) ("In sum, the evidence at trial shows that while magazines may be necessary to render firearms operable, LCMs, as a subset of magazines, are never necessary to render firearms operable.").  LCMs thus are not "arms" within the text of the Second Amendment.

### C. Assault Weapons and LCMs Fall Outside the Text of the Second Amendment Because Neither Are "Commonly Used" in Self-Defense.

Even if LCMs are considered "arms," Plaintiffs still did not show that either assault weapons or LCMs "facilitate armed self-defense," and so both are outside the scope of the Second Amendment's protections.  *Bruen*, 597 U.S. at 28.

The Second Amendment's text protects "only" arms in "common use at the time." *Bruen*, 597 U.S. at 47.  It is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *id.* at 21 (quoting *Heller*, 554 U.S. at 626), but rather "covers modern instruments *that facilitate armed self-defense*," *id.* at 28 (emphasis added).  As noted, the Supreme Court has identified self-defense as the "central component" of the Second Amendment right.  *Bruen*, 597 U.S. at 29; *McDonald*, 561 U.S. at 767; *Heller*, 554 U.S. at 599.

As described above, Section II(C)(1), *OST* rejected Plaintiffs' proposed "popularity" test for constitutionality.  Although it did so while engaging in the second step of *Bruen*'s analysis—the historical inquiry—its reasoning equally applies within *Bruen*'s first step.  *See Alaniz*, 69 F.4th at 1128 (placing the question whether a weapon is "in common use today for self-defense" within the "threshold inquiry" of "*Bruen* step one").  Placement of the "common use" inquiry at step one—where Plaintiffs bear the burden—is consistent with a number of post-*Bruen* decisions.  *See, e.g., United States v. Berger*, --- F. Supp. 3d ---, 2024 WL 449247, at *6 (E.D. Pa. Feb. 6, 2024) (citing cases and, after extensive analysis, deciding to "assess the common-use issue at step one" of the *Bruen* framework).

Also as described above, Section II(C)(3)(b), the District Court correctly concluded that both assault weapons and LCMs "are not reasonably suitable for

self-defense under normal circumstances, nor are they normally used for that purpose." Add:24. And as to LCMs in particular, this Court concluded on a very similar factual record that a ban on LCMs imposes "at most" a "negligible burden" on armed self-defense. *OST*, 95 F.4th at 46. As a result, Plaintiffs failed to carry their burden at the first step of the *Bruen* analysis to show that the arms and accessories they wish to keep and carry are in common use for self-defense. The Court could affirm the District Court's decision on that basis alone.

## IV.    Plaintiffs Failed to Carry their Burden on the Remaining Preliminary Injunction Factors.

The District Court correctly concluded a plaintiff's failure to show likelihood of success "is itself preclusive of the requested relief" and so did not address the other preliminary injunction factors. Add:37 (quoting *Bayley's Campground Inc. v. Mills*, 985 F.3d 153, 158 (1st Cir. 2021)). In any case, Plaintiffs made no factual showing below of irreparable harm, failing to present any evidence that the Act has, at any time in its 25-year history, impaired their ability to defend themselves or their families. In contrast to the absence of irreparable harm to Plaintiffs, the remaining two factors —potential harm to the Commonwealth and the public interest—overwhelmingly favor denial of the preliminary injunction. The dangers the Act seeks to avert—the mass killings of innocents, the gruesome injuries, the murder of police officers—are detailed above,

and they fully support denying an injunction, so that Massachusetts's 25-year-old law can remain in effect.

## **CONCLUSION**

For the reasons set forth above, the order of the District Court denying Plaintiff-Appellants' Motion for Preliminary Injunction should be affirmed.

Respectfully submitted,

ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts

*/s/ Julie Green*
Julie E. Green, First Circuit No. 93492
Grace Gohlke, First Circuit No. 1204282
Assistant Attorneys General
Government Bureau
Office of the Attorney General of Massachusetts
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200
Julie.Green@mass.gov
Grace.Gohlke@mass.gov

April 29, 2024

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

I hereby certify that:

1.  This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because the brief contains 12,748 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 with 14-point, Times New Roman font.

*/s/ Julie Green*

April 29, 2024

## CERTIFICATE OF SERVICE

I hereby certify that this brief, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), on April 29, 2024.

*/s/ Grace Gohlke*
Counsel for the Defendant-Appellee

## **ADDENDUM**

In addition to the required inclusion of the order on appeal, this Addendum consists exclusively of statutes submitted to the Court in accordance with Fed. R. App. P. 28(f), and so is not subject to the 25-page limit set forth in First Circuit Local Rule 28.0(a)(2).

Memorandum and Order on Plaintiff's Motion for Preliminary
    Injunction, *Joseph R. Capen and National Association for
    Gun Rights v. Andrea Joy Campbell, in her official capacity
    as Attorney General*, United States District Court for
    Massachusetts, Civil Action No. 22-11431-FDS,
    dated December 21, 2023 ............................................................ Add:1

Mass. Gen. Laws c. 140, § 121 ............................................................ Add:39

Mass. Gen. Laws c. 140, § 131M ......................................................... Add:42

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **JOSEPH R. CAPEN and NATIONAL ASSOCIATION FOR GUN RIGHTS,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Civil Action No. 22-11431-FDS** |
| **ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts,** | ) ) ) ) ) | |
| **Defendant.** | ) ) ) | |

**MEMORANDUM AND ORDER ON PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

**SAYLOR, C.J.**

This case involves a Second Amendment challenge to a Massachusetts statute prohibiting the possession, sale, and transfer of certain semiautomatic weapons, as well as magazines capable of holding more than ten rounds of ammunition.  *See* Mass. Gen. Laws ch. 140, §§ 121, 131M.  Plaintiff Joseph R. Capen alleges that, but for the ban, he would acquire the proscribed firearms and magazines for self-defense and other purposes.  The National Association for Gun Rights is a non-profit association that alleges that its members are similarly situated to Capen.

Plaintiffs have moved for preliminary relief enjoining enforcement of the statute.  For the reasons set forth below, the statute comports with the requirements of the Second Amendment, and therefore plaintiffs cannot demonstrate a likelihood of success on the merits of their claims. The motion will accordingly be denied.

**ADD:1**

## I.    Background

The Court relies on the memoranda submitted by the parties and four *amici curiae*,
affidavits, and documentary evidence to decide the present motion.[1]

### A.    Factual

#### 1.    The Parties

Joseph R. Capen is a resident of Massachusetts.  (Compl. ¶ 2).  According to the
complaint, he is eligible to receive and possess firearms and magazines and, "but for the credible
threat of prosecution under the challenged laws, would purchase the Banned Firearms and
Banned Magazines to keep in his home for self-defense and other lawful purposes."  (*Id.*).

The National Association for Gun Rights ("NAGR") is a non-profit association organized
under 26 U.S.C. § 501(c)(4).  (*Id.* ¶ 1).  According to the complaint, "NAGR seeks to defend the
right of all law-abiding individuals to keep and bear arms."  (*Id.*).

Andrea Campbell is the Attorney General of Massachusetts and the chief law-
enforcement officer for the Commonwealth.  (*Id.* ¶ 4).[2]

#### 2.    The Challenged Statutes

The Massachusetts statute at issue was modeled after the (now-expired) 1994 Public
Safety and Recreational Firearms Use Protection Act, Pub. L. No. 103-322, §§ 110101-06, 108
Stat. 1796, 1996-2010 (1994) (the "federal statute").  That statute banned the manufacture,
transfer, and possession of nineteen specific models of "semiautomatic assault weapons," along

---

[1] The Brady Center to Prevent Gun Violence, March for Our Lives, Giffords Law Center to Prevent Gun
Violence, and Everytown for Gun Safety Support Fund submitted *amicus curiae* briefs in support of defendant's
opposition to the motion for preliminary injunction.

[2] This suit was originally brought against Charles D. Baker, Jr. and Maura Healey, the Governor and
Attorney General of the Commonwealth (respectively) at the time the suit was filed.  The claim against Governor
Baker was dismissed on November 1, 2022.  Andrea Campbell is the current Attorney General.

with copies or duplicates of those firearms.  *Id.* § 110102(b), 108 Stat. 1997-98.[3]  It also banned

any semiautomatic rifle, pistol, or shotgun with two or more combat-oriented features as defined

by the statute.  *Id.*  Those features included, for example, folding or telescoping stocks,

protruding pistol grips, barrel shrouds, and threaded barrels designed to accept silencers or flash

suppressors.  *Id.*

    Separately, the federal statute banned "large capacity ammunition feeding devices,"

defined as "a magazine, belt, drum, feed strip, or similar device . . . that has a capacity of, or that

can be readily restored or converted to accept, more than 10 rounds of ammunition."  *Id.*

§ 110103(b), 108 Stat. 1999.[4]

    In adopting the statute, Congress acknowledged that the prohibited assault weapons had

"a capability for lethality—more wounds, more serious, in more victims—far beyond that of

other firearms in general, including other semiautomatic guns."  H.R. Rep. No. 103-489, at 19-20

(1994).  By its terms, the federal statute expired in 2004.  *See* Pub. L. No. 103-322, § 110105,

108 Stat. 2000 (1994).

    The Massachusetts statute ("the Act"), which was passed in 1998 and made permanent

after the federal statute expired, makes it a crime to sell, transfer, or possess assault weapons.

Mass. Gen. Laws ch. 140, § 121.  The proscribed firearms include both specific models, such as

the Colt AR-15, and unenumerated weapons with two or more of the features identified in the

---

[3] Plaintiffs contend that "assault weapon" is "a rhetorically charged political term meant to stir the emotions of the public."  (Pls. Mem. ¶ 1).  They propose using the term "banned firearm" instead.  Because the First Circuit used the term "assault weapon" to refer to the same statute in *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019), this memorandum and order will follow suit.

[4] Again, plaintiffs contend that the term "large-capacity feeding device" is "politically charged rhetoric," as magazines capable of holding more than ten rounds are "standard."  (Brown Decl. ¶ 4).  They propose using the term "banned magazine" instead.  (Pls. Mem. ¶ 2).  Again, the First Circuit in *Worman* (and most other courts) have used the term "large-capacity magazines (LCMs)," and this memorandum and order will do the same.  *See Worman*, 922 F.3d at 30.

federal ban.  *Id.*  The Act also prohibits the sale, transfer, and possession of "large capacity feeding devices" capable of holding more than ten rounds of ammunition or more than five shotgun shells.  Mass. Gen. Laws ch. 140, § 131M.

### B.    Procedural Background

The complaint alleges that the Act violates plaintiffs' Second Amendment rights to keep and bear arms by banning firearms and magazines "typically possessed by law-abiding citizens for lawful purposes."  (Compl. ¶ 34-37).  Plaintiffs seek a declaratory judgment under 28 U.S.C. § 2201 that the Act is unconstitutional, a preliminary and permanent injunction enjoining defendant from enforcing the Act, remedies under 42 U.S.C. § 1983, and reasonable attorneys' fees and costs under 42 U.S.C. § 1988.  (*Id.* ¶ 38-40).

## II.    Legal Standard

A preliminary injunction is an "extraordinary and drastic remedy" that "is never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (quoting *Yakus v. United States*, 321 U.S. 414, 440 (1944)).  A plaintiff seeking a preliminary injunction must establish that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction serves the public interest.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  A plaintiff's likelihood of success on the merits "weighs most heavily" in the court's determination; without it, the remaining factors "become matters of idle curiosity."  *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020) (citing *New Comm Wireless Servs. v. SprintCom Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)).  "[A]n inquiring court need not conclusively determine the merits of the movant's claim; it is enough for the court simply to evaluate the likelihood . . . that the movant ultimately will prevail on the merits."  *Id.* at 18.

III.    **Likelihood of Success on the Merits**

    A.    **Second Amendment Jurisprudence**

The Second Amendment provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  The modern understanding of that amendment has been explored by the Supreme Court in three cases and a brief *per curiam* decision:  *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curiam); and *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

    1.    *Heller*

The Supreme Court's "first in-depth examination of the Second Amendment" came in 2008 with its decision in *Heller*, 554 U.S. at 635.  There, the court struck down the District of Columbia's "total ban on handguns, as well as its requirement that firearms in the home be kept nonfunctional even when necessary for self-defense." *Id.* at 576.  The court's opinion directly addressed the question of what kinds of weapons are protected by the Second Amendment.

*Heller* interpreted the Second Amendment as having two constituent parts:  a prefatory clause ("A well regulated militia, being necessary to the security of a free State") and an operative clause ("the right of the people to keep and bear Arms, shall not be infringed"). *Id.* at 579, 595.  Interpreting the latter, the court ruled that the term "arms" applied "to weapons that were not specifically designed for military use and were not employed in a military capacity." *Id.* at 581.  It also confirmed the holding in *Muscarello v. United States*, 524 U.S. 125 (1998), that to "bear arms" meant to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* at 584.

The court concluded that the operative clause "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592.  But it also noted:

> Of course the right [is] not unlimited, just as the First Amendment's right of free speech was not.  Thus, we do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose*.

*Id.* at 595 (citation omitted).

The court specifically clarified that one of the limitations of the Second Amendment is that it "extends only to certain types of weapons."  *Id.* at 623.  Among other things, the court discussed its decision in *United States v. Miller*, 307 U.S. 174 (1939), where the court "upheld against a Second Amendment challenge two men's federal indictment for transporting an unregistered short-barreled shotgun in interstate commerce, in violation of the National Firearms Act."  *Heller*, 554 U.S. at 621-22.  The court emphasized that the basis for the *Miller* decision was not that the defendants had been carrying the shotguns for "nonmilitary use," but that "the *type of weapon at issue* was not eligible for Second Amendment protection . . . ."  *Id.* at 622.

The court then observed:

> We may as well consider at this point . . . *what* types of weapons *Miller* permits.  Read in isolation, *Miller*'s phrase "part of ordinary military equipment" could mean that only those weapons useful in warfare are protected.  That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns (not challenged in *Miller*) might be unconstitutional, machineguns being useful in warfare in 1939.  We think that *Miller's* "ordinary military equipment" language must be read in tandem with what comes after:  "[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time."  The traditional militia was formed from a pool of men bringing arms "in common use at the time" for lawful purposes like self-defense. . . .  We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.

*Id.* at 624-25 (citations omitted).

Critically, the court then noted the following:

> Like most rights, the right secured by the Second Amendment is not unlimited.
> From Blackstone through the 19th-century cases, commentators and courts
> routinely explained that the right was not a right to keep and carry any weapon
> whatsoever in any manner whatsoever and for whatever purpose. . . .  Although
> we do not undertake an exhaustive historical analysis today of the full scope of
> the Second Amendment, nothing in our opinion should be taken to cast doubt on
> longstanding prohibitions on the possession of firearms by felons and the
> mentally ill, or laws forbidding the carrying of firearms in sensitive places such as
> schools and government buildings, or laws imposing conditions and qualifications
> on the commercial sale of arms.
>
> We also recognize another important limitation on the right to keep and carry arms.
> *Miller* said, as we have explained, that the sorts of weapons protected were those
> "in common use at the time."  We think that limitation is fairly supported by the
> historical tradition of prohibiting the carrying of "dangerous and unusual weapons."

*Id.* at 626-27 (citation omitted).  It went on to say:

> [T]he inherent right of self-defense has been central to the Second Amendment
> right.  The handgun ban amounts to a prohibition of an entire class of "arms" that
> is overwhelmingly chosen by American society for that lawful purpose.  The
> prohibition extends, moreover, to the home, where the need for defense of self,
> family, and property is most acute.  Under any of the standards of scrutiny that we
> have applied to enumerated constitutional rights, banning from the home "the
> most preferred firearm in the nation to 'keep' and use for protection of one's
> home and family," . . . would fail constitutional muster.
>
> It is no answer to say . . . that it is permissible to ban the possession of handguns
> so long as the possession of other firearms (*i.e.*, long guns) is allowed.  It is
> enough to note . . . that the American people have considered the handgun to be
> the quintessential self-defense weapon.  There are many reasons that a citizen
> may prefer a handgun for home defense:  It is easier to store in a location that is
> readily accessible in an emergency; it cannot easily be redirected or wrestled
> away by an attacker; it is easier to use for those without the upper-body strength
> to lift and aim a long gun; it can be pointed at a burglar with one hand while the
> other hand dials the police.  Whatever the reason, handguns are the most popular
> weapon chosen by Americans for self-defense in the home, and a complete
> prohibition of their use is invalid.

*Id.* at 628-29.

Finally, the court concluded that, in substance, the Second Amendment "elevates above

all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth

and home." *Id.* at 635.  It acknowledged, however, that it did not seek "to clarify the entire field" of the Second Amendment, preferring to leave defining those contours for later cases.  *Id.*

### 2.    *McDonald* **and** *Caetano*

Two years later, in *McDonald*, the Supreme Court held that the Second Amendment applies to the states through the Fourteenth Amendment.  561 U.S. at 791.  Among other things, it also reiterated "that individual self-defense is 'the central component' of the Second Amendment right."  *Id.* at 767 (quoting *Heller*, 554 U.S. at 599).

Next, in a *per curiam* opinion in *Caetano*, the court overturned a decision of the Massachusetts Supreme Judicial Court upholding a statute prohibiting the possession of stun guns.  577 U.S. at 411-12.  The SJC had offered three explanations for its holding:  first, that stun guns were not protected because they were not in common use at the time of the Second Amendment's enactment; second, that stun guns were "unusual" (and thus unprotected) because they are "a thoroughly modern invention"; and third, that the record did not suggest that stun guns are "readily adaptable to use in the military."  *Id.*  The Supreme Court noted that all three explanations expressly contradicted *Heller*, and accordingly vacated the judgment.  *Id.*

### 3.    *Bruen*

Most recently, in *New York Rifle & Pistol Ass'n v. Bruen*, the Supreme Court struck down a New York statute conditioning the issuance of a firearms license on an individualized showing of special need.  597 U.S. at 70.

The court's analysis began by noting that "[i]n *Heller* and *McDonald*, we held that the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense."  *Id.* at 17.  It then observed that "[i]n the years since, the Courts of Appeals have coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny."  *Id.*  At the first step of that test, "the government

[would] justify its regulation by establishing that the challenged law regulates activity falling outside the scope of the right as originally understood." *Id.* at 18 (quotation omitted).  At the second step, the courts would apply strict scrutiny to the "core" Second Amendment right (generally defined as the right to self-defense in the home), and intermediate scrutiny to other aspects of the right, which required the government to show that the regulation was substantially related to achieving an important governmental interest. *Id.* at 18-19.

The Supreme Court expressly rejected that analytical framework. *Id.* at 19-24.  Instead, it announced the following rule:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Id.* at 17 (quotation and citation omitted).

The court was clear that this "methodological approach" to the Second Amendment embraced the one taken in *Heller*, particularly its emphasis on interpreting the amendment in light of its text, history, and tradition. *Id.* at 19-20.  During that discussion, it noted that in *Heller* it had concluded that "the right secured by the Second Amendment is not unlimited," and that "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 21.  It added:  "For example, [the court] found it 'fairly supported by the historical tradition of prohibiting the carrying of  dangerous and unusual weapons' that the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'" *Id.* (quoting *Heller*, 554 U.S. at 627).

After explicating the role of history and tradition in interpreting the amendment, the court

reiterated its formulation of the applicable test.  *Id.* at 22-27.  After some discussion, it stated:

> The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding.  In some cases, that inquiry will be fairly straightforward.  For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century.

*Id.* at 26.  But if the challenged laws address "unprecedented societal concerns or dramatic technological changes," the historical analysis requires a "more nuanced approach."  *Id.* at 27.[5]

The court stated that reasoning by analogy from the historical record applies "the balance struck by the founding generation to modern circumstances."  *Id.* at 29 n.7.  In particular, "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar."  *Id.* at 28-29 (quotation omitted).  Such an analogue must bear more than a remote resemblance, but a "government [need only] identify a well-established and representative historical analogue, not a historical *twin*."  *Id.* at 30.  Among other things, it observed:

> While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think that *Heller* and *McDonald* point toward at least two metrics:  how and why the regulations burden a law-abiding citizen's right to armed self-defense. As we stated in *Heller* and repeated in *McDonald*, "individual self-defense is 'the central component' of the Second Amendment right." Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are "central" considerations when engaging in an analogical inquiry.

*Id.* at 29 (citations omitted).

---

[5]   The court was clear, however, that the simple fact that a weapon was modern was not sufficient to amount to a "dramatic technological change":

> We . . . recognized in *Heller* at least one way in which the Second Amendment's historically fixed meaning applies to new circumstances:  Its reference to "arms" does not apply "only [to] those arms in existence in the 18th century." . . . Thus, even though the Second Amendment's definition of "arms" is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.

*Id.* at 28 (citations omitted).

The court then applied that framework to the New York statute at issue, concluding that the "proper cause" requirement was unconstitutional. *Id.* at 70. Specifically, it decided that the statute "violate[d] the Fourteenth Amendment in that it prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 71.

Justice Alito, in a concurring opinion, stated that the majority did not "decide anything about the kinds of weapons that people may possess," and noted that *Heller* and *McDonald* retain their significance. *Id.* at 72 (Alito, J., concurring). Similarly, Justice Kavanaugh, also concurring and joined by Chief Justice Roberts, reiterated that the opinion did not disturb the conclusions of *Heller* and *McDonald* that certain firearm regulations—including those prohibitions on carrying dangerous and unusual weapons—were permissible. *See id.* at 80-81 (Kavanaugh, J., concurring).[6]

## B.    The Analytic Framework

The present case involves a challenge to restrictions on particular types of weapons and magazines. Again, the basic analytical framework is set forth in *Bruen*: first, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct"; and second, if the presumption applies, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 17. While there are many aspects of that framework that are unresolved, it is useful to begin by identifying several guideposts that have been clearly established by the Supreme Court.

---

[6] After *Heller* and *McDonald*, the First Circuit, along with nearly every other circuit court, had adopted a two-step interest-balancing framework for analyzing Second Amendment challenges. *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019). As noted, *Bruen* explicitly rejected that two-step framework. 597 U.S. at 19. In doing so, it cited *Worman* as one of the cases that improperly applied that test. *Id.* at 19 n.4.

Accordingly, while the First Circuit itself has not abrogated *Worman*, it is clear that the central holding, including the adoption of the two-step framework, is no longer good law. Nonetheless, to the extent that *Worman* contains analysis that is not inconsistent with *Bruen*, it may be considered as persuasive.

1.    **Basic Principles**

First, "individual self-defense is the *central component* of the Second Amendment right." *Bruen*, 597 U.S. at 29 (quoting *Heller*, 554 U.S. at 599).

Second, the regulation of certain types of weapons is permissible. *See Heller*, 554 U.S. at 623 ("*Miller* stands . . . for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons."). Some firearms may be regulated either (1) because they are not in "common use"—that is, not "typically possessed by law-abiding citizens for lawful purposes," like self-defense—and therefore fall outside the scope of the Second Amendment, or (2) because they are historically subject to regulation, such as "dangerous and unusual" weapons. *Heller*, 554 U.S. at 625-28. *Heller* made that clear, and nothing in *McDonald, Caetano*, or *Bruen* altered, or even cast doubt on, that basic proposition. *See, e.g.*, *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627) (reiterating that there are historical analogues for regulating "dangerous and unusual" weapons).

Third, the protection of the Second Amendment is not limited to arms that existed at the time of the founding. *Bruen*, 597 U.S. at 28; *Heller*, 554 U.S. at 582; *Caetano*, 577 U.S. at 412.

Fourth, the protection of the Second Amendment is not limited to arms that are useful for military purposes. *Heller*, 554 U.S. at 589; *Caetano*, 577 U.S. at 412.

Fifth, handguns are the "quintessential self-defense weapon." *Heller*, 554 U.S. at 629. It seems likely, therefore, that legislatures have some greater degree of latitude when regulating firearms that are not handguns.

Sixth, it appears to be clear—although the Supreme Court has not directly addressed the issue in its recent cases—that the Second Amendment does not protect either short-barreled

shotguns or machine guns.  *See Heller*, 554 U.S. at 622-24 (discussing *Miller*).[7]  Those firearms are therefore examples of the types of weapons that can be prohibited without violating the Second Amendment.

With those principles as a starting point, the Court will turn to two unresolved issues concerning the analytical framework.

### 2.        "In Common Use"

Both *Heller* and *Bruen* stated, in multiple contexts, that the Second Amendment applies to firearms that are "in common use."  *See, e.g.*, *Heller*, 554 U.S. at 627 ("*Miller* said, as we have explained, that the sorts of weapons protected were those 'in common use at the time.'  We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"); *Bruen*, 597 U.S. at 32 ("Nor does any party dispute that handguns are weapons 'in common use' today for self-defense.").  That has led to considerable confusion among courts and commentators over the meaning and application of the phrase "in common use" and the interplay between the phrases "in common use" and "dangerous and unusual" weapons.[8]

Plaintiffs contend that if a weapon is popular—that is, if thousands or even millions of copies of that weapon have been sold—then, by definition, it is "in common use" and is protected by the Second Amendment.  Put simply, in their view, if a firearm is currently in

---

[7] The discussion in *Heller* concerning the *Miller* case contained no suggestion or hint that the regulation of short-barreled shotguns or machine guns might be constitutionally infirm.  As to short-barreled shotguns, the court simply accepted the validity of the holding in *Miller*.  *See Heller*, 554 U.S. at 625 ("We . . . read *Miller* to say . . . that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.").  As to machine guns, the court went even further; it said that it "would be a startling reading of [*Miller*]" to conclude that only military weapons were protected, "since it would mean that the National Firearms Act's restrictions on machineguns . . . might be unconstitutional."  *Id.* at 624.

[8] The First Circuit noted this difficulty in *Worman*, but simply assumed that the proscribed weapons fell "somewhere within the compass of the Second Amendment" before proceeding to examine the Act under the intermediate scrutiny standard, employing the now-defunct interest-balancing approach.  922 F.3d at 35-36.

"common use," its sale and possession are protected and no further analysis is required.

Whatever the meaning of "common use," that contention cannot be correct. Such a rule would lead to a host of absurd results. Among other things, the constitutionality of the regulation of different firearms would ebb and flow with their sales receipts. Weapons that unquestionably would have been considered within the ambit of the Second Amendment at the time of ratification (such as a smooth-bore, muzzle-loading musket) would lose their protection because of their relative rarity today. Conversely, an entirely novel weapon that achieved rapid popularity could be rendered beyond the reach of regulation if innovation and sales outstripped legislation. *See Kolbe v. Hogan*, 849 F.3d 114, 141 (4th Cir. 2017) (under the "popularity" approach, any "new weapon would need only be flooded on the market prior to any governmental prohibition in order to ensure it constitutional protection").

Moreover, the constitutional analysis would be trapped in an infinite circularity: a weapon may be banned because it is not in common use, and it is not in common use because it is banned. *See Worman*, 922 F.3d at 35 n.5 (citing *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) (acknowledging that assessing the constitutionality of firearms legislation based on "how common a weapon is at the time of litigation would be circular")).

Finally, that proposed application of a "common use" standard would effectively ignore an important underpinning of *Bruen*: that the meaning of the Second Amendment should be grounded in text, history, and tradition, not shifting modern attitudes, and that its protection should be categorical. *See Bruen*, 597 U.S. at 79 (Kavanaugh, J., concurring).

In any event, there are at least two possible approaches to considering the issue of "common use." One approach—which is perhaps the most in keeping with the language and reasoning of *Heller* and *Bruen*—is to ask first whether the firearm is the *general* type of weapon

that is in common use by ordinary citizens for lawful purposes such as self-defense.  If the answer is yes, the Second Amendment presumptively applies.  However, certain *specific* types of such weapons may still be subject to regulation if they are "dangerous and unusual," consistent with text, history, and tradition.  Put another way, the first step (that is, what is presumptively protected by the Second Amendment) addresses broad categories, and the second step (that is, what may be regulated) applies to specific types of weapons (or, in appropriate cases, specific persons who cannot possess weapons or specific places where weapons cannot be carried).

Under that framework, handguns, rifles, and shotguns are the general types of firearms that are in common use by ordinary citizens for lawful purposes.  Machine guns are not.  Nor, for that matter, are mortars, rocket launchers, or shoulder-fired missile systems.  Even so, some types of handguns, rifles, or shotguns might be subject to government regulation if that restriction is consistent with the historical tradition of governing "dangerous and unusual" weapons.  Thus, for example, while shotguns as a general class of firearms might warrant presumptive protection, *short-barreled* shotguns are "dangerous and unusual," and therefore may be regulated.  *See Heller*, 554 U.S. at 625.

Alternatively, because the terms "common use" and "unusual" are essentially opposites, it is possible that the analysis may involve only a single question:  whether the challenged regulation comports with the tradition of regulating "dangerous and unusual" weapons.

Under either approach, the result here is the same.  Both sides agree that the weapons at issue are presumptively protected by the Second Amendment, therefore the Court does not need to resolve the meaning of "in common use."  The question thus becomes whether "the regulation is consistent with this Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 17.

### 3.    "Dangerous and Unusual"

Although the Supreme Court has made clear that there is a historical tradition of regulating "dangerous and unusual weapons," it has not yet had occasion to address the contours of that principle.[9]

At minimum, however, it seems evident that the "dangerous and unusual" exception must be considered not only in light of history and tradition, but also the fundamental purpose of the Second Amendment—that is, protecting the right to "armed self-defense."  *See Bruen*, 597 U.S. at 29 ("whether modern and historical regulations impose a comparable burden *on the right of armed self-defense* and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry" (quotation omitted) (emphasis added)).  Indeed, if the meaning of the term "dangerous and unusual" is not considered in light of that purpose, it is difficult to give it any coherent analytic significance.

First, all firearms, by intention and design, are "dangerous."  All are designed to kill or inflict serious injury.  Accordingly, for the term "dangerous" to have any meaning at all, it must be refined in some way, or it will simply apply to every type of firearm.  *See Caetano*, 577 U.S. at 418 (Alito, J., concurring) (noting that if the standard for defining "dangerous" included all weapons that were designed and constructed to produce death or great bodily harm, "virtually every covered arm would qualify as 'dangerous.'").

---

[9] In *Heller*, the Supreme Court alluded to William Blackstone's statement that "[t]he offense of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land." 4 WILLIAM BLACKSTONE, COMMENTARIES *148-49 (emphasis added).  Although the original note described "dangerous *or* unusual" weapons, the Supreme Court has expressly stated in *Heller* and *Bruen* that the relevant tradition is one of regulating "dangerous *and* unusual weapons."  *See Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 47; *see also Caetano*, 577 U.S. at 417 (Alito, J., concurring) ("[T]his is a conjunctive test:  A weapon may not be banned unless it is *both* dangerous *and* unusual."); *Delaware State Sportsmen's Ass'n, v. Delaware Dep't of Safety & Homeland Sec.*, 2023 WL 2655150, at *7 (D. Del. Mar. 27, 2023).

Furthermore, because all firearms are "dangerous," all firearms are potentially useful for self-defense.  Again, unless the term applies to every firearm, there must be a feature of a weapon that makes it *unreasonably* dangerous for self-defense and other lawful purposes.  A light machine gun, for example, can fire many hundreds of rounds per minute, which is a useful characteristic on a battlefield.  But a private home bristling with machine guns at every corner—although it might be considered well-defended—obviously poses a danger to others that goes far beyond the reasonable requirements of self-defense.[10]

Finally, and as discussed, it would add nothing to the analytic framework if an "unusual" weapon were simply deemed to be one not "in common use."  Assuming the term "unusual" has an independent meaning, it must likewise derive at least in part from the essential purpose of the Second Amendment.

The language of *Heller* is instructive.  There, the court stated that "the American people have considered the handgun to be the quintessential self-defense weapon," and outlined several reasons why:

> [It is] easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; [and] it can be pointed at a burglar with one hand while the other hand dials the police.

554 U.S. at 629.  If a handgun has features that make it *more* suitable for self-defense, it follows that other firearms may have features—including not only capabilities, but also size, length, and weight—that make them *less* suitable for that purpose.  Thus, for example, while a machine gun certainly could have self-defense uses, it would be a highly unusual weapon to carry on a city sidewalk or to keep at a bedside in case of an intruder, even if it were legal to possess one.

---

[10] Again, it seems clear that machine guns are not protected by the Second Amendment.  *See Heller*, 554 U.S. at 624-26.

In short, the tradition that permits the regulation of "dangerous and unusual" weapons must be interpreted in light of the essential purpose of the Second Amendment.  For a weapon to fit within that exception, and therefore be subject to regulation, a weapon must be *unreasonably* dangerous and unusual for ordinary citizens to use for lawful purposes, particularly self-defense.

With that prelude, the Court will turn to the constitutionality of the Act at issue here.

C.      **The Challenged Statute – the Prohibited Firearms**

The first set of issues concerns the prohibition on certain types of assault weapons.

1.      **The Nature of the Restriction**

The Act prohibits two classes of weapons:  nineteen specific models (or their duplicates), and any weapons using two or more prohibited features.  Mass. Gen. Laws ch. 140, § 121.  The prohibited weapons all use a semiautomatic action and include various types of rifles, shotguns, and pistols.

It is important to make clear what the Act does not do.  Plaintiffs appear to conflate the Act's prohibition on specific assault weapons with a prohibition on all semiautomatic weapons as a class.  (Pl. Reply at 3-4).  That is incorrect.  The Act does not prohibit weapons based on their semiautomatic function; it only bans *some* semiautomatic weapons, based either on their specific make and model, or through an enumerated list of features, not their firing mechanism.[11] Indeed, as then-Judge Kavanaugh noted in *Heller II*, it would be incoherent to prohibit a class of firearms based on their semiautomatic function when semiautomatic handguns are afforded constitutional protection.  *See Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).  Still, the fact that some semiautomatic weapons

---

[11] Plaintiffs appear to concede as much, as they state in their complaint that the Act applies only to "certain semi-automatic firearms." (Compl. ¶ 13).  Similarly, and as discussed below, plaintiffs claim that a ban on large-capacity magazines is equivalent to a ban on all magazines, which is also clearly inaccurate.  (*See* Section III.D.1).

are entitled to a level of constitutional protection does not require the conclusion that all

semiautomatic weapons must be entitled to the same. *See Worman*, 922 F.3d at 32 n.2

(discussing the circularity of characterizing the "assault weapons" as a class of arms).

Plaintiffs have focused almost exclusively on the Act's prohibition of a particular model

of semiautomatic rifle—specifically, the Colt AR-15. This memorandum and order will

accordingly follow suit.[12]

### 2. Step One: Whether the Conduct is Within the Scope of the Second Amendment

As discussed, the Court will assume, without deciding, that the weapons proscribed by

the Act are bearable arms that fall "somewhere within the compass of the Second Amendment."

*Worman*, 922 F.3d at 36.

### 3. Step Two: Whether the Regulation is Consistent with Historical Tradition

The next step is to determine whether the Act "is consistent with the Nation's historical

tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

#### a. "Dramatic Technological Changes" and "Unprecedented Societal Concerns"

The initial question is the role of historical analogues in the analytic framework. The

*Bruen* court directed that when "a challenged regulation addresses a general societal problem

that has persisted since the 18th century, the lack of a distinctly similar historical regulation

addressing that problem is relevant evidence that the challenged regulation is inconsistent with

the Second Amendment." *Bruen*, 597 U.S. at 26. However, where there have been

"unprecedented societal concerns or dramatic technological changes," a "more nuanced

---

[12] If there are relevant differences between the AR-15 and any other prohibited weapons that require different treatment for purposes of addressing the constitutionality of the Act, plaintiffs have not called them to the attention of the Court.

approach" may be required.  *Id.* at 27.  Under that approach, courts are directed to "[r]eason[] by analogy" to determine whether the modern regulation is "relevantly similar" to historical regulations.  *Id.* at 29.

The parties disagree as to whether the advent of assault weapons constitutes a "dramatic technological change" for those purposes.  *Bruen*, 597 U.S. at 27-29.  Similarly, they disagree as to whether the modern increase in mass shootings is an "unprecedented societal concern."  *Id.*

Plaintiffs contend that this is a straightforward case involving an outright ban on a class of weapons that (they claim) existed prior to the founding and were in common use by the time the Second Amendment was adopted.  They contend that the first firearm able to fire more than ten rounds without reloading was invented in 1580, and that firearms capable of shooting 18 or 24 shots before reloading, such as the "pepperbox-style" pistol, were available before the ratification of the Fourteenth Amendment.  (Pls. Mem. at 19).  Repeating rifles, like the Winchester 66 and 73, could shoot more than 10 rounds from a cartridge and sold more than a million copies between 1873 and 1941.  (*Id.*).  According to plaintiffs, the apparent prevalence of such weapons means that there has been no dramatic technological change, and, along with a lack of laws restricting them at the time of the adoption of the Second or Fourteenth Amendments, is evidence that the Act is unconstitutional.

Defendant, on the other hand, contends that development of modern assault weapons marks a dramatic technological shift that, in turn, has created unprecedented social problems, particularly the risk of mass shootings.  According to defendant's experts, guns during the colonial and founding eras were mainly muskets and fowling pieces that could fire single shots

and had to be manually reloaded.  (Roth ¶ 15-16).[13]  Firearms capable of firing more than ten rounds did technically exist, but they were "anything but common, ordinary, or found in general circulation."  (Spitzer ¶¶ 38-53).  It was not until after World War I that automatic and semiautomatic weapons became commercially available.  (Spitzer ¶ 48; Roth ¶¶ 28, 31-33).  Assault weapons, such as the AR-15, did not become popular with civilians until the present century.  (Donahue ¶¶ 103-06; Roth ¶ 49; Busse ¶¶ 23-25).

Moreover, defendant contends that "[t]he spread of assault weapons . . . has created a modern phenomenon of mass shootings that would have been unimaginable to prior generations."  (Def. Opp'n at 29).  Homicide rates during the founding era were low, guns were not frequently used in homicides, and as a practical matter individuals could not go on killing sprees.  (Roth ¶¶ 14-17, 41; Cornell ¶¶ 19-21).  High-fatality homicide events committed by individuals only became possible after the development of assault weapons.  (Spitzer ¶¶ 13-22; Roth ¶¶ 44-46).  According to defendant, because modern-day assault weapons represent a dramatic shift from the technology that existed in the founding era, the absence of historical regulations banning such weapons is not determinative of the Act's constitutionality.

It seems clear—indeed beyond reasonable dispute—that there has been a "dramatic technological change" from a pepperbox-style pistol to a modern AR-15.  The features of modern assault weapons—particularly the AR-15's radical increases in muzzle velocity, range, accuracy, and functionality—along with the types of injuries they can inflict are so different from colonial firearms that the two are not reasonably comparable.  Even without considering the threats posed by mass shooting events, the Court is satisfied at this stage that defendant has met

---

[13] Unless otherwise noted, citations to defendant's experts and their exhibits refer to the affidavits attached to her opposition to plaintiffs' motion.  (ECF No. 21).

her burden of showing that there has been a "dramatic technological change" that, in turn, requires reasoning by analogy from the historical record. *See Bruen*, 597 U.S. at 27-29.

The next step is to determine whether there are "relevantly similar" historical precedents to the challenged regulation. *Id.*

### b.    <u>The Regulatory Tradition</u>

As discussed, the Supreme Court has already determined that there is a history and tradition of regulating "dangerous and unusual" weapons. That finding somewhat simplifies the task of considering appropriate historical analogues, because the existence of the categorical principle, if not its specific outline, has already been made clear.

Defendant points to "an established tradition throughout American history of targeting specific unusually dangerous weapons and accessories when they have contributed to rising homicide and other crime without a corresponding utility for self-defense." (Def. Opp'n at 31). Her experts have submitted evidence that from the founding era, states have regulated fighting knives, concealable pistols, Bowie knives, and multi-shot revolvers, all of which were widely used in unlawful behavior and contributed to rising crime rates. (Roth ¶¶ 26-28; Spitzer ¶¶ 50, 64-73; Rivas ¶¶ 20-28; *see also* Spitzer Ex. E, "Dangerous Weapons Laws"). Bowie knives, in particular, were "extensive and ubiquitous," and were subject to regulation by 49 states because of the dangers they posed to ordinary citizens. (Spitzer ¶¶ 71-73).

Regulation of automatic and semiautomatic weapons began to occur in the early 20th century, when their "uniquely destructive capabilities" became apparent as they found their way into civilian life. (Spitzer ¶¶ 16-30; Roth ¶ 47; *see also* Spitzer Ex. D, "Machine Gun and Semi-Automatic Firearms Laws").

Plaintiffs contest some of the proffered analogues.[14]  But their effort to distinguish the proffered analogues from the Act is, in substance, the same argument they make throughout: that restrictions on "dangerous and unusual weapons" cannot apply to the proscribed firearms because they are "in common use" today.[15]

In any event, although certain regulations offered by defendant may be closer to the Act than others, she need only identify "a well-established and representative historical analogue, not a historical *twin*."  *Bruen*, 597 U.S. at 30.  The relevant history affirms the principle that in 1791, as now, there was a tradition of regulating "dangerous and unusual" weapons—specifically, those that are not reasonably necessary for self-defense.

Furthermore, it is surely true that where technological changes have been extreme, precise historical analogues become less useful except at a high (or categorical) level.  Here, there is a recognized categorical principle—the "dangerous and unusual" exception.  The Court must bear in mind that the purpose of the exercise is not to perform a technical comparison for its own sake, but to determine whether the challenged regulation comports with the fundamental purpose of the Second Amendment—that is, protecting the right to "armed self-defense."  *See Bruen*, 597 U.S. at 29 ("whether modern and historical regulations impose a comparable burden *on the right of armed self-defense* and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry" (quotation omitted) (emphasis added)).

---

[14] For example, defendant points to a series of laws regulating the proper storage of gunpowder in the late-18th century.  (Def. Opp'n 31-32).  Plaintiffs respond that the Supreme Court in *Heller*, in response to the dissent's invocation of the same historical laws, noted that they "do not remotely burden the right of self-defense as much as an absolute ban on handguns."  *Heller*, 554 U.S. at 632.  Clearly, however, the Act is not an absolute ban on any class of weapons, let alone a "quintessential" self-defense weapon.

[15] Plaintiffs also contend that some of the historical statutes prohibited public or concealed carry, rather than possession, and are therefore inapplicable.  That distinction is irrelevant when considering the types of weapons being regulated, rather than the manner they are carried.

Here, the historical tradition of regulating "dangerous and unusual" weapons is "relevantly similar" to the Act because both the historical analogues and the Act pose a similar burden on the right to bear arms and are comparably justified. *See Bruen*, 597 U.S. at 29.

First, both the proffered analogues and the Act impose a minimal burden on the right of self-defense. Both narrowly target a specific group of dangerous weapons rather than an entire class. As set forth in greater detail below, the proscribed weapons are not reasonably suitable for self-defense under normal circumstances, nor are they normally used for that purpose. *See Worman*, 922 F.3d at 37; *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 260 (2d Cir. 2015) (assault weapons ban was "substantially less burdensome" than complete handgun ban because it regulated only "a limited subset of semiautomatic firearms"); *Heller II*, 670 F.3d at 1262 (assault weapons ban "d[id] not effectively disarm individuals or substantially affect their ability to defend themselves"); *Kolbe*, 849 F.3d at 138 (same); *Assoc. of New Jersey Rifle & Pistol Clubs (ANJRPC) v. Attorney Gen. of New Jersey*, 910 F.3d 106, 117-18 (3d Cir. 2018) (same).[16] Ordinary citizens remain free, in both cases, to possess weapons for self-defense that are reasonably suited for that purpose—most notably, handguns (the "quintessential" weapon of self-defense). *See Worman*, 922 F.3d at 37.

Second, the Act and its historical analogues are "comparably justified" as efforts to respond to threats to public safety. While the historical weapons at issue were less lethal than modern-day assault weapons, both historical and modern regulations addressing dangerous and unusual weapons were adopted in response to rising crime, public violence, and disorder. Unlike

---

[16] The cited cases, which predate *Bruen*, analyzed the burden imposed by the challenged regulations on the Second Amendment right to determine what level of scrutiny applied. While *Bruen* made clear that means-end scrutiny is not appropriate in Second Amendment cases, it also directed that courts compare the burden imposed by relevant historical analogues to that imposed by modern regulations. Therefore, the Court considers these cases to be persuasive authority on the subject of how to assess that comparative burden.

handguns, assault weapons are uniquely dangerous to law enforcement because their features allow shooters to engage targets from far greater distances, to do so more accurately, and to penetrate body armor.  (Donohue ¶ 44; Yurgealitis ¶ 92).  As a result, assault weapons are disproportionately used to kill police officers.  (Donohue ¶ 44).  And, as set forth below, they pose a unique danger to the public, among other reasons due to their destructive power.  Those concerns—the protection of law enforcement and the public—have animated the states to pass regulations on dangerous weapons throughout the nation's history.

In short, the Act and the analogous historical regulations impose comparable burdens on the right to armed self-defense, and those burdens are comparably justified.[17]

### c.    "Dangerous and Unusual"

The final question is whether the proscribed arms qualify as "dangerous and unusual" within the context of that historical tradition—that is, whether they are unreasonably dangerous and unusual for ordinary citizens to use for lawful purposes, particularly self-defense.

To begin, there can be little serious question that assault weapons, such as the AR-15, have characteristics that give them capabilities far beyond those of a typical handgun.  *See Worman*, 922 F.3d at 37 (considering that question under the Act and noting that "wielding the proscribed weapons for self-defense within the home is tantamount to using a sledgehammer to crack open the shell of a peanut").  For example, the AR-15 has substantially greater range and muzzle velocity than a 9mm handgun.  (Roth ¶¶ 49-50).  Assault rifles were developed for modern military combat, not self-defense.  (*Id.* ¶¶ 49, 92-95).  Indeed, the AR-15 is functionally identical to its military counterparts, the M16 and its carbine version, the M4, which have the

---

[17] Other district courts have reached similar conclusions when faced with the same task of identifying historical analogues to modern assault-weapons regulations.  *See Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, at *9-13; *Bevis v. City of Naperville*, 2023 WL 2077392, at *10-16 (N.D. Ill. Feb. 17, 2023); *Grant v. Lamont*, 2023 WL 5533522, at *6-8 (D. Conn. Aug. 28, 2023).

same basic structure, operation, near-equivalent muzzle velocities (3300 feet per second), and rates of effective fire (45 rounds per minute).  (*Id.* ¶¶ 49, 85).

The primary difference between the AR-15 and the M16/M4 is that the latter originally had a fully automatic function.  That is a feature that the U.S. Marine Corps discarded in favor of a maximum setting of a three-round burst—a decision made to *enhance* lethality by slowing the rate of fire, conserving ammunition, and improving accuracy.  (*Id.* ¶ 49).  The U.S. Army Manual on Advanced Rifle Marksmanship for the M16/M4 series weapons likewise notes that "[a]utomatic or burst fire is inherently less accurate than semiautomatic fire."  (Gohlke Ex. 10).

In short, the AR-15 is a weapon with the same basic characteristics, functionality, capabilities, and potential for injury as the standard-issue rifle for infantry troops.  It can be fired in the same way that military forces recommend that it be used for maximum effectiveness.  Without question, it is a "weapon[] . . . most useful in military service" rather than in self-defense.  *Heller*, 554 U.S. at 627; *see also Kolbe*, 849 F.3d at 135 (determining that because the banned assault weapons were "like M-16 rifles . . . they are among those arms that the Second Amendment does not shield").

Of course, the fact that the AR-15 was developed as a military weapon does not alone render it "dangerous and unusual."  *Heller*, 554 U.S. at 624-25.  Rather, it is the fact that the design and features of an AR-15, compared to a typical handgun, makes it an unreasonably dangerous and unusual weapon for ordinary self-defense purposes.

First, the intrinsic characteristics of assault weapons make them poor self-defense weapons.  AR-15s are physically unsuited to typical self-defense scenarios.  They are significantly heavier and longer than typical handguns, making them less concealable, more difficult to use, and less readily accessible, particularly for an inexperienced user.  (*See*

Yurgealitis ¶ 82-91 (discussing several disadvantages of assault weapons in a self-defense context)).  They are not generally useful or appropriate weapons for ordinary citizens to keep at their bedsides, or to carry on city streets as they go about their daily business.

The firepower of an AR-15 also contributes to making it generally unsuitable for self-defense.  The muzzle velocity of rounds fired by an AR-15 is 3200-3300 feet per second, nearly double that of an ordinary 9mm handgun.  (Yurgealitis ¶ 83; Roth ¶ 49).  That muzzle velocity means that its fired rounds can cause more damage due to their higher speed.  (Gohlke Ex. 24 at 855-56).  They pose a serious risk of "over-penetration"—that is, passing through their intended target and impacting a point beyond it.  Rounds from an AR-15 can pass through most construction materials, even at ranges of 350 yards.  (Yurgealitis ¶¶ 83-84).  The danger of over-penetration increases the risk, even if the weapons are employed properly, to bystanders, family members, or other innocent persons well outside the intended target area.  (*Id.* ¶ 84; Donohue ¶ 155); *see also Worman*, 922 F.3d at 37 (noting that assault weapons "can fire through walls, risking the lives of those in nearby apartments or on the street").

Although most center-fire rifles have muzzle velocities that are at least comparable to the AR-15 (although typically lower), AR-15s pair that high muzzle velocity with a comparatively low level of kinetic energy per round due to its relatively small bullet.  (Gohlke Ex. 25).  Indeed, a round fired from an AR-15 distributes less than half of the kinetic energy of one fired from a hunting rifle.  (*Id.*).  In other weapons, the higher kinetic energy is distributed, in part, to the shooter as recoil, which necessarily disrupts follow-on shots.  (*Id.*; Gohlke Ex. 24 at 864).  In an AR-15, however, the lower kinetic energy means that rounds fired with a high muzzle velocity can also be fired in rapid succession on a precise target, even while standing or moving, because a shooter's position is relatively unaffected by the recoil of each shot.  (Gohlke Ex. 24 at 865 and

Ex. 25).  Less recoil translates into "more rounds on target," and thus greater lethality.  (Gohlke

Ex. 24 at 865).  That combination of high muzzle velocity and low kinetic energy contributes to

making the AR-15 uniquely dangerous.

Beyond their intrinsic characteristics, the injuries inflicted by assault weapons can be

catastrophic, again far surpassing the destructive power of typical semiautomatic handguns.  *See*

*Worman*, 922 F.3d at 39-40 (listing accounts of injuries caused by assault weapons); Gohlke Exs.

19-22 (containing articles written by doctors recounting their experiences treating victims shot

by assault weapons).  The ballistic effects of high-velocity rounds on a human body are severe.

(Gohlke Exs. 23-24).  Unlike lower-velocity rounds, bullets from assault rifles create

"cavitation" in the penetrated tissues, inflicting catastrophic bleeding, breaking bones, and

causing irreversible tissue damage.  (Gohlke Ex. 23).  "For example, a typical 9mm wound to the

liver will produce a pathway of tissue destruction in the order of [one inch] to [two inches].  In

comparison, an AR 15 will literally pulverize the liver, perhaps best described as dropping a

watermelon onto concrete."  (Gohlke Ex. 25).  These injuries—inflicted with precision from

hundreds of yards away—go far beyond the reasonable requirements of self-defense.[18]

Plaintiffs do not seriously challenge the proposition that AR-15s are not useful for

ordinary self-defense purposes.  Their only responses are to reiterate that the banned weapons are

in "common use" within the United States; that the "common use" determination should be

based on sales numbers; and to argue that there are potentially some self-defense applications for

the proscribed weapons.  Again, as to the first two objections, it is insufficient that a weapon

merely be "common" for regulation to be impermissible.  As to the third, while it may be true

---

[18] To be clear, the issue is not whether there is a single particular characteristic of the proscribed weapons that renders them "dangerous and unusual," but their features considered in combination.

that an AR-15 *could* be useful in *some* self-defense scenarios, so too could an open-bolt machine gun or an automatic grenade launcher, or indeed any firearm of any size, shape, or description. The mere *possibility* that a firearm could be used for self-defense therefore has no real significance in the constitutional analysis.

In short, the weapons proscribed by the Act are not suitable for ordinary self-defense purposes, and pose substantial dangers far beyond those inherent in the design of ordinary firearms. Under the circumstances, the weapons qualify as "dangerous and unusual" within the meaning of the analytical framework of the Second Amendment.

### d.    Conclusion

For the foregoing reasons, the Court finds that the prohibitions on certain assault weapons in the Act comports with the nation's historical tradition of weapons regulation. The banned weapons are "dangerous," because they are unreasonably dangerous for ordinary purposes of self-defense due to their extreme lethality and high potential for collateral harm, and they are "unusual," because it would be unusual for an ordinary citizen to carry such a weapon on his person on the street for self-defense, or to use it in the home to confront invaders or to protect against personal violence. Plaintiffs have therefore failed to establish a likelihood of success on the merits of their Second Amendment claim as to the proscribed firearms.

### D.    The Challenged Statute – the Prohibited Magazines

The second set of issues concerns the prohibition on large-capacity magazines ("LCMs").

### 1.    The Nature of the Restriction

Along with the ban on assault weapons, the Act also prohibits the sale, transfer, or possession of any "large capacity feeding device," which is defined as "a fixed or detachable magazine, box, drum, feed strip or similar device capable of accepting, or that can be readily converted to accept, more than ten rounds of ammunition or more than five shotgun shells."

Mass. Gen. L. ch. 140 §§ 121, 131M.  That ten-round limit applies to all magazines, including those used in semiautomatic handguns.  The Act does not prohibit the use of magazines capable of holding fewer than ten rounds.

### 2.    Step One:  Whether the Conduct Is Within the Scope of the Second Amendment

The first step in the constitutional analysis is to determine whether LCMs are "arms" within the meaning of the Second Amendment.[19]  An object may be a bearable "arm" within the textual meaning of the amendment if it is a "[w]eapon[] of offence, or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."  *Heller*, 554 U.S. at 581 (citations omitted).

### a.    Whether Magazines Are "Arms"

No magazine, regardless of capacity, is itself an "arm" within the plain meaning of that term.  A magazine is a mechanical device that enables the functioning of a semiautomatic weapon by feeding a round into the weapon's chamber after each preceding round is fired.  (Busse ¶ 14).  It has no use independent of its attachment to a firearm.  *See Ocean State Tactical v. Rhode Island*, 646 F. Supp. 3d 368, 387 (D.R.I. Dec. 14, 2022).

The historical record likewise suggests that a magazine is not an "arm."  According to defendant's expert, there was a clear distinction between "arms" and "accoutrements" during the founding and reconstruction eras.  (Baron ¶ 30).  The term "arms" referred generally to weapons, while "accoutrements" referred to accessories such as ammunition, ammunition containers, flints, scabbards, holsters, armor, and shields.  (*Id.* ¶ 9, 31-32).  The closest founding-era

---

[19] The issue of whether LCMs are "arms" was raised by *amici* in *Worman*, and for that reason the court "assumed without deciding" that LCMs were "arms" for Second Amendment purposes.  *Worman*, 922 F.3d at 33 n.3, 30; *see also New York State Rifle & Pistol Ass'n*, 804 F.3d at 263 n.127.

analogues to modern-day magazines were "cartridge boxes" or "cartouch boxes," which were almost always mentioned in lists of accoutrements and not known as weapons. (*Id.* ¶ 32-34). Based on that evidence, magazines would not fall within the founding-era definition of a bearable "arm." *See Ocean State Tactical*, 646 F. Supp. 3d at 386-87 ("LCMs, like other accessories to weapons, are not used in a way that 'cast[s] at or strike[s] another.'" (quoting *Heller*, 554 U.S. at 582)); *Duncan v. Bonta*, 19 F.4th 1087, 1104-05 (9th Cir. 2021) (en banc) ("On its own, a magazine is practically harmless and poses no threat to life or limb"). Plaintiffs do not offer a competing historical narrative.

Under the circumstances, it seems clear that LCMs are not "arms" within the textual meaning of the Second Amendment. *See Oregon Firearms Fed'n v. Brown*, 644 F. Supp. 3d 782, 798-802 (D. Or. 2022); *Ocean State Tactical*, 646 F. Supp. 3d at 384-88. But even if they are not, that does not end the inquiry. A firearm by itself is useless; it can only function with certain additional external components or accessories, most notably ammunition. That raises the issue of how the Second Amendment applies to those items.

### b.      Firearm Components and Accessories

There is no question that because some kinds of firearms are constitutionally protected, the components and accessories of protected firearms that are integral to their function must also be protected.

Ammunition is the most obvious example. *See, e.g.*, *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("A regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose."); *Miller*, 307 U.S. at 180 ("The possession of arms also implied the possession of ammunition, and the authorities paid quite as much attention to the latter as to the former."); *cf. Heller*, 554 U.S. at 630 (invalidating a regulation that required firearms be "rendered and kept

inoperable at all times" in the home because it "ma[de] it impossible for citizens to use them for the core lawful purpose of self-defense.").

On the other hand, some accessories, such as silencers, do not affect the essential operation of a weapon and so do not fall within the scope of the Second Amendment's protection. *See United States v. Hasson*, 2019 WL 4573424, at *4-5 (D. Md. Sept. 20, 2019), *aff'd*, 26 F.4th 610 (4th Cir. 2022); *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("A silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence').").

Magazines occupy something of a middle ground. For a semiautomatic weapon to function as designed, ammunition must generally be fed into it by a magazine. (Busse ¶ 14). In that sense, a magazine is an essential part of the weapon, and some courts have therefore determined that the Second Amendment's protections extend to them. *See Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) ("[T]o the extent that certain firearms capable of use with a magazine . . . are commonly possessed by law-abiding citizens for lawful purposes, our case law supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines necessary to render those firearms operable."); *ANJRPC*, 910 F.3d at 116 ("Because magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment."); *Duncan v. Becerra*, 970 F.3d 1133, 1146 (9th Cir. 2020) ("Without a magazine, many weapons would be useless, including 'quintessential' self-defense weapons like the handgun."); *Hanson v. District of Columbia*, 2023 WL 3019777, at *7 (D.D.C. Apr. 20, 2023).

But while magazines as a general class might be owed constitutional protection, LCMs as a specific subset of that class are never necessary for a firearm to function. *See Oregon Firearms Fed'n v. Kotek Oregon All. for Gun Safety*, 2023 WL 4541027, at *26 (D. Or. July 14, 2023). As

defendant points out, and plaintiffs do not contest, any semiautomatic weapon using a detachable magazine can accept one that holds ten rounds or fewer. (*See* Busse ¶ 14; Yurgealitis ¶ 61).

It seems clear, then, that a total ban on magazines would almost surely fall afoul of the Second Amendment. But it is entirely unclear why that principle—that *some* magazines should be accorded constitutional protection—requires protection of *all* magazines, regardless of capacity. If there is a reason why that should be so, plaintiffs have not supplied it.

On balance, the Court is persuaded that plaintiffs have not demonstrated that all magazines, regardless of capacity, fall within the protection of the Second Amendment. It is uncertain what precise analytic framework should be employed to consider the issue of the constitutionality of *limits* on magazine capacity. Without more specific guidance from the Supreme Court or the First Circuit, the Court will consider, as it would with a restriction on a weapon, whether the Act's prohibition of LCMs aligns with the nation's historical tradition.

3. **Step Two: Whether the Regulation Is Consistent with Historical Tradition**

    a. **"Dramatic Technological Changes" and "Unprecedented Societal Concerns"**

The parties dispute whether the advent of LCMs represents a "dramatic technological change" and whether the modern increase in mass shootings is an "unprecedented societal concern." *Bruen*, 597 U.S. at 27. Plaintiffs assert that magazines with the capacity for more than ten rounds "have been available for centuries," but they offer no historical support for that conclusion. (Def. Mot. at 21). They also contend that "multi-shot firearms" have existed since the time of the founding, pointing to weapons such as the pepperbox-style pistol and—leaping to 1866—the Winchester 66, a cartridge-fed repeating rifle. (*Id.* at 19).

As a technological matter, plaintiffs' examples are inapposite. None of the "multi-shot" weapons they allude to were semiautomatic; that capability was not developed until the late 19th

century.  The pepperbox-style pistol, for example, could fire multiple shots only because it included several bundled individual barrels, not because it was fed ammunition from any magazine.  (Spitzer ¶ 45).  Similarly, the Winchester Repeaters were lever-action rifles, which had to be manually reloaded after each shot, rather than automatically fed by a magazine. (Spitzer ¶ 48; Vorenberg ¶ 21).  Neither of those technologies is analogous to the modern semiautomatic action, which loads automatically from a magazine every time a shot is fired.[20] LCMs therefore represent a dramatic change in firearm technology.

Defendant has also presented evidence that mass shootings are an "unprecedented societal concern," and that LCMs play a pivotal role in those events because they allow perpetrators to fire more rounds before pausing to reload—an interval that might allow victims to escape and law enforcement or others to intervene.  *See Worman*, 922 F.3d at 39 (citing *Heller II*, 670 F.3d at 1264) (discussing the use of LCMs in mass shootings).

There were, of course, homicides in 1791.  No doubt, some portion of those homicides were perpetrated by people using firearms.  But there is no evidence that there were *any* single-event, single-perpetrator mass homicides, much less homicides of that nature on a regular basis. Again, while the Court need not reach the issue of whether such homicides are an "unprecedented societal concern," the truth of that proposition nonetheless seems obvious.

In any event, because defendant has met her burden of showing that there has been a "dramatic technological change," the Court may reason by analogy to evaluate historical analogues to the Act.

---

[20] Automatic weapons will continue to fire as long as the trigger is depressed, while a semiautomatic weapon will fire a single shot for every press of the trigger.  Both types of weapons *load* automatically because of their design.

b.     **The Regulatory Tradition**

To a substantial extent, the same regulatory history that applies to assault weapons also applies to LCMs, given that LCMs are not arms themselves but are a component of such weapons.  However, defendant has also submitted evidence of other analogues that bear discussion.

Gunpowder, for example, was regulated extensively very early in the nation's history, despite being essential to the function of early firearms.  (Cornell ¶¶ 29-30).  A 1783 Massachusetts law forbade any person to "take into any Dwelling-House, Stable, Barn, Outhouse, Warehouse, Store, Shop, or other Building, within the Town of Boston, any . . . Fire-Arm, loaded with, or having Gun-Powder," and permitted the seizure of any loaded firearm that "shall be found" there.  1782 Mass. Acts 119, ch. 46 (Gohlke Ex. 12).

Defendant also cites to regulations passed in the early 20th century that addressed magazine capacities or limits on the number of rounds a weapon could fire before reloading.  (Spitzer ¶¶ 24-31).  Twenty-three states passed such laws between 1917 and 1934.  (Spitzer Table 1).  Massachusetts, for example, passed a law that prohibited any firearm that reloaded automatically after a single shot.  1927 Mass. Acts 413, 416 (Spitzer Ex. D at 13) (designating such weapons as "machine guns").

Plaintiffs contest the consideration of this more modern history on the ground that it does not offer any insight into the meaning of the Second Amendment in either 1791 or 1868.  While there is an "ongoing scholarly debate" over precisely which era should inform the historical analysis, the Court need not reach that issue here.  *Bruen*, 597 U.S. at 37.  None of the statutes offered by defendant "contradicts earlier evidence."  *Id.* at 66.  And while it would be unreasonable to expect identical laws to have existed before LCMs were even invented, the more modern laws did not conflict with any existing laws at the time they were passed.  *Id.*

Thus, for example, machine guns did not exist until the late 19th century, at which point laws were passed to regulate them.  While there was, understandably, a lack of machine gun regulation prior to their invention, that absence did not "contradict" the new laws, and thus had no impact on the government's ability to regulate machine guns.  *See Heller*, 554 U.S. at 624.

Furthermore, defendant's offered historical regulations are "relevantly similar" to the Act because they pose a similar burden and are comparably justified.  *See Bruen*, 597 U.S. at 29.

First, the Act poses a minimal burden on self-defense.  It does not prohibit all magazines, only those that can hold more than ten rounds.  Again, any semiautomatic weapon using a detachable magazine can accept one that holds ten rounds or fewer.  And there is no restriction on the number of magazines that an individual may own or carry.

If there is a reason why an eleven-round magazine, rather than a ten-round magazine, is reasonably necessary for purposes of self-defense, it is not apparent from the record.  Ordinary citizens undertaking lawful activities do not typically engage in extended firefights.  To the contrary, defendant has provided substantial evidence that, in typical self-defense scenarios, a defender will only fire two or three shots.  (Allen ¶¶ 10, 18).  To the extent that the ten-round limit burdens the use of a semiautomatic firearm at all, it is because a brief pause to reload a new magazine would be required before the next round can be fired.  Indeed, plaintiffs have not pointed to a single case where the ability to fire more than ten rounds without reloading has been essential to self-defense.

Plaintiffs again simply fall back on their assertion that magazines capable of holding more than ten rounds are "in common use," and therefore deserve protection.  They have not, however, provided any evidence at this stage that a magazine that can hold more than ten rounds is necessary, useful, or even desirable for self-defense purposes.  Based on the record, therefore,

the burden of the Act on the reasonable requirements of ordinary citizens for self-defense is minimal at best.

Second, the prohibition on LCMs is comparably justified to respond to threats to public safety, particularly mass shootings. In mass shooting events, the average number of shots fired is upward of 99 rounds. (Allen ¶ 38). Out of 115 such events, where the type of magazine was known, 73 involved the use of an LCM. (Allen ¶ 35). In the same dataset, there was an average of 25 casualties when an LCM was involved, versus 9 without one. (*Id.*). That data supports the government's proffered reasoning that the regulation of LCMs is justified based on their role in these incidents.

In short, and in simple terms, the limit on magazine capacity imposes virtually no burden on self-defense, and is comparably justified to historical regulations.

### c. <u>Conclusion</u>

In summary, the Court finds that the prohibition on LCMs in the Act comports with the nation's historical tradition of weapons regulations. Even if they may be considered "arms" within the meaning of the Second Amendment, the historical record demonstrates that the Act's restrictions pose a minimal burden on the right to self-defense and are comparably justified to historical regulation. Plaintiffs have therefore failed to establish a likelihood of success on the merits of their Second Amendment claim as to the prohibited magazines.

## IV. <u>Other Requirements for Preliminary Relief</u>

When a plaintiff fails to meet his burden to show a likelihood of success on the merits, "failure to do so is itself preclusive of the requested relief." *Bayley's Campground Inc. v. Mills*, 985 F.3d 153, 158 (1st Cir. 2021). The Court, therefore, will not address the remaining requirements for obtaining preliminary injunctive relief.

## V.    <u>Conclusion</u>

For the foregoing reasons, plaintiffs have not shown a likelihood of success on the merits

of their claims.  Accordingly, plaintiffs' motion for a preliminary injunction is DENIED.

**So Ordered.**


                                                    /s/  F. Dennis Saylor IV
                                                    F. Dennis Saylor IV
Dated:  December 21, 2023                            Chief Judge, United States District Court

| Part I | ADMINISTRATION OF THE GOVERNMENT |
| **Title XX** | PUBLIC SAFETY AND GOOD ORDER |
| **Chapter 140** | LICENSES |
| **Section 121** | FIREARMS SALES; DEFINITIONS; ANTIQUE FIREARMS; APPLICATION OF LAW; EXCEPTIONS |

Section 121. As used in sections 122 to 131Y, inclusive, the following words shall, unless the context clearly requires otherwise, have the following meanings:—

"Ammunition", cartridges or cartridge cases, primers (igniter), bullets or propellant powder designed for use in any firearm, rifle or shotgun. The term "ammunition" shall also mean tear gas cartridges.

"Assault weapon", shall have the same meaning as a semiautomatic assault weapon as defined in the federal Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. section 921(a)(30) as appearing in such section on September 13, 1994, and shall include, but not be limited to, any of the weapons, or copies or duplicates of the weapons, of any caliber, known as: (i) Avtomat Kalashnikov (AK) (all models); (ii) Action Arms Israeli Military Industries UZI and Galil; (iii) Beretta Ar70 (SC–70); (iv) Colt AR–15; (v) Fabrique National FN/FAL, FN/LAR and FNC; (vi) SWD M–10, M–11, M–11/9 and M–12; (vi) Steyr AUG; (vii) INTRATEC TEC–9, TEC–DC9 and TEC–22; and (viii) revolving cylinder shotguns, such as, or similar to, the Street Sweeper and Striker 12; provided, however, that the term assault weapon shall not include: (i) any of the weapons, or replicas or duplicates of such weapons, specified in appendix A to 18 U.S.C. section 922 as appearing in such appendix on September 13, 1994, as such weapons were manufactured on October 1, 1993; (ii) any weapon that is operated by manual bolt, pump, lever or slide action; (iii) any weapon that has been rendered permanently inoperable or otherwise rendered permanently unable to be designated a semiautomatic assault weapon; (iv) any weapon that was manufactured prior to the year 1899; (v) any weapon that is an antique or relic, theatrical prop or other weapon that is not capable of firing a projectile and which is not intended for use as a functional weapon and cannot be readily modified through a combination of available parts into an operable assault weapon; (vi) any semiautomatic rifle that cannot accept a detachable magazine that holds more than five rounds of ammunition; or (vii) any semiautomatic shotgun that cannot hold more than five rounds of ammunition in a fixed or detachable magazine.

*[Definition of "Bump stock" in first paragraph applicable as provided by 2017, 110, Sec. 53.]*

"Bump stock", any device for a weapon that increases the rate of fire achievable with such weapon by using energy from the recoil of the weapon to generate a reciprocating action that facilitates repeated activation of the trigger.

"Conviction", a finding or verdict of guilt or a plea of guilty, whether or not final sentence is imposed.

"Court", as used in sections 131R to 131Y, inclusive, the division of the district court department or the Boston municipal court department of the trial court having jurisdiction in the city or town in which the respondent resides.

"Deceptive weapon device", any device that is intended to convey the presence of a rifle, shotgun or firearm that is used in the commission of a violent crime, as defined in this section, and which presents an objective threat of immediate death or serious bodily harm to a person of reasonable and average sensibility.

"Extreme risk protection order", an order by the court ordering the immediate suspension and surrender of any license to carry firearms or firearm identification card which the respondent may hold and ordering the respondent to surrender all firearms, rifles, shotguns, machine guns, weapons or ammunition which the respondent then controls, owns or possesses; provided, however, that an extreme risk protection order shall be in effect for up to 1 year from the date of issuance and may be renewed upon petition.

**ADD:39**

"Family or household member", a person who: (i) is or was married to the respondent; (ii) is or was residing with the respondent in the same household; (iii) is or was related by blood or marriage to the respondent; (iv) has or is having a child in common with the respondent, regardless of whether they have ever married or lived together; (v) is or has been in a substantive dating relationship with the respondent; or (vi) is or has been engaged to the respondent.

"Firearm", a stun gun or a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches in the case of a shotgun as originally manufactured; provided, however, that the term firearm shall not include any weapon that is: (i) constructed in a shape that does not resemble a handgun, short-barreled rifle or short-barreled shotgun including, but not limited to, covert weapons that resemble key-chains, pens, cigarette-lighters or cigarette-packages; or (ii) not detectable as a weapon or potential weapon by x-ray machines commonly used at airports or walk- through metal detectors.

"Gunsmith", any person who engages in the business of repairing, altering, cleaning, polishing, engraving, blueing or performing any mechanical operation on any firearm, rifle, shotgun or machine gun.

"Imitation firearm", any weapon which is designed, manufactured or altered in such a way as to render it incapable of discharging a shot or bullet.

"Large capacity feeding device", (i) a fixed or detachable magazine, box, drum, feed strip or similar device capable of accepting, or that can be readily converted to accept, more than ten rounds of ammunition or more than five shotgun shells; or (ii) a large capacity ammunition feeding device as defined in the federal Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. section 921(a)(31) as appearing in such section on September 13, 1994. The term "large capacity feeding device" shall not include an attached tubular device designed to accept, and capable of operating only with,.22 caliber ammunition.

"Large capacity weapon", any firearm, rifle or shotgun: (i) that is semiautomatic with a fixed large capacity feeding device; (ii) that is semiautomatic and capable of accepting, or readily modifiable to accept, any detachable large capacity feeding device; (iii) that employs a rotating cylinder capable of accepting more than ten rounds of ammunition in a rifle or firearm and more than five shotgun shells in the case of a shotgun or firearm; or (iv) that is an assault weapon. The term "large capacity weapon" shall be a secondary designation and shall apply to a weapon in addition to its primary designation as a firearm, rifle or shotgun and shall not include: (i) any weapon that was manufactured in or prior to the year 1899; (ii) any weapon that operates by manual bolt, pump, lever or slide action; (iii) any weapon that is a single-shot weapon; (iv) any weapon that has been modified so as to render it permanently inoperable or otherwise rendered permanently unable to be designated a large capacity weapon; or (v) any weapon that is an antique or relic, theatrical prop or other weapon that is not capable of firing a projectile and which is not intended for use as a functional weapon and cannot be readily modified through a combination of available parts into an operable large capacity weapon.

"Length of barrel" or "barrel length", that portion of a firearm, rifle, shotgun or machine gun through which a shot or bullet is driven, guided or stabilized and shall include the chamber.

"Licensing authority", the chief of police or the board or officer having control of the police in a city or town, or persons authorized by them.

*[Definition of "Machine gun" in first paragraph applicable as provided by 2017, 110, Sec. 53.]*

"Machine gun", a weapon of any description, by whatever name known, loaded or unloaded, from which a number of shots or bullets may be rapidly or automatically discharged by one continuous activation of the trigger, including a submachine gun; provided, however, that "machine gun" shall include bump stocks and trigger cranks.

"Petition", a request filed with the court by a petitioner for the issuance or renewal of an extreme risk protection order.

"Petitioner", the family or household member, or the licensing authority of the municipality where the respondent resides, filing a petition.

"Purchase" and "sale" shall include exchange; the word "purchaser" shall include exchanger; and the verbs "sell" and "purchase", in their different forms and tenses, shall include the verb exchange in its appropriate form and tense.

**ADD:40**

"Respondent", the person identified as the respondent in a petition against whom an extreme risk protection order is sought.

"Rifle", a weapon having a rifled bore with a barrel length equal to or greater than 16 inches and capable of discharging a shot or bullet for each pull of the trigger.

"Sawed-off shotgun", any weapon made from a shotgun, whether by alteration, modification or otherwise, if such weapon as modified has one or more barrels less than 18 inches in length or as modified has an overall length of less than 26 inches.

"Semiautomatic", capable of utilizing a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and requiring a separate pull of the trigger to fire each cartridge.

"Shotgun", a weapon having a smooth bore with a barrel length equal to or greater than 18 inches with an overall length equal to or greater than 26 inches, and capable of discharging a shot or bullet for each pull of the trigger.

"Stun gun", a portable device or weapon, regardless of whether it passes an electrical shock by means of a dart or projectile via a wire lead, from which an electrical current, impulse, wave or beam that is designed to incapacitate temporarily, injure or kill may be directed.

"Substantive dating relationship", a relationship as determined by the court after consideration of the following factors: (i) the length of time of the relationship; (ii) the type of relationship; (iii) the frequency of interaction between the parties; and (iv) if the relationship has been terminated by either person, the length of time elapsed since the termination of the relationship.

*[Definition of "Trigger crank" in first paragraph applicable as provided by 2017, 110, Sec. 53.]*

"Trigger crank", any device to be attached to a weapon that repeatedly activates the trigger of the weapon through the use of a lever or other part that is turned in a circular motion; provided, however, that "trigger crank" shall not include any weapon initially designed and manufactured to fire through the use of a crank or lever.

"Violent crime", shall mean any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or possession of a deadly weapon that would be punishable by imprisonment for such term if committed by an adult, that: (i) has as an element the use, attempted use or threatened use of physical force or a deadly weapon against the person of another; (ii) is burglary, extortion, arson or kidnapping; (iii) involves the use of explosives; or (iv) otherwise involves conduct that presents a serious risk of physical injury to another.

"Weapon", any rifle, shotgun or firearm.

Where the local licensing authority has the power to issue licenses or cards under this chapter, but no such licensing authority exists, any resident or applicant may apply for such license or firearm identification card directly to the colonel of state police and said colonel shall for this purpose be the licensing authority.

The provisions of sections 122 to 129D, inclusive, and sections 131, 131A, 131B and 131E shall not apply to:

(A) any firearm, rifle or shotgun manufactured in or prior to the year 1899;

(B) any replica of any firearm, rifle or shotgun described in clause (A) if such replica: (i) is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition; or (ii) uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade; and

(C) manufacturers or wholesalers of firearms, rifles, shotguns or machine guns.

**ADD:41**

| Part I | ADMINISTRATION OF THE GOVERNMENT |
|---|---|
| **Title XX** | PUBLIC SAFETY AND GOOD ORDER |
| **Chapter 140** | LICENSES |
| **Section 131M** | ASSAULT WEAPON OR LARGE CAPACITY FEEDING DEVICE NOT LAWFULLY POSSESSED ON SEPTEMBER 13, 1994; SALE, TRANSFER OR POSSESSION; PUNISHMENT |

Section 131M. No person shall sell, offer for sale, transfer or possess an assault weapon or a large capacity feeding device that was not otherwise lawfully possessed on September 13, 1994. Whoever not being licensed under the provisions of section 122 violates the provisions of this section shall be punished, for a first offense, by a fine of not less than $1,000 nor more than $10,000 or by imprisonment for not less than one year nor more than ten years, or by both such fine and imprisonment, and for a second offense, by a fine of not less than $5,000 nor more than $15,000 or by imprisonment for not less than five years nor more than 15 years, or by both such fine and imprisonment.

The provisions of this section shall not apply to: (i) the possession by a law enforcement officer; or (ii) the possession by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving such a weapon or feeding device from such agency upon retirement.